Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia ▾

____Civil_____ Division

|  |  |
|---|---|
| Samiha Ayyash,<br>Feras Hindi<br>Tala Josephano | )<br>)<br>)<br>) |

_____

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

**-v-**

Gulf Air B.S.C , American Airlines INC

_____

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

Case No.   24-cv-03434

_____

*(to be filled in by the Clerk's Office)*

Jury Trial:  *(check one)*  ☑Yes  ☐No

## COMPLAINT FOR A CIVIL CASE

### I.   The Parties to This Complaint

#### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Samiha Ayyash |
| Street Address | 7823 New London Dr, |
| City and County | Springfield, Fairfax |
| State and Zip Code | VA 22153 |
| Telephone Number | 703-980-6955 |
| E-mail Address | ayyashsamiha@gmail.com |

**RECEIVED**

DEC 31 2024

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

#### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

  Name       Gulf Air B.S.C

  Job or Title *(if known)*   Foreing airlines

  Street Address     1717 Pennsylvania Ave., N.W., 12th Floor

  City and County     Washington

  State and Zip Code    D.C. 20006.

  Telephone Number    1 (888) 359-4853

  E-mail Address *(if known)*

Defendant No. 2

  Name       American Airlines INC

  Job or Title *(if known)*   Foreign Airlines

  Street Address     1090 VERMONT AVE. NW

  City and County     Washington

  State and Zip Code    DC 20005

  Telephone Number    800-433-7300

  E-mail Address *(if known)*

Defendant No. 3

  Name

  Job or Title *(if known)*

  Street Address

  City and County

  State and Zip Code

  Telephone Number

  E-mail Address *(if known)*

Defendant No. 4

  Name

  Job or Title *(if known)*

  Street Address

  City and County

  State and Zip Code

  Telephone Number

  E-mail Address *(if known)*

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

[ ] Federal question         [✔] Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff,  *(name)*  Samiha _____, is a citizen of the State of *(name)*  Virginia _____ .

b.    If the plaintiff is a corporation

The plaintiff,  *(name)* _____, is incorporated under the laws of the State of *(name)* _____,
and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant,  *(name)* _____, is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____ .

b.    If the defendant is a corporation

The defendant,  *(name)*  Gulf Air B. S C                              , is incorporated under

the laws of the State of *(name)*                                    , and has its

principal place of business in the State of *(name)*                              .

Or is incorporated under the laws of *(foreign nation)*    Bahrain                        ,

and has its principal place of business in *(name)*    Bahrain                        .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

Samiha: Loss of substantial financial support from Captain Alhindi, including approximately $500 monthly contributions for essential living expenses and caregiving costs.Increased financial burden on Plaintiff Feras due to taking on caregiving responsibilities and covering expenses previously managed by Captain Alhindi. Funeral event expenses and legal proceedings up to 3/2023 emotional distress and severe psychological harm suffered

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

This is a civil action arising from the preventable death of Captain Mohannad Alhindi, who tragically died from a cardiac incident while on duty for Gulf Air B.S.C.(C) (hereinafter " Gulf Air" ) on December 14, 2022, in Dhaka, Bangladesh. Plaintiffs Samiha Ayyash and Feras Hindi, the mother and brother of Captain Alhindi, respectively, bring this case against the Defendants for their collective failure to uphold their legal and contractual obligations regarding aviation safety, as mandated by both U.S. and international regulations. These failures led directly to the death of Captain Alhindi, causing significant financial loss and severe emotional distress to the Plaintiffs. SEE ATTACHMENT

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

SEE ATTACHMENT

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## V.      Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:             12/09/2024

Signature of Plaintiff

Printed Name of Plaintiff       Samiha Ayyash   FERAS Hindi  Tala Josephano

### B.      For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**United States District Court**

**District of Columbia**

1. Samiha Ayyash, Feras Hindi

Pro Se

7823 New London Dr, Springfield, VA 22153

(703) 980-6955

AyyashSamiha@gmail.com

**AMENDED CLAIM  COMPLAINT FOR A CIVIL CASE**

**ATTACHMENTS 1-7**

Negligence Per Se ,Negligence ,Wrongful Death , Breach of Fiduciary Duty

Fraudulent Concealment , Fraudulent Misrepresentation, Constructive Fraud, NIED

and IIED

RECEIVED

DEC 31 2024

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

**ATTACHMENT 2**

## **JURISDICTION**

1. **Jurisdiction**

   This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity
   jurisdiction) because the amount in controversy exceeds $75,000, exclusive
   of interest and costs, and there is complete diversity of citizenship between

   **Plaintiffs and Defendants:**

   I. Plaintiff Samiha and Plaintiff Feras are residents & Citizens of Virginia Plaintiff Tala
   is Citizen and resident of California

   II. Gulf Air is incorporated and has its principal place of business in Bahrain.

   III. American Airlines is incorporated in Delaware with its principal place of business in
   Texas.

   B. **Venue**

   Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2)
   substantial parts of the events or omissions giving rise to this action occurred in
   this jurisdiction, venue serves the convenience of witnesses.  All Defendants can
   be served in DC. No other Forum available.

**ATTACHMENT 3**

## 3. PARTIES

**Plaintiffs**

   **1. Samiha Ayyash** Address: 7823 New London Dr, Springfield, VA 22153

     Relationship: Mother, heir, beneficiary, and dependent of Captain

     Mohannad Alhindi, Referred to by " The Captain "

   **2. Feras Hindi**  Address: 7823 New London Dr, Springfield, VA 22153

     Relationship: Brother of Captain Mohannad Alhindi

   **3. Tala Josephano** 615 S Catalina Ave #233 Redondo Beach CA 90277

   Relationship : Sister of the Captain and Feras and daughter of Samiha**.**

**Defendants**

   1. **Gulf Air B.S.C.(C)** Principal Place of Incorporation : Bahrain  . DC Registered

   Agent : Evelyn D. Sahr, Drew M. Derco, Eckert Seamans Cherin & Mellott, LLC,

   1717 Pennsylvania Ave., N.W., 12th Floor, Washington, D.C. 20006. Gulf Air Has a

   company registered in NY

   2. **American Airlines, Inc. :**Principal Place of Incorporation: Texas  Registered

   Office Address :CORPORATION SERVICE COMPANY 1090 VERMONT AVE. NW

   Washington DC 20005

**ATTACHMENT 3**

**Table of Violations**

1. Gulf Air Negligence & Breach of Duties - **Page 10**
2. Gulf Air Violation of Codeshare Guidelines and DOT Orders and Rules
    - A. Failure to Detect and Mitigate Crew Medical Incapacitation - **Page 12**
    - B. Gulf Air Failure in Crew Medical Examination - **Page 14**
3. Gulf Air Violation of ICAO Annex 6
    - C. Gulf Air Violations of ICAO Annex 6 (3.3.2) - **Page 18**
    - Gulf Air's Failure in Implementing an Effective Safety Management System (SMS) - **Page 18**
4. Violations of ICAO Annex 19
    - D. Gulf Air's Failure in Implementing an Effective Safety Management System (SMS) - Page 21
5. Gulf Air Negligence in Hospital Choice & Quality of Care
    - E. Breach of Duty of Care in Providing Adequate Medical Care - **Page 25**
    - F. Breach in Providing the Captain's Medical History - **Page 25**
6. Gulf Air Duties & Breaches Leading to Percutaneous Coronary Intervention (PCI)
    - G. Breach of Duty of Care by Not Disclosing Material Facts - **Page 28**
7. Breach of Fiduciary Relationship - **Page 31**
8. Breach of Duty of Superior Knowledge
    - H. Heightened Duty in Emergencies - **Page 34**
9. Gulf Air Fraudulent Concealment
    - I. Fraudulent Concealment Related to PCI Consent - **Page 36**
10. Hospital Records Seizure and Intentional Concealment by Gulf Air - **Page 51**
11. Fraudulent Misrepresentation of Death Summary & Hospital Records - **Page 66**
12. Gulf Air False Representation
13. A. Media Representation – January 2023 - **Page 78**
13. American Airlines as Second Defendant - **Page 8**
14. AA False Representation of Audit Certificates Submitted to the FAA - **Page 85**
15. Gulf Air Violation of Public Interest - **Page 95**
16. American Airlines Violation of Public Safety - **Page 100**
17. Attachment 4 - Claims - **Page 102**

**ATTACHMENT 4**

1. **STATEMENT OF FACTS**

2. Gulf Air has faced multiple incidents of crew incapacitations, including a flight attendant's heart attack in November 2022 and the death of Captain Alhindi in December 2022, caused by neglect in medical evaluations and safety systems. Despite these documented events, Gulf Air failed to treat them as serious safety threats, did not implement corrective actions, and failed to report incidents to regulators as required by ICAO Annexes 13.

3. On December 14, 2022, Captain Alhindi, a 63-year-old Gulf Air pilot, became incapacitated while on duty in Dhaka, Bangladesh. This occurred shortly before he was scheduled to operate a codeshare flight with American Airlines.

4. Eight hours later, Captain Alhindi died in a hospital due to a 99% blockage in his left coronary artery, and negligence which followed four heart attacks. As proven, this condition (99% Blockage) had developed over several years.

5. Gulf Air's systemic negligence, including failure to address crew health risks and concealment of incapacitation incidents, endangered public safety and violated international safety standards.

6. The airline's failure to provide timely medical care or transparency about crew health risks directly contributed to Captain Alhindi's death. Gulf Air's persistent safety failures and noncompliance with regulations on medical risk management continue to jeopardize aviation safety, exacerbating the harm caused by the Captain's death and posing risks to crew and passengers.

7. **GULF AIR & American Airlines Duty under Rules & Regulations**

8. Gulf Air and American Airlines, as common air carriers, are bound by international and U.S. aviation regulations. These include the following standards:

    A. **Annex 1:** Personnel Licensing

    B. **Annex 6:** Operation of Aircraft

    C. **Annex 13:** Investigation and Reporting of Incidents

    D. **Annex 19:** Safety Management Systems (SMS)

9. **Department of Transportation (DOT) Orders and Requirements:**

10. The DOT states that before implementing code-share operations, U.S. carriers must ensure the foreign carrier partner meets international safety standards through a safety audit.

11. The audit results must be submitted to the FAA for review, and the benefits, including service expansion and competition, are also considered in assessing public interest.

12. **Adherence to Safety including Adherence to ICAO Regulations**

    A. DOT Order Gulf Air and AA: DOT-OST-2008

    B. DOT Order Gulf Air and Etihad: DOT-OST-2019

    C. DOT Codeshare Requirements

    D. Public Interest

13. **FAA/DOT Guidelines**

    A. FAA/DOT Codeshare Guidelines

    B. FAA 14 CFR 129: Regulations for Foreign Air Carriers

14. **International Treaties and Agreements:**

    **A.** Montreal Convention

    **B.** Aviation agreements between the U.S. and Gulf Air/American Airlines

    **C.** Open Sky Agreement

    **D.** Obligation to prioritize public safety and welfare in operations.

**15.** **GULF AIR's History of Safety Failures and Ongoing Negligence**

**16.** Gulf Air's history of systemic safety failures, including crew incapacitations, emergency landings, and operational breaches, demonstrates a pattern of negligence that contributed to Captain Alhindi's death.

**17.** A recent cyberattack on Gulf Air and Bahrain Airport further underscores the airline's failure to uphold safety and operational security

**18.** **Sample of Historical Incidents Highlighting Systemic Safety Negligence:**

    **A.** **1986**: Bombing and hijacking incident raised concerns about Gulf Air's security.

    **B.** **1994**: Gulf Air launched nonstop flights to JFK despite safety concerns.

    **C.** **1997**: Gulf Air's U.S. operations were suspended due to financial and safety failures.

    **D.** **August 2000**: A fatal crash killed 143, linked to pilot error and inadequate training shortly after expansion

    **E.** **2019**: Gulf Air entered a codeshare with Etihad Airways, and subsequent safety incidents went unreported and ongoing deficiencies to safety systems

    **F.** A list of Gulf Air's safety incidents and incapacitations will be presented.

**19.** **Sample of Recurring Crew Incapacitation Events:**

A. **2004**: Captain Alhindi's first incapacitation due to undiagnosed high blood pressure, leading to hospitalization and long-term treatment.

B. **March 9, 2017**: Co-pilot incapacitated mid-flight, causing an emergency landing.

C. **November 23, 2022**: Flight attendant Yaser suffered a heart attack mid-flight, prompting an emergency landing.

D. **December 14, 2022**: Captain Alhindi's incapacitation and death.

E. **Dec 2022 to mid-2023**: Gulf Air erased social media posts about incapacitations and deaths, with plaintiffs holding proof of concealment.

F. According to a study, most of Gulf Air incidents are due to Pilot errors specifically Bahraini Nationals

20. **GULF AIR Deceptive Practices and Regulatory Failures:**

A. **2008**: Gulf Air's codeshare agreement with American Airlines put it under DOT, FAA andICAO oversight.

B. **2017**: Gulf Air misrepresented its safety record to the IOSA to obtain certification. Continuous false representation and concealing in their May application every year

C. **2021**: Despite unresolved safety issues and DOT approvals, Gulf Air continues to falsely announce to resume nonstop U.S. flights deceiving the Public

21. **GULF AIR Negligence Around Time of Captain Alhindi's Death:**

 **A.** **December 6, 2022**: Gulf Air applied for DOT foreign air carrier permits without addressing fitness and safety failures.

 **B.** **December 14, 2022**: Gulf Air became aware of Captain Alhindi's death and their failures.

 **C.** **December 17, 2022**: Gulf Air failed to report the death or prior incapacitations, continuing noncompliance with ICAO regulations.

 **D.** **December 2022**: Gulf Air concealed critical safety incidents in DOT applications, including fatalities in late 2022.

22. **GULF AIR NEGLIGENCE & BREACH OF DUTIES**

23. **GULF AIR VIOLATION OF Codeshare Guidelines and DOT Orders and Rules**

    A. ***Failure to Detect and Mitigate Crew Medical Incapacitation***

24. **Gulf Air's Duty to Captain Alhindi**

25. Gulf Air, as Captain Alhindi's employer, had a duty to ensure his health and safety by providing a safe working environment, proper rest, and regular medical evaluations. This included conducting health assessments to identify risks that could affect his ability to fly. Gulf Air was also responsible for maintaining effective contracts with Aviation Medical Examiners and adhering to international aviation standards.

26. Gulf Air had a heightened duty to ensure pilots' medical fitness, particularly for those with known risk factors. This duty stemmed from two main responsibilities:

    A.  Compliance with ICAO standards, including cardiovascular assessments for pilots over 60.

    B.  The independent duty to establish systems ensuring adherence to medical standards.

27. Gulf Air failed to fulfill these obligations, violating its duties, his employment contract, DOT orders, ICAO Annexes 1, 6, and 19, as well as FAA codeshare safety guidelines and public interest.

28. These failures directly contributed to Captain Alhindi's incapacitation and death from a preventable medical condition, causing significant harm to his dependents.

29. Gulf Air's systemic negligence endangered public safety by exposing passengers

and crew to foreseeable risks of catastrophic consequences during flight operations.

30. This pattern of disregard for its responsibilities reflects the airline's broader failure to comply with its legal and ethical duties to employees and the public.

31. Gulf Air's gross negligence in failing to detect and mitigate the risks of crew medical incapacitation directly endangered the safety of passengers, crew members, and the public.

32. The airline consistently failed to fulfill its duty to detect crew incapacitations as safety hazards, violating established regulatory requirements, including those imposed by the International Civil Aviation Organization (ICAO).

33. This failure allowed significant medical risks to remain undetected and unaddressed, thus compromising aviation safety.

34. Had Gulf Air adhered to its obligations to detect these risks, it could have identified potential threats to flight safety and implemented appropriate preventive measures to avoid tragedies, such as the incapacitation of Captain Alhindi and his health deterioration

35. The failure to detect and address crew medical issues was not only a direct violation of safety protocols but also a foreseeable factor leading to the preventable incident "injury" that claimed Captain Alhindi's life.

### B. **GULF AIR Failure In Crew Medical Examination**

36. Given Captain Mohannad's age, hypertension, and prior medical incapacitation, Gulf Air's duty extended to implementing heightened scrutiny to prevent foreseeable medical emergencies.

37. Gulf Air breached its duty in four critical ways:

   **A.** Failure to Ensure Adequate Medical Examinations:

   **B.** Noncompliance with ICAO Standards

   **C.** Lack of Internal Oversight

   **D.** Neglect of Known Risk Factors

   **E.** Failure to detect safety risk in health assessments

38. Gulf Air's breaches and negligence directly caused Captain Mohannad's incapacitation and ultimately his death due to 99% blockage

39. Gulf Air's failures prevented the detection of Captain Mohannad's life-threatening 99% coronary artery blockage, which would have been identified through proper medical examinations.

40. Had Gulf Air complied with DOT orders and ICAO standards and conducted thorough cardiovascular assessments, Captain Mohannad would have been grounded until treated or suspended till recovery, preventing his gradual build up of the blockage, his incapacitation and death. Mainly preventing an unfit pilot from flying risking his life and others.

41. Gulf Air's failure to ensure compliance and address known risks led directly to Captain Mohannad's incapacitation and death

42. The harm resulting from Gulf Air's negligence was entirely foreseeable

43. Captain Mohannad's age, hypertension, and prior medical history made him highly vulnerable to incapacitation during flight.

44. ICAO standards mandate enhanced medical scrutiny for high-risk pilots to prevent precisely the type of incapacitation that occurred.

45. A responsible reasonable airline would have recognized the risk of undiagnosed conditions in high-risk pilots and implemented measures to ensure compliance with medical standards, which Gulf Air failed to do.

46. **Gulf Air's negligence caused significant and preventable harm:**

   **A.** Captain Mohannad's incapacitation and death were direct consequences of Gulf Air's failure to ensure his medical fitness to fly.

   **B.** The Captain's medical emergency could have endangered passengers, crew, and the general public, due to Gulf Air failure in proper medical oversight in aviation.

47. Had Gulf Air fulfilled its duty of care, Captain Mohannad's condition would have been detected, treated, and monitored, preventing his death and the risks posed to flight safety and Captain and Plaintiffs would not have been harmed

### C.  <u>GULF AIR Violation Of ICAO Annex 6</u>

48. Gulf Air violated DOT Order and ICAO Annex 6 by neglecting crew health data integration, fatigue management, and fitness measures, and implementing an effective Safety and fatigue systems, leading to preventable incidents and the Captain's death

### I.    **Failure to Implement an Effective Fatigue Risk Management System (FRMS) For Fitness Monitoring**

49.  ICAO Annex 6 Part I outlines the duty of aircraft operators to manage fatigue and ensure flight and cabin crew maintain adequate alertness levels.

50.  Gulf Air had the duty to  follow prescriptive flight time, duty period, and rest period limitations and establish an approved Fatigue Risk Management System (FRMS) to ensure adequate crew alertness.

51. The airline was required to incorporate scientific principles in its approach to fatigue management to ensure crew members were fit for duty.

52. Gulf Air was obligated to continuously identify and address fatigue-related safety hazards that could affect crew performance.

53. The airline had the responsibility to implement processes for mitigating fatigue risks to prevent unsafe operations.

54. Gulf Air was required to ensure that relevant personnel were properly trained in FRMS procedures and operations.

55. Gulf Air must continuously monitor the performance of its FRMS and ensure it provides an equivalent or better level of safety than prescriptive regulations.

**56.** **Violations & Breaches of Duty in Violating Regulations**

**57.** Gulf Air failed to meet these obligations

**58.** The airline did not implement either prescriptive fatigue regulations or an effective FRMS, violating ICAO requirements.

**59.** Gulf Air and its systems failed to adequately identify and manage fatigue-related safety hazards, particularly concerning high-risk crew members.

**60.** Gulf Air did not implement an adequate risk mitigation processes system for crew fatigue, which contributed to unsafe operations and exacerbated health risks for specific crew members, including Captain Alhindi.

**61.** There is no evidence that Gulf Air provided sufficient FRMS training to its relevant personnel, which would have helped mitigate fatigue risks.

**62.** The airline failed to effectively monitor and review the performance of any FRMS or its fatigue management practices, leading to the failure of these systems to prevent fatigue-related safety hazards.

**63.** These breaches led to unsafe crew operations, contributing directly to the incapacitation of Captain Alhindi and his death

**64.** Despite the existence of these systems, they were ineffectively utilized, failing to address cumulative fatigue and integrate health monitoring for high-risk crew members like Captain Alhindi.

**65.** Gulf Air ignored known risk factors associated with Captain Alhindi's health, making the health risk foreseeable and preventable.

**66.** This failure permitted unsafe schedules and unmitigated fatigue, exacerbating Captain Alhindi's cardiovascular stress and contributing to his incapacitation and

death.

67. Gulf Air's systemic neglect violated established safety standards, exposing both crew and passengers to preventable risk

68. Gulf Air's unsafe scheduling and failure to monitor his health directly contributed to the rapid deterioration of his condition, including the development or worsening of his arterial blockage.

69. Gulf Air should have foreseen the risk of incapacitation due to Captain Alhindi's health profile and the airline's scheduling practices.

70. The incapacitation and death were preventable if the systems in place were adequately implemented, especially during high-demand periods.

71. But for Gulf Air's failure to utilize its Fatigue Risk Management System (FRMS) effectively, Captain Alhindi's high-risk health profile would have been flagged. This would have triggered preventive measures, including reduced workloads, adjusted schedules, and more frequent medical evaluations.

72. These interventions would have likely identified his health deterioration and revealed the critical arterial blockage in time for treatment, preventing his incapacitation and death. Gulf Air's systemic failures were the indispensable cause of this preventable tragedy.

73. But for Gulf Air's violation of DOT Order by Violating ICAO Annex 6 in failing to implement an effective Fatigue Risk Management System (FRMS), Captain Alhindi's cumulative fatigue and cardiovascular stress would not have reached critical levels.

74. Without proper monitoring and intervention, his 99% arterial blockage built up

and went undetected, directly leading to his incapacitation and preventable

death. Gulf Air's systemic negligence in violating safety protocols created a

foreseeable risk of harm, resulting in the tragic and unnecessary loss of life

causing harm to the Plaintiffs

**75.** The airline's failure not only jeopardized Captain Alhindi's health but also

compromised passenger and crew safety, Gulf Air's actions and the ultimate

harm caused.

**76.** Gulf Air's failure to implement SMS components mandated under DOT order that

requires adherence to Annexes 6 and 19 , demonstrates its breach of the duty of

care owed to its crew and the Captain as required by industry standards and

DOT oversight

**D. <u>GULF AIR Violations of ICAO Annex 6 (3.3.2)</u>**

**II.    Gulf Air's Failure in Implementing an Effective Safety Management System (SMS)**

**77.** **Gulf Air's Duty in implementing Effective System**

**78.** Under ICAO Annex 6, Section 3 Gulf Air was required to establish and maintain an effective Safety Management System (SMS) that would identify, assess, and mitigate safety hazards, particularly fatigue and health risks for crew members.

**79.** **Failure to Identify and Address Fatigue and Health Risks:**

Gulf Air did not establish an SMS capable of identifying fatigue and health risks, particularly for high-risk individuals like Captain Alhindi, who had known health conditions. The airline lacked a systematic process to assess fatigue-related hazards and health risks for crew, especially those with cardiovascular conditions or other medical issues.

**80.** Gulf Air's Safety Management System (SMS) failed to address crew fatigue and health risks, lacking a Fatigue Risk Management System (FRMS) or sufficient protocols, especially during high-demand periods.

**81.** The absence of continuous monitoring and regular assessments prevented necessary interventions, contributing to Captain Alhindi's incapacitation.

**82.** This failure to implement effective safety measures directly led to unsafe operational conditions and exacerbated Captain Alhindi's health risks, resulting in his death.

**83.** The failure to identify risks such as cumulative fatigue and pre-existing cardiovascular issues meant Gulf Air did not intervene to adjust schedules or

provide proper health monitoring, allowing these factors to exacerbate and lead to Captain Alhindi's rapid health deterioration.

84. Captain Alhindi's incapacitation could have been prevented or mitigated if Gulf Air's SMS had been in place to monitor his health and assess fatigue risks.

85. The risks of fatigue and health issues, particularly for a high-risk individual like Captain Alhindi, were foreseeable.

86. Gulf Air should have been aware that its failure to implement an effective SMS could lead to safety hazards, including the risk of incapacitation due to fatigue or cardiovascular stress.

87. Fatigue risks are well-established as a safety hazard in aviation. Given Captain Alhindi's known cardiovascular condition, it was foreseeable that excessive work hours, stress, and fatigue could lead to a severe health event, potentially resulting in incapacitation or death.

88. Gulf Air's failure to act on these foreseeable risks, such as by adjusting schedules, improving health monitoring, and integrating fatigue risk management, exposed its crew and passengers to preventable harm.

89. The failure to properly manage fatigue and health risks had significant and tragic consequences for Captain Alhindi.

90. Gulf Air's failure to address cumulative fatigue from extended work hours and insufficient rest exacerbated Captain Alhindi's cardiovascular stress, leading to rapid health deterioration, incapacitation, and death.

91. The lack of an SMS and fatigue management systems allowed his condition to worsen undetected.

**92.** The airline did not assess fatigue risks during high-demand periods or adjust workloads for high-risk crew members, nor did it incorporate feedback to improve safety measures. Additionally, Gulf Air failed to communicate safety risks and adequately train personnel to manage health-related issues.

**93.** Had Gulf Air implemented necessary safety systems, including health assessments and fatigue management protocols, the arterial blockage could have been identified earlier, potentially preventing the fatal event.

**94.** This failure caused both physical harm to Captain Alhindi, the Plaintiffs and organizational harm, exposing crew and passengers to preventable risks.

**95.** Gulf Air's failure to address Captain Alhindi's fatigue and health risks caused not only his death but also significant emotional and financial harm to his mother and siblings, who lost a beloved family member.

**96.** Their grief and suffering were compounded by the preventable nature of the tragedy, exposing them to ongoing psychological distress

### E.  **VIOLATING DOT ORDER & VIOLATIONS of ICAO Annex 19**

97. **Gulf Air's Failure in Implementing an Effective Safety Management System (SMS)**

98.  Gulf Air's Safety Management System (SMS) failed to detect, identify and mitigate critical risks, such as fatigue and health issues, especially for high-risk crew members like Captain Alhindi.

99. Gulf Air lacked continuous monitoring and failed to treat incidents like the November 2022 flight attendant incapacitation as systemic safety hazards.

100.    Had Gulf Air and its SMS detected these incidents, it could have identified the need for enhanced medical assessments and adjusted the Captain's workload accordingly.

101.    Gulf Air's SMS failures directly contributed to Captain Alhindi's incapacitation and death. By failing to detect and address systemic risks, such as incapacitation events and cumulative fatigue, Gulf Air allowed the Captain's health to deteriorate without intervention.

102.    The airline's neglect to flag high-risk crew profiles or adjust workloads during the high-demand World Cup period exacerbated his cardiovascular condition, culminating in his death.

103.    Previous Incapacitation including the November 2022 flight attendant incapacitation was a clear warning sign that Gulf Air ignored, failing to evaluate safety protocols and mitigate similar risks for other crew members.

104.    The airline's failure to implement an effective Safety Management System (SMS), as required by DOT, FAA, and ICAO, exposed passengers, crew, and the

public to unnecessary risks.

**105.**   This negligence caused severe financial and emotional harm to the plaintiffs,

including the loss of Captain Alhindi and his income, support, and guidance, and

deprived them of a chance to prevent these damages.

**106.**   Had Gulf Air followed ICAO requirements and DOT orders—such as

implementing an effective SMS system—their preventable losses would have

been avoided

**107.**   Gulf Air's SMS failures deprived the plaintiffs of a foreseeable opportunity to

prevent these damages

### F.  GULF Air Negligence In Hospital Choice & Quality of Care

**108.     Duty and Breach of Duty**

Gulf Air, as Captain Alhindi's employer, had a heightened duty to ensure his

health and safety during emergencies. Despite this obligation, Gulf Air failed to

pre-arrange agreements with competent hospitals in Bangladesh and directed

the ambulance to United Hospital, which lacked the necessary specialists for

critical cardiac care.

**109.**    Their representatives actively managed the Captain's care without ensuring

the chosen facility could provide adequate treatment.

**110.**    Gulf Air's choice to admit the Captain to United Hospital directly caused

delays in care, as the hospital lacked a senior cardiologist and other essential

resources especially at 4:30am

**111.**    Medical experts will confirm earlier intervention by a qualified specialist or

transfer to a different Hospital, an accredited facility equally accessible, could

have stabilized the Captain's condition. Gulf Air's negligence in selecting the

hospital was the proximate cause of harm.

**112.**    If Gulf Air had acted earlier to arrange proper medical care or a specialist, the

Captain's critical condition could have been stabilized before reaching the PCI

table.

**113.**    It was foreseeable that placing a critically ill individual in an inadequately

equipped hospital in Bangladesh—a country known for medical malpractice and

lack of accountability—would lead to worsened outcomes.

**114.**    Gulf Air should have anticipated these risks and acted prudently by selecting

a better-equipped hospital or arranging specialist care in advance.

115.   Gulf Air's actions resulted in preventable delays, causing the Captain's condition to deteriorate to a point of no return. This failure caused emotional and financial harm to the family, who relied entirely on Gulf Air's representations and were denied the chance to seek effective care.

116.   Gulf Air's reliance on word-of-mouth recommendations and failure to act during the 8 hours at the hospital reflect systemic negligence, directly linking their actions to the harm suffered by the Captain and his family.

117.   It is widely known that medical malpractice and lack of accountability are prevalent issues in Bangladesh's healthcare system, and Gulf Air should have anticipated these risks when choosing a hospital and providing care for their Pilot

118.   Gulf Air's decision to place the Captain in an unqualified hospital was a critical error in judgment, directly linking its negligence to the outcome.

119.   Gulf Air knew or should have known that admitting the Captain to an inadequately equipped facility created foreseeable risks of delays, ineffective treatment, and further harm to him and to the Plaintiffs

120.   Gulf Air's failure to address the Captain's known medical risks (e.g., 99% arterial blockage) and failure to arrange competent care earlier exacerbated his condition, with more negligence acts, making death more likely regardless of the hospital's role.

### G. **Breach of Duty of Care in Providing Adequate Medical Care**

**121.** Gulf Air failed to fulfill its duty of care by admitting the Captain to United Hospital and keeping him there despite its known deficiencies and lack of specialized cardiac care.

**122.** Failing to consult a senior cardiologist or initiate life-saving procedures promptly.

**123.** Neglecting to secure a comprehensive medical plan, resulting in fragmented and inadequate treatments

### H. **Breach In Providing The Captain's Medical History**

**124.** Gulf Air breached its duty by failing to provide Captain Alhindi's medical history during a critical emergency. This history, which included his cardiovascular issues which led to prior suspension after Incapicitation, hypertension, prescribed medications, and past cardiac incidents, was essential for accurate diagnosis and immediate treatment.

**125.** Gulf Air, as the Captain's employer, had the obligation and ability to ensure this information was readily accessible for emergencies but failed to do so

**126.** Instead, Gulf Air relied on the Captain's wife to relay medical details. This caused significant delays due to time zone differences and her limited access to complete medical records.

**127.** Gulf Air's initial responsibility was to ensure the Captain's medical history, including his suspension, hypertension, and prior cardiac incidents, was readily available in their system for emergency situations.

**128.** Relying on the Captain's wife to provide this critical information was

unnecessary and avoidable, as the airline's duty of care mandated maintaining such records on a need-to-know basis for immediate medical intervention.

**129.**   The lack of timely, accurate information directly led to the hospital's misdiagnosis and delayed treatment missing the "Golden Hour," the critical window for effective intervention.

**130.**   The absence of the Captain's medical history resulted in a cascade of preventable harm, including missed opportunities for specialized cardiac care.

**131.**   This failure contributed to the Captain experiencing two additional heart attacks, further deterioration of his condition, and his eventual transfer to the ICU. Even at this stage, Gulf Air still did not provide the necessary medical history, exacerbating delays and errors in care or made sure there was a specialist or medical plan

**132.**   Had Gulf Air ensured the Captain's medical history was readily available and provided it directly to medical staff, the severity of his condition would have been immediately apparent.

**133.**   Any prudent healthcare provider, with possession of a patient's medical history knowledge, would have initiated timely and appropriate interventions.

**134.**   This breach directly caused delays, misdiagnosis, and a worsened prognosis, ultimately leading to his death.

**135.**   The harm was foreseeable given Gulf Air's knowledge of the Captain's risks and the standard industry practice of maintaining accessible medical records for emergencies.

**I.** **GULF AIR DUTIES & Breaches Leading To Percutaneous coronary intervention (PCI)**

**136.**    Given the life-threatening nature of the situation, Gulf Air was required to act with heightened diligence and expertise, taking immediate steps to ensure the Captain received proper medical care and intervention.

**137.**    The Plaintiffs relied entirely on Gulf Air to act in the Captain's best interests, as they were 20 hours away and unable to access information or intervene independently.

**138.**    By managing the Captain's treatment, choosing the hospital,facilitating procedures, and overseeing the consent process, Gulf Air assumed a **duty** to ensure timely and proper medical intervention.

**139.**    Despite the urgency, the Captain was left without appropriate care for two critical hours. By the time senior doctors arrived at the hospital, the proposed PCI procedure was too late to prevent further deterioration and save his life.

**140.**    Gulf Air and its representatives owed a heightened duty of care to disclose material facts regarding the Captain's condition and the hospital's limitations, enabling the family to make informed decisions.

**141.**    The Plaintiffs' reliance on Gulf Air's representations reinforced the airline's obligation to provide full and truthful disclosures, which it failed to do, depriving the Captain of timely and adequate care.

### J.  _Breach of Duty of Care by Not Disclosing Material Facts_

**142.**  Gulf Air breached this duty by Remaining Silent and Withholding key information about risks and the hospital's limitations during his time at the hospital and in obtaining consent from Plaintiff Feras

**143.**  Gulf Air breached this duty by Partial Disclosures in Failing to disclose the absence of specialists and delays in care.

**144.**  Gulf Air breached this duty by Misleading Assurances and Providing reassurances that created a false sense of security about the hospital's capabilities.

**145.**  Captain Alhindi survived his first heart attack at the airport, indicating that timely and effective medical intervention upon arrival at the hospital could have stabilized his condition.

**146.**  Medical experts will confirm that earlier intervention and involvement of a senior cardiologist or immediate transfer to a better-equipped facility could have prevented his subsequent heart attacks and deterioration.

**147.**  Gulf Air admitted the Captain to United Hospital, a facility lacking critical cardiac expertise outside working hours, despite "EverCare" Hospital being equally accessible and the only Internationally-accredited hospital in the area and not owned by mafia as United Hospital known in Bangladesh

**148.**  EverCare's accreditation and proven capability in managing cardiac emergencies at any time, demonstrate that a better alternative was readily available but overlooked by Gulf Air.

**149.**  From 4:30 AM to 10:30 AM, the Captain was left without the care of a senior

cardiologist, a delay that allowed his condition to worsen.

**150.** Gulf Air withheld critical information about United Hospital's limitations, including the absence of a senior cardiologist and delayed care, preventing Plaintiffs from making informed decisions.

**151.** If Gulf Air had disclosed these deficiencies, Plaintiffs could have arranged a transfer to Evercare Hospital, contacted the U.S. embassy, or involved their to advocate for better care on-site or look for the best cardiologist and retained him to go help his brother.

**152.** Had the Captain been transferred to Evercare or any other adequately equipped hospital, he would have received timely and advanced care.

**153.** This pattern of inadequate care highlights Gulf Air's failure to foresee the risks of admitting the Captain to this facility.

**154.** A Gulf Air pilot at the Captain's funeral stated that if the Captain had been treated elsewhere, he would have survived.

**155.** Gulf Air's decisions directly delayed proper care and specialist involvement, leading to inadequate treatment that caused the Captain's condition to progress from manageable to fatal

**156.** These omissions deprived the Captain of the chance to recover, leaving him in a "no return" stage that culminated in his death.

**157.** The Plaintiffs justifiably and reasonably relying entirely on Gulf Air's representations and assurances, were misled into believing that the Captain was receiving adequate care.

**158.** This reliance prevented them from seeking alternative solutions or taking

timely action, compounding the delays and contributing to the Captain's worsening condition.

**159.** Gulf Air knew that withholding critical information about the hospital's deficiencies, lack of a senior cardiologist, and delays in treatment would prevent the family from making informed decisions, leading to foreseeable harm.

### K. Breach of Fiduciary Relationship

**160.** **Obligation to Disclose Material Facts**

**161.** Gulf Air owed a duty to disclose all material facts regarding the Captain's medical condition and the hospital's capabilities.

**162.** As the dominant party in this situation, Gulf Air had exclusive access to critical information and was relied upon by the plaintiffs, Samiha and Feras, to act in the Captain's best interest. Gulf Air Breached this duty

**163.** **Duty of Trust**

**164.** Captain Mohannad Alhindi was a loyal Gulf Air employee for over 30 years. Gulf Air had previously managed his medical care during past illnesses, they had a relationship of trust and reliance.

**165.** Gulf Air managed the Captain's medical insurance through company-sponsored plans and clinics; they had authority and responsibility over his healthcare.

**166.** At the time of his medical emergency, Captain Alhindi was on duty in a foreign country, far from his home and family, relying entirely on Gulf Air for immediate support and care. Captain was unconscious since his incapacitation

**167.** Gulf Air, through its operational policies , employment contract and regulatory obligations, was required to manage the Captain's health and safety during emergencies, including the co-pilot's role in facilitating medical care.

**168.** Gulf Air directed airport medics, dispatched the ambulance to United Hospital, admitted him, signed consent of treatment at ER,  contacted the Captain's wife, and sought consent from his brother, Feras, for medical procedures, assuming

full authority over his care.

169.    As a large international corporation, Gulf Air wielded significant influence in Bangladesh, controlling local resources and medical interventions, leaving the Captain's family entirely dependent on its actions and representations.

**170.    DUTY OF RELIANCE**

171.    Plaintiffs relied entirely on Gulf Air's knowledge and actions during the emergency, as they lacked access to critical information or alternative means to make informed decisions about Captain Alhindi's care.

172.    Feras's reliance was demonstrated by his call to Gulf Air's 1-800 number, where he was only informed of the Captain's admission to United Hospital, and over ten messages to the co-pilot, frustrated with  his inability to reach the hospital for updates.

173.    Aware of Feras's dependency, Gulf Air and the co-pilot controlled all critical information, acting as his sole source of updates and leaving him unable to independently protect his brother's interests.

**174.    DUTY OF LOYALTY & DUTY OF CONFLICT OF INTEREST**

175.    Gulf Air and its representatives, including the co-pilot, owed a duty of loyalty to prioritize Captain Alhindi's and his family's best interests, based on their employer-employee relationship, control over his medical care, the family's reliance during the emergency and foreseeability of harm.

176.    Gulf Air prioritized its own interests, including avoiding liability and reputational harm, over the Captain's well-being by withholding critical information, choosing an inadequately equipped hospital, and failing to involve a

specialist, depriving the family of informed decision-making.

**177.** The airline's actions were influenced by concerns over potential lawsuits, prior medical incapacitation incidents, and ongoing U.S. Department of Transportation (DOT) applications, leading to systemic failures in their medical protocols.

**178.** These breaches directly caused Captain Alhindi's deterioration to a "no return" stage leading to his death, and inflicted emotional and financial harm on the Plaintiffs , who relied on Gulf Air's reassurances and were denied the opportunity to secure proper care

### L.  _Breach of Duty of Superior Knowledge:_

**179.**  With access to critical information, including medical records and the hospital's capabilities, Gulf Air was obligated to use their superior knowledge responsibly and transparently.

**180.**  Gulf Air held superior knowledge of Captain Alhindi's critical condition, the hospital's deficiencies, and the absence of specialists, which they failed to disclose to the family. Gulf Air was aware that the Plaintiffs mainly Feras wasn't able to get through to the hospital or doctors they were notified

**181.**  The withheld information, including the risks of delayed care and the inadequacy of United Hospital, was essential for the family to make informed medical decisions.

### M.  _Heightened Duty in Emergencies:_

**182.**  Captain Alhindi collapsed at the airport, suffering three heart attacks by 8:00 am, and was intubated and placed on a ventilator. Gulf Air failed to provide immediate, life-saving measures or ensure access to appropriate medical care.

**183.**  Gulf Air's representatives were fully briefed on the Captain's critical condition but admitted him to United Hospital, a facility lacking necessary specialists, and approved emergency procedures without ensuring adequate resources.

**184.**  By coordinating medical assistance, arranging ambulance transport, and managing hospital communication, Gulf Air assumed control of the situation, creating an obligation to act with heightened diligence and care.

**185.**  Knowing the family was 22 hours away in the U.S., Gulf Air withheld critical information, provided vague assurances, and failed to assist Feras, delaying

meaningful intervention and worsening the Captain's condition.

**186.**   As an international airline with significant resources, Gulf Air failed to use its capabilities to provide proper care, reflecting broader systemic failures in handling employee health and safety.

**187.**   Gulf Air's breach of heightened duty caused preventable delays, emotional and financial harm to the family, and the Captain's deterioration to a "no return" stage

**188.** __GULF AIR FRAUDULENT CONCEALMENT  (1)__

    **N.** __Fraudulent Concealment  PCI Consent__

**188.** On December 13, 2022, at approximately 10:30 PM EST (Virginia time), a recorded call was initiated to obtain a consent for a PCI (Percutaneous Coronary Intervention) procedure from Plaintiff Feras. Participants in this call included:

    **A. Issa Shaah** (Bangladesh Dhaka Station Manager) – He is Gulf Air senior authority responsible for overseeing medical emergencies who arrived late and gave False statements multiple times to the Authorities

    **B. Khalil Razzak** (Co-Pilot, Gulf Air) who accompanied the Captain in the ambulance to United Hospital from the Airport, remained with him at the hospital, and assumed responsibility for immediate medical arrangements. Khalil explicitly knew during the comment call that the doctor was difficult to understand and was lying

    **C. Professor Omar Farouk** (Doctor at United Hospital) –"senior doctor" on the call, yet not a cardiologist and newly arrived at the hospital. His broken English created a language barrier, leaving the family unable to comprehend critical details about the Captain's condition. **The doctor, lied and Gulf Air remained Silent knowing he's lying**

    **D. Amani Alhindi** (Captain's Wife, Naperville, IL) –who has her own share of negligence

    **E. Touleen Alhindi** lives in Chicago (Captain's Daughter) – Who asked for the risks and was downplayed by the Doctor

    **F. Ahmad Alhindi** who lives in IL (Wife's Brother) –Was at the Wife house

during the call and present as part of the discussion.

**G. Feras Alhindi** (Captain's Brother, Springfield, VA) –Primary participant in the call as the family sought his consent for the PCI. Feras was not the legal next of kin; his consent was obtained deceptively. Feras was located in Springfield, VA, using his personal cell phone (703) 980-6955.

**H. Feras's Daughter** (DOE 1) – Recorded the call due to the family's inability to understand the doctor's explanations. This recording confirms the Co-Pilot's acknowledgment that the doctor was not clear and lying

189.    The call at 10:30 PM EST (10:30 am Bangladesh Time ) occurred as the Captain's condition rapidly declined due to a lack of specialized care and providing medical history.

190.    By this time, over six hours had passed without medical intervention, heightening the urgency for accurate and transparent disclosures.

191.    The late timing and missed opportunities for timely interventions that would have happened  with full family awareness.

192.    Gulf Air intentionally concealed material facts depriving the family of the opportunity to seek independent medical intervention or transfer the Captain to a more competent facility.

193.     This conduct was a deliberate attempt to keep the family uninformed and prevent them from making an alternative, informed decision covering up their initial negligences

**194.    Gulf Air concealed a material facts**

**195.**    Gulf Air's representatives, including Station Manager Issa Shaah and Co-Pilot Khalil Razzak, deliberately concealed material facts critical to the consent process call for the PCI procedure, depriving Feras of the opportunity to make an informed decision.

**196.**    Gulf Air, aware of the Captain's worsening condition and the hospital's deficiencies, withheld these critical details during the consent call on December 13, 2022, at approximately 10:30 PM (EST):

> **I.    Material Fact (1) Time Of Arrival & Loss Of Golden**

**197.**    During the critical phone call, the doctor inaccurately stated that the Captain had "fallen at the airport" at **5:00 AM**. In reality, the Captain fell at **3:50 AM and had** already arrived at the hospital by **4:30 AM** and was receiving treatment in the Emergency Room (ER) until **6:00 AM**, when he was moved to the ICU.

**198.**    The Captain suffered two more heart attacks between around **6:20–7:00 AM**, two hours gap from his arrival ,not as claimed and implied by the doctor

**199.    Co Pilot Khalil**, who had accompanied the Captain to the hospital, and **Issa Shaah**, Gulf Air's Station Manager, were present on the call and fully aware of the actual timeline. Despite their direct knowledge, both remained silent and failed to correct the doctor's false statement. Their deliberate silence allowed this critical misinformation to go unchallenged, supporting and confirming  the doctor's misleading narrative.

**200.**    This misrepresentation created the false impression that the Captain's condition deteriorated at the airport and that he had received appropriate care

immediately upon arrival at the hospital and hasn't been there for long without care

201.    By remaining silent, Khalil and Issa Shaah intentionally avoided disclosing key facts that would have raised serious questions about the hospital's ability to provide PCI procedure or any procedure or care and its failure to act during the critical "golden hour."

202.    Their silence was intended to suppress Feras's ability to assess the situation accurately and make un-informed decisions inducing his reliance.

203.    This omission effectively prevented Feras from:

   A.  Questioning the doctor's credibility and the hospital's handling of the emergency.

   B.  Exploring alternative actions, such as transferring the Captain to a better-equipped facility or involving specialists sooner.

   C.  Realizing that the Captain's delayed care significantly contributed to his deteriorating condition.

   D.  Putting him in stage if urgency and distraction that this happened quick and out of nowhere the Captain's critical situation is deteriorating

204.    The coordinated silence by Khalil and Issa Shaah demonstrates intent to mislead, as they actively allowed the false timeline to remain uncontested.

205.    This ensured Feras's reliance on the doctor's incorrect account, manipulating his decision to consent to the PCI procedure under the false belief that it was the best and only option for the Captain's survival.

II.    **Material Fact (2) The Captain had been without specialist care or appropriate treatment for over six hours at United Hospital.**

206.    The hospital had demonstrated significant delays in care and mismanagement of the Captain's condition.

207.    **Timeline of Negligence**

A.    **4:30 AM**: Gulf Air failed to ensure that the hospital had the Captain's medical records, which delayed accurate diagnosis and treatment.

B.    **5:00–9:30 AM**: Gulf Air did not request the presence of a specialist or establish a proper medical plan for the Captain's treatment, despite his deteriorating condition.

208.    This prolonged delay in specialist intervention increased the risks of complications and worsened his prognosis. Gulf Air failed to disclose this material fact, leaving Plaintiff Feras under the false impression that the Captain was receiving timely and adequate care.

209.    Gulf Air concealed the hospital's inability to manage critical cardiac emergencies, leaving the family unaware of the facility's limitations. These delays and deficiencies directly undermined the potential for a successful outcome.

210.    **United Hospital lacked a senior cardiologist or experienced specialists to evaluate or perform the PCI procedure.**

211.    Despite their knowledge of this critical deficiency, Gulf Air's representatives, including the Co-Pilot who remained at the hospital, failed to disclose the absence of necessary expertise.

**212.** This omission significantly compromised the safety and effectiveness of the proposed PCI intervention.

**213.** Gulf Air was aware that the hospital lacked specialized care, as no specialist was available until after 9:30 AM, when the PCI procedure was ultimately decided. This delay was a clear sign of the hospital's inability to manage the Captain's critical condition effectively.

**214.** Both the Co-Pilot's statement and the hospital's death summary confirm the absence of a senior cardiologist before 10:00 AM, further highlighting the hospital's inadequacy during critical hours.

**215.** All that time the Co Pilot didn't think of questioning why there isn't any procedure being taken, or any specialist.

**216.** The Co-Pilot and Gulf Air representatives initially relied on the hospital's ability to manage the Captain's condition. However, when the specialist arrived after normal working hours, it became apparent that the hospital had missed critical opportunities to intervene effectively during the golden hour.

**217.** By this point, Gulf Air and its representatives were aware that these delays and omissions significantly contributed to the Captain's deteriorating condition.

**218.** By the time the PCI procedure was considered, Gulf Air and its Co-Pilot understood from the brief that the Captain's condition was effectively irreversible. They knew that the critical damage to his health had already occurred, and the PCI would do little to alter the outcome.

**219.**    The Captain was now unlikely to recover meaningfully, and his condition had reached a point where further intervention would not reverse the harm caused by the lack of timely and adequate care including the high risk.

**220.**    Recognizing this, Gulf Air refrained from disclosing these critical realities to Feras. Instead, they allowed the doctor's incomplete explanation, hindered by language barriers and communication issues, to mislead Feras into believing that the procedure was both necessary and potentially life-saving.

**221.**    By remaining silent, Gulf Air ensured that Feras would consent to the PCI without fully understanding its limited efficacy and the Captain's dire prognosis shifting the responsibility to the family. This deliberate omission demonstrates Gulf Air's intent to mislead, motivated by their knowledge of the Captain's critical state and the potential liability arising from their earlier failures to act.

### III.    Material Facts (3) Failure to Disclose the True Risks of the PCI Procedure

**222.**    During the consent process, the risks of the PCI procedure were repeatedly minimized or left unanswered, despite three direct inquiries from Feras, the Captain's daughter, and Feras's wife. When asked about the risks, the doctor provided vague and dismissive responses, eventually stating that there are "always risks" but downplaying them by describing the procedure as "standard."

**223.**    Even when Feras explicitly asked about the risks after the procedure, the doctor failed to provide a clear or comprehensive answer, instead emphasizing the urgency of proceeding without delay.

**224.** Gulf Air's representatives, including Khalil and Issa Shaah, were present and fully briefed on the Captain's critical condition and the hospital's lack of necessary expertise to perform the PCI procedure safely. Despite this knowledge, they remained silent throughout the consent process, failing to correct the doctor's lies and incomplete explanations of the risks of the PCI.

**225.** This omission created a false sense of security, leading the family to believe that the procedure was both routine and urgently required, without fully understanding its risks or the hospital's inability to handle such a critical case effectively.

**226.** Gulf Air's silence and failure to disclose critical facts deprived the family of the opportunity to explore alternatives, such as transferring the Captain to Evercare Hospital or consulting with a qualified specialist who could have provided a more accurate assessment of his condition and the risks of the PCI procedure, or decide if they don't want the PCI.

**227.** *-Despite the outcome, it the **right of knowing** in order to choose what's best for the Captain is what Gulf Air deprived Plaintiffs from -*

**228.** By remaining silent, Gulf Air's representatives knowingly reinforced the doctor's misleading assurances, manipulating the family's decision-making and ensuring consent under false pretenses.

**229.** This deprived the family of the ability to make an informed decision that could have prioritized the Captain's best interests.

**230.** The omission, combined with Gulf Air's superior knowledge of the hospital's deficiencies and the Captain's deteriorating condition, demonstrates an intent to

suppress critical information. Gulf Air's actions directly impacted the consent process, concealing material risks the family had a right to know.

231.    These withheld facts, including the hospital's limitations, the absence of a senior cardiologist, and the Captain's deteriorating condition, delayed action, led to inadequate treatment, and culminated in his fourth and final heart attack. Their failure to disclose these facts prevented the family from seeking better care, ultimately denying the Captain a chance for survival and improved outcomes.

232.    **Gulf Air Representatives intentionally concealed the fact with the intent to defraud**

233.    This silence, coupled with the doctor's dismissive responses, created a false sense of security, misleading Feras into believing the hospital was adequately equipped to handle the procedure.

234.    Instead, the Co-Pilot applied undue pressure by offering to sign the consent form on Feras's behalf, further depriving the family of the opportunity to weigh their options. This coercion introduced additional stress and urgency, causing Feras to feel rushed and incapable of resisting Gulf Air's narrative.

235.    Compounding their silence, Gulf Air representatives allowed the doctor to falsely imply that the Captain had only recently deteriorated, concealing the fact that critical time had already been lost due to the hospital's inability to act during the golden hour.

236.    This omission prevented Feras from fully understanding the severity of the situation or the hospital's role in exacerbating his brother's condition.

237.    By remaining silent, Gulf Air knowingly reinforced the doctor's misleading

assurances, concealing the hospital's limitations and the true risks of the PCI procedure.

238.    This included failing to disclose that the hospital lacked the appropriate specialists before 9:30 am , as well as the fact that any potential benefits of the PCI procedure were now minimal due to prior delays.

239.    Their deliberate omission ensured compliance under false pretenses, preventing Feras from making an informed decision.

240.    Gulf Air's actions were driven by a clear intent to suppress critical information and avoid liability for the delays and inadequate care the Captain had already received.

241.    Their silence ensured that the narrative presented to Feras would divert blame away from Gulf Air's role in the Captain's condition, focusing instead on the procedure's urgency.

242.    This directly impacted the consent process, resulting in Feras providing uninformed consent under **duress**, which deprived the family of the opportunity to explore better care alternatives and ultimately led to further harm.

243.    **Duty To Disclose**

244.    **Duty of Disclosure**: Gulf Air, with superior knowledge of the hospital's deficiencies, had a fiduciary duty to disclose all material facts about the Captain's medical condition and the hospital's care.

245.    **Duty of Trust and Dependency**: The plaintiffs placed trust in Gulf Air to protect the Captain, creating a legal and equitable duty for Gulf Air to act in their best interests.

246.   **Duty of Informed Consent**: Gulf Air, by facilitating consent, assumed the obligation to disclose all risks, alternatives, and limitations regarding the Captain's treatment.

247.   **Duty of Accurate Information**: Gulf Air had a duty to provide truthful, complete, and transparent information about the Captain's condition and the hospital's deficiencies.

248.   **Emergency Duty of Care**: Gulf Air had a heightened duty to ensure proper treatment for the Captain and to inform the family of the hospital's limitations.

249.   **Duty Against Misrepresentation**: Gulf Air's partial disclosure misled the family, as they mentioned the hospital's name and stated their staff was present but withheld critical details about the absence of specialists and the hospital's inadequacy.

250.   **Duty to Prevent Foreseeable Harm**: Gulf Air should have anticipated harm from failing to disclose critical material facts during a medical emergency.

251.   **Control and Knowledge**: Gulf Air had full control over the Captain's medical decisions, records, and care, with representatives present and aware of the hospital's deficiencies.

252.   Despite this, they failed to disclose to the Plaintiff mainly Feras the truthful information or take the necessary steps to involve a specialist or initiate a life-saving procedure, significantly compromising the Captain's chances of survival.

253.   Despite knowing of Samiha status as automatic beneficiary in Islamic religion, estates and insurance policies. Gulf Air did not notify all the dependant, the

beneficiary and heir Plaintiff Samiha. Samiha wasn't  notified to participate in these medical decisions

**254.   Plaintiff Feras  was unaware of the concealed fact and would have acted differently if they had known**

**255.**   Despite being aware of the Captain's critical condition, the hospital failed to address the situation for six hours, exacerbating the Captain's health issues

**256.**   As the entity managing the Captain's care, Gulf Air had a heightened duty to act transparently and prioritize the Captain's welfare.

**257.**   The family relied on Gulf Air's assurances due to their lack of proximity to the situation and inability to independently verify the hospital's capabilities.

**258.**   Had Gulf Air provided the necessary information, the family might have considered different options to ensure proper treatment.

**259.**   The family placed justifiable trust in Gulf Air's actions, relying on the airline's reputation, its prior care for the Captain, and its involvement in previous medical situations. This trust led Feras to reasonably believe that believing their type of care and  consenting to the PCI procedure was the best course of action.

**260.**   Feras, unaware of the hospital's inability to act quickly or competently, relied on Gulf Air's trust and involvement and representations, believing that the procedure was routine and urgently needed and that the hospital was adequately equipped to handle it. This lack of awareness was a direct result of Gulf Air's failure to disclose critical information.

**261.**   Gulf Air's silence and omissions created a misleading impression that the hospital was adequately equipped to handle the Captain's condition.

**262.** The Plaintiffs trusted Gulf Air's involvement and were unable to explore alternative care options due to Gulf Air's assurances, omissions, and the family's justifiable trust in the airline.

**263.** Feras justifiably and reasonably relied on Gulf Air's misleading silence and misrepresentation that the hospital was capable of handling the Captain's condition. Feras had no other way of verifying any of the information, he had no reason to doubt Gulf Air and their representatives' ability to take the rights actions  in medical crisis

**264.** Gulf Air and the Co Pilot knew Feras didn't have any information when the doctor called.

**265.** The Plaintiffs reasonably relied on Gulf Air's status as a global airline managing the situation, expecting them to act in the Captain's best interests and provide accurate information.

**266.** Gulf Air Co Pilot And Station Manager had a duty to speak and intentionally failed to do so.

**267.** Gulf Air's failure to disclose the lack of a specialist and the hospital's delays amounted to fraudulent concealment. This omission deprived the Plaintiffs of the opportunity to intervene or make an informed decision, directly contributing to the Captain's preventable death.

**268.** By remaining silent, Gulf Air and its representatives avoided scrutiny of their own negligence in failing to ensure proper care for the Captain. This silence allowed them to evade responsibility for the deficiencies in medical treatment and the failure to act appropriately.

269.    Gulf Air and its representatives ensured that the decision to proceed with the PCI was made under false pretenses. By withholding critical information, they prevented the family from exploring alternative care options that could have led to better outcomes.

270.    It is foreseeable that failing to disclose material facts during a consent process could mislead the decision-maker into making choices that result in harm. **Gulf Air's omission directly contributed to Plaintiff Feras decision to consent to the PCI under misguided assumptions.**

271.    The Captain's critical medical condition (e.g., heart attacks, arterial blockage) and the foreseeable risks associated with Gulf Air's failure to ensure proper care or disclose the hospital's deficiencies were significant.

272.    **Intent to Deflect Responsibility**

273.    The station manager, fully aware of the Captain's critical condition, refused to consent to the procedure and shifted the responsibility to the family, delaying treatment by 50 minutes and contributing to the fatal heart attack.

274.    This deliberate action was Gulf Air's intent to deflect responsibility for its negligence, including inadequate medical care and lack of specialist oversight.

275.    Gulf Air's refusal to address its operational failures and ensure proper medical response demonstrates intent to avoid legal and regulatory consequences.

276.    By withholding critical information and manipulating the consent process, Gulf Air prioritized its interests over transparency and accountability, leaving Feras to make an emotional, uninformed decision.

277.    The concealment of material facts during the consent process is not an

isolated incident but part of a broader pattern of Gulf Air's intentional actions aimed at misleading the plaintiffs.

278.    This chain of events reveals a deliberate effort by Gulf Air to avoid accountability and manipulate the family into decisions that served the airline's interests rather than the Captain's welfare.

279.    **The plaintiff suffered damages as a result of the concealment**

280.    Feras suffered profound emotional harm, believing his uninformed consent contributed to his brother's death. Gulf Air's omissions and misrepresentations denied Feras the opportunity to make an informed decision or pursue better care alternatives

281.    The concealment of material facts caused Feras to rely on Gulf Air's involvement and representations, which created a false sense of security. This misplaced trust amplified Feras's ongoing distress when he learned of the hospital's deficiencies and Gulf Air's failure to act transparently.

282.    The Captain's fourth and final heart attack, occurring during the PCI procedure, underscores the inadequacy of care and Gulf Air's role in preventing timely intervention.

283.    Even if the Captain's condition was critical, Gulf Air's omissions foreseeably deprived the Plaintiff Feras and Samih of alternative options that might have improved the outcome.

284.    Gulf Air's documented pattern of withholding critical information in emergencies demonstrates a systemic disregard for transparency, further supporting the claim of fraudulent concealment.

283.    **GULF AIR FRAUDULENT CONCEALMENT  (2)**

**P.  Hospital Records Seizure & Intentional Concealment by Gulf Air**

284.    **Gulf Air & Its Representatives Concealed Material Facts**

285.    At 12:00 PM on December 14, 2022, at United Hospital in Dhaka Bangladesh, Gulf Air learned that the PCI procedure had been conducted without proper oversight.

286.    Gulf Air discovered critical failures in its own medical monitoring and safety risk systems, including the unaddressed 99% arterial blockage that rendered Captain Alhindi medically unfit to fly.

287.    Despite this knowledge, Gulf Air continued to withhold these facts from the plaintiffs, obstructing their ability to uncover negligence in real time or ask for an autopsy.

288.    Gulf Air had a vested interest in minimizing liability and avoiding the costs of alternative arrangements or a public acknowledgment of its failures.

289.    Gulf Air's reliance on unqualified doctors and failure to investigate hospital deficiencies contributed to the Captain's health deterioration. By concealing these risks, Gulf Air allowed the situation to worsen, ultimately leading to his death.

290.    **Gulf Air concealed Material Facts**

291.    On December 14, 2022, at approximately 12:00 PM, Gulf Air representatives Issa Shaah, the Station Manager at Dhaka, and Co-pilot Khalil Abdulrazak, acting under Gulf Air's directives, seized critical medical records from United Hospital in Dhaka, Bangladesh.

292.    These representatives signed for the records under the pretense of delivering

them to the plaintiffs when transferring Captain Mohannad Alhindi's remains and assured the hospital staff that these records would assist the family in understanding the medical care provided .

**293.** The records included detailed medical documentation essential for assessing the Captain's health prior to his death and determining the events that transpired during his medical treatment, critical to evaluating the severity of the Captain's 99% arterial blockage and whether his condition was properly managed and the procedures done at the hospital.

**294.** Despite these assurances, Gulf Air failed to deliver these records after the burial, providing only the death summary while withholding the remaining critical documents, thereby obstructing the plaintiffs' ability to request an autopsy, verify the quality of care, or initiate timely legal proceedings

**295.** The withheld records constitute material facts essential for identifying and proving Gulf Air's negligence, specifically:

**I.    Material Facts Related to the 99% Arterial Blockage**:

**296.    Coronary Angiography (CAG) Report**: Reveals the extent and duration of the blockage and provides insights into whether Gulf Air's medical monitoring failed to identify this life-threatening condition.

**297.** The absence of this record deprived the plaintiffs of evidence showing that Gulf Air neglected its duty to monitor and address a critical medical issue that developed over years.

**298.    Echocardiogram (ECHO) and Doppler Studies**: Show the functioning of the Captain's heart, which should have been monitored given his high-risk profile.

These tests are directly linked to Gulf Air's obligation to ensure fitness-to-fly and would demonstrate systemic failures in pilot health evaluations.

299.  **Chest X-rays**: Would indicate chronic or long-standing cardiovascular issues that Gulf Air's health assessments failed to detect or address. Possible undetected other diseases. Withholding these records prevented an independent review including whether Gulf Air had sufficient protocols to identify chronic cardiovascular risks in its pilots.

II.    **Material Facts Related to the PCI Procedure**:

300.  **PTCI (Percutaneous Transluminal Coronary Angioplasty) CD & Reports**: Detail the specifics of the procedure, including whether it was performed properly and if any errors occurred due to the lack of a specialist on-site.

301.  By withholding these records, Gulf Air obstructed the plaintiffs' ability to determine if the lack of adequate care directly contributed to the Captain's death and

302.  **Death Summary**:

303.  While part was provided, its accuracy and completeness are in question due to fraudulent misrepresentation in it and Gulf Air's attempts to suppress other critical records.

304.  The missing records, the Cardiologists reports surrounding the PCI procedure and care leading to the death contradict the reliability of the summary provided, indicating deliberate misrepresentation.

305.  **CT Scan**:

306.  Gulf Air failed to disclose critical medical history indicating that Captain

Mohannad Alhindi had underlying cardiovascular issues, which would have been essential information during his emergency treatment.

307.   Instead, the ER team, unaware of this medical history, wasted crucial time performing a CT scan of his head—meant to rule out neurological conditions such as stroke

308.   This CT scan result was clear, further proving that Gulf Air's failure to provide his cardiovascular history directly delayed appropriate treatment for his severe arterial blockage.

309.   During the prolonged head exam, Captain Alhindi's oxygen levels dropped to critical levels, necessitating intubation and an urgent return to the ER.

310.   The Co-pilot, Khalil Abdulrazak, failed to disclose these critical developments to the family during the consent call, depriving them of the opportunity to make informed decisions or insist on prioritizing cardiac-focused care

### III.    Medical History Records in Gulf Air Possession

311.    Gulf Air's internal health assessments would have revealed whether the Captain was ever diagnosed or flagged for conditions requiring further evaluation. It would have revealed if Gulf AIr adhered to ICAO required medical evaluation of high risk profile and provided tangible evidence

312.   The concealment of these records indicates Gulf Air's intent to suppress evidence of long-term medical oversight failures, preventing accountability.

**313.    Gulf Air Had A Duty To Disclose Hospital Records to Plaintiffs**

**314.    Duty of Trust from Custodianship of Records**

315.    By assuming control of these documents, Gulf Air placed itself in a position of trust, creating a duty to disclose the records to the Plaintiffs..

316.    Gulf Air failed to deliver these critical records to Feras as promised, instead withholding them after the burial.

317.    This breach obstructed Feras' ability to access key information about his brother's treatment and verify whether negligence occurred.

318.     Gulf Air involved Feras in providing consent for medical decisions during Captain Alhindi's treatment, creating a duty of good faith, transparency, and full disclosure.

319.    This duty obligated Gulf Air to inform Feras of all material facts, including the hospital records that they later seized, which were crucial for understanding the cause of death and treatment adequacy.

320.    Gulf Air violated this duty by withholding the hospital records, which contained essential information,

321.    This concealment deprived Feras of the ability to make informed decisions, such as demanding further investigation or requesting an autopsy at the time of burial had he known.

322.    By seizing the hospital records, Gulf Air assumed legal custody of these documents. As a custodian, Gulf Air had a duty to disclose and return the records to Feras upon request, particularly when these documents became central to legal proceedings initiated by the plaintiffs.

**323.**   Gulf Air's refusal to return the hospital records—despite multiple formal requests and court orders—constituted a deliberate breach of this legal duty. This obstruction directly prevented Plaintiffs from pursuing legal claims against negligent parties, investigating negligence, and holding Gulf Air accountable.

**324.**   **Duty to Disclose Accurate Information to Samiha as Legal Heir:**

As Captain Alhindi's legal heir, Samiha had the right to receive accurate and timely information about:

**A.**  The circumstances of her son's death,

**B.**  The true names of the doctors involved and the procedures performed,

**C.**  Any evidence revealing negligence in his care or health monitoring.

Gulf Air failed to provide this critical information.

**D.**  The seized hospital records

**E.**  Inheritance information , life insurance Policies

**F.**  **Duty to Disclose Medical History Records**

**325.**   Gulf Air maintained internal medical records for Captain Alhindi, including fitness-to-fly evaluations and medical exams results and assessments, critical for assessing his health prior to the PCI procedure ( the 99% Blockage ).

**326.**   Gulf Air had a duty to disclose these records to the Plaintiff Samiha, investigators, the court, and the CAAB. Instead, it concealed both internal and hospital records, breaching its obligation and obstructing transparency

**327.    Gulf Air Intentionally Concealed The Facts With The Intent To Defraud**

**328.    Intent to Suppress Evidence of Negligence**

**329.**    Gulf Air deliberately withheld critical medical records essential for identifying and proving its negligence. These records directly relate to Gulf Air's long-standing failure to monitor and address Captain Alhindi's health risks.

**330.    Specific Risks Suppressed**:

    **A.**  Existence and Age of the 99% Arterial Blockage:

    **B.**  Adequacy of Health Monitoring Program

    **C.**  PCI Procedure Mismanagement

    **D.**  Hospital Negligence

    **E.**  CoPilot and Gulf Air Staff Negligence and Fraud.

**331.**    These records were indispensable for determining Gulf Air's role in contributing to Captain Alhindi's death through its failure to identify and mitigate his medical risks.

**332.**     By withholding these records and his medical records—despite multiple legal requests and court orders—Gulf Air deprived the plaintiffs of their right to independently verify negligence, request an autopsy, and initiate timely legal action.

**333.**    The plaintiffs were prevented from accessing evidence critical to determining whether Gulf Air's health monitoring program failed to detect and address long-standing medical risks, such as the Captain's 99% arterial blockage.

**334.**    If the plaintiffs had access to the cardiology reports and angiography CDs,

they could have independently verified the hospital's claims that a balloon was inserted during the PCI procedure and understood the 99% blockage exact time of build up.

**335.**    They could also assess staff statements that the Captain suffered his final heart attack upon entering the PCI room, proving delays in response and potential mismanagement.

**336.**    Gulf Air's refusal to disclose these records obstructed the plaintiffs' ability to request a timely autopsy, which could have verified the causes of death and revealed delays or procedural mismanagement during treatment.

**337.**    If the plaintiffs had been fully aware of the negligence from the airport to the PCI room, including evidence of delayed procedures and mismanagement, they would have immediately requested an autopsy to determine whether timely intervention could have saved the Captain's life and to determine the prolonged negligence by Gulf Air failures and violations that led to his death.

**338.**    Without tangible evidence from the seized hospital records, the plaintiffs' claims could be dismissed as speculative. Access to these records would have substantiated Gulf Air's systemic failures and United Hospital's negligence, enabling the plaintiffs to pursue timely legal remedies with stronger claims.

**339.**    Beginning on **December 16, 2022**, the plaintiffs formally requested Captain Alhindi's complete medical history and hospital records from Gulf Air, including health assessments, medical examinations, and records maintained by the airline's clinic.

**340.**    Despite formal requests, Gulf Air refused to provide these records, This

further obstructed the plaintiffs' efforts to hold Gulf Air accountable.

**341.**   The withheld medical Airlines records were critical for investigations and legal claims

**342.**   These records could directly contradict Gulf Air's claims of proactive health monitoring and system failures, revealing that the arterial blockage was overlooked despite routine screenings.

**343.**   Gulf Air's refusal to disclose these results concealed material delays in the Captain's treatment, further obstructing accountability.

**344.**   Potentially missing all required examinations by regulations which could have contributed to the Captain's deteriorating health.

**345.**   Gulf Air's concealment of records also raises questions about whether systemic failures allowed critical health risks to go undiagnosed.

**346.**   Gulf Air's repeated failure to comply with court orders, combined with its refusal to cooperate with investigative memos dated May 16, 2023 (Memo No. 1841), and June 25, 2023 (Memo No. 2401), demonstrates a deliberate strategy to suppress evidence and obstruct justice.

**347.**   Despite many court orders and multiple family requests issued between May 2023 and February 2024, Gulf Air failed to:

**A.**  Produce the seized medical records.

**B.**  Provide witnesses such as Co-pilot Khalil, who was directly involved in the events leading to Captain Alhindi's death.

**C.**  Disclose critical evidence, including CCTV footage, cardiology records, and procedural details.

**D.** Failed to provide his Medical Certificate Class 1. Captain Mohannad didn't have a valid Medical license or any formal identification for his hypertension.

**E.** Medical records to prove his fitness and that ICAO required exams were conducted and in Gulf Air Risk System

**348.** Gulf Air's suppression of evidence was not incidental but a calculated strategy to avoid accountability

**349.** This delay not only hindered the plaintiffs but also obstructed civil aviation authorities and investigators seeking to establish liability

**350.** By withholding critical evidence, Gulf Air avoided exposure of systemic failures and procedural mismanagement.

**351.** Gulf Air's conduct aligns with a pattern of evading regulatory scrutiny and suppressing accountability, as seen in prior cases involving similar tactics

**352.** Gulf Air's continued refusal to disclose medical records and evidence demonstrates its intent to obstruct justice. The airline deliberately prioritized its interests over transparency, depriving the plaintiffs and investigators of essential information

**353.** Gulf Air's intent to suppress evidence is evident in its refusal to comply with court orders and provide material documents, even when directly requested by plaintiffs and investigators. The timing of this suppression during active investigations further underscores its calculated effort to obstruct justice.

**354.** When plaintiff Tala attempted to file a complaint for obstruction of justice in Bangladesh, Gulf Air leveraged its influence within the judicial system to obstruct

her efforts and illegally the judge didn't accept the case patronizing the Plaintiff of going after big Airlines

355. This influence was demonstrated by Gulf Air orchestrating a coercive act against Tala at the court, where she was physically attacked by individuals allegedly sent by Gulf Air station manager Issa Shaah, who has strong connections with high officials .

356. This intimidation was not an isolated incident but a deliberate effort to deter her from pursuing further legal actions.

357. Gulf Air continues to harass the Plaintiffs mainly Tala leveraging influence inside the U.S Government

358. Gulf Air's timing of the attack, occurring immediately after Tala's attempt to hold them accountable, underscores their intent to suppress any legal or investigative scrutiny.

359. Gulf Air strategically employed delay tactics to mislead investigators, repeatedly making unfulfilled promises to produce evidence and present witnesses. These assurances were calculated to create the illusion of compliance, all while Gulf Air deliberately withheld critical evidence, leaving key claims against both the hospital and the airline unverifiable.

360. This prolonged obstruction is Gulf Air's intent to manipulate the investigative process and shield itself from accountability, further compounding the harm to the plaintiffs and the pursuit of justice.

361. Gulf Air intentionally concealed critical information about Captain Alhindi's medical unfitness to fly, including his 99% arterial blockage and its failure to

implement proper health screening systems for pilots

362.　Gulf Air was aware that revealing these systemic failures would directly impact its operational safety record, which was under scrutiny during its December 2022 DOT audit. Concealing this evidence ensured Gulf Air maintained a facade of compliance to avoid regulatory penalties and disruptions to its U.S. codeshare partnerships

363.　These omissions coincided with Gulf Air's submissions to the U.S. Government on December 22 2022, reflecting an effort to suppress material facts that could harm its regulatory standing and commercial interests.

364.　Gulf Air strategically delayed or tampered with records, including falsifying safety records, to prevent the DOT from identifying operational failures that could jeopardize its market access and partnerships with U.S. airlines.

365.　By prioritizing the protection of its DOT certification and commercial relationships, Gulf Air deliberately placed its corporate ambitions above transparency, safety obligations, and accountability.

366.　Gulf Air's decision to suppress key documents was not incidental but a calculated effort to ensure its continued access to lucrative U.S. aviation markets.

367.　Gulf Air deliberately withheld critical information about life insurance and retirement benefits from Samiha, the legal heir, while selectively disclosing these benefits to Captain Alhindi's wife.

368.　This selective disclosure was designed to sow confusion within the Captain's family, effectively stalling potential claims and dividing the legal avenues available to the plaintiffs.

**369.** Gulf Air delayed providing the death summary until after the burial, obstructing any immediate investigation or autopsy and preventing the plaintiffs from uncovering the full circumstances surrounding the Captain's death.

**370.** This delay ensured that any investigation into the cause of death, including negligence in health monitoring or emergency response protocols, was compromised, further shielding Gulf Air from liability.

**371.** These actions were calculated to minimize Gulf Air's financial liabilities by obstructing Samiha's ability to assert inheritance rights and potential claims against the airline or the hospital.

**372.** Gulf Air exploited this delay to divert attention away from its systemic failures, leveraging the lack of available evidence to weaken the plaintiffs' legal standing.

**373.** By concealing tangible evidence and delayed disclosures, Gulf Air prevented scrutiny of its operational and medical failures. The absence of these critical records effectively silenced key claims against Gulf Air, allowing it to benefit and protect its financial and legal interests during a period of heightened regulatory and commercial pressure.

**374.** Gulf Air's calculated efforts to delay investigations and obscure operational failures ensured potential estate-related disputes and negligence claims did not gain traction during its DOT audit and commercial negotiations.

**375.** Gulf Air's actions demonstrate a clear intent to manage public perception and regulatory scrutiny by obstructing legal avenues for the plaintiffs, ensuring that its financial and operational stability remained intact during critical U.S. government reviews.

376.    During this period, Gulf Air prioritized safeguarding its corporate ambitions, including securing DOT certification and maintaining codeshare partnerships, over its legal obligations to the Captain's family.

377.    By denying the plaintiffs access to evidence essential for verifying negligence and asserting inheritance rights, Gulf Air not only obstructed justice but also inflicted intentional significant financial and emotional harm, further compounding the tragedy of Captain Alhindi's death.

378.    The suppression of evidence was done  to gain an unfair advantage, protect financial interests, and evade liability.

379.     Gulf Air's suppression undermines public safety and regulatory integrity, making their actions not only a private wrong but also a public hazard.

380.    **Plaintiff Feras Was Unaware and Would Have Acted Differently**

381.    Feras's reliance on Gulf Air was reasonable, justifiable, and foreseeable, given the airline's assurances, control over critical medical records, and longstanding trust as Captain Alhindi's employer.

382.    Gulf Air's misrepresentations and omissions directly obstructed Feras's ability to uncover the truth, pursue justice, and protect his family's rights. This reliance was a substantial factor in preventing timely action, resulting in material harm to Feras and his family.

383.    Samiha's reliance on Gulf Air was reasonable and foreseeable, given its role as her son's employer and its representations of handling all matters transparently.

384.    By misrepresenting facts, withholding critical records, and concealing

insurance details, Gulf Air breached this trust, obstructing Samiha's ability to act promptly to assert her legal rights, pursue justice, and uncover the truth about her son's death. These actions materially harmed Samiha and exacerbated her loss.

**385.**    Gulf Air's fraudulent concealment of critical medical records and misrepresentation of facts caused significant emotional distress to Samiha and Feras, leaving them unable to uncover the truth about Captain Alhindi's death and denying them closure.

**386.**    The lack of transparency forced them to engage in prolonged legal battles and investigative efforts, resulting in substantial financial burdens. Samiha was further deprived of timely access to insurance benefits and her rightful claims as the Captain's legal heir.

**387.**    Tala incurred significant travel, legal, and security costs to obtain records Gulf Air should have disclosed, facing personal risks in confronting alleged criminals during her efforts to seek justice. Feras and Samiha's inability to travel compounded their distress, as they depend on Tala to represent them in Bangladesh and hold the hospital and Gulf Air accountable.

**388.**    Gulf Air's actions shielded hospital negligence and colluded to bury the case, preventing accountability and allowing further harm to occur, including the preventable death of another child.

**389.**    This obstruction exacerbated the Plaintiffs' grief, financial losses, and emotional suffering, as Gulf Air prioritized its own interests over transparency, safety, and justice

**390.** <u>**GULF AIR FRAUD (2)**</u>

**O. Fraudulent Misrepresentation of Death Summary and Hospital Records**

**391. False Representation in Death Summary**

**392.** Gulf Air, represented by its Co-Pilot Khalil Razzak, knowingly and intentionally delivered the falsified death summary from United Hospital in Dhaka.

**393.** The report, along with the Captain's belongings and phone, was handed directly to Nancy Alhendi, the sister of Amani Alhindi (the Captain's wife), at the airport.

**394.** Gulf Air's legal team and Chief of Staff Oun also attended the burial later that day, strategically excluding Feras and the Captain's mother, Samiha, from receiving any information or accessing the falsified report.

**395.** By ensuring the report was delivered through Khalil Razzak and bypassing Feras and Samiha, Gulf Air's representatives demonstrated intent to control the narrative and conceal the full truth from the rightful heirs.

**396.** The falsified death summary was delivered on December 16, 2022, at approximately 11:00 AM, an hour before Captain Alhindi's burial.

**397.** This timing ensured that Feras and Samiha had no opportunity to review or contest the contents of the report, as the burial was imminent and their focus was diverted by grief and ceremonial obligations.

**398.** Gulf Air intentionally delayed delivery of the report until shortly before the burial to limit the plaintiffs' ability to investigate or object to its inaccuracies.

**399.** The report was hand-delivered by Khalil Razzak to Nancy Alhendi at the

Amman Airport in Jordan, far removed from the other plaintiffs.

**400.**    Gulf Air's team, including legal representatives and the Chief of Staff, later attended the burial, where they continued to withhold critical information and hospital documents from Feras and Samiha.

**401.**    Later, during the funeral gathering at the family home, Gulf Air's legal team attended with retirement money and award certificates for the Captain. Despite this opportunity to disclose the full report to all plaintiffs present, including Feras and Samiha, Gulf Air chose not to do so. Instead, Gulf Air selectively disclosed the report earlier to Nancy at the airport, bypassing other heirs and ensuring limited scrutiny of its contents before the burial.

**402.**    Gulf Air's delivery of the falsified death summary at the airport, specifically to Nancy Alhendi, Captain Alhindi's wife's sister, where Feras was absent, raises questions about intent and timing

**403.**    . The timing of the delivery—an hour before the burial—effectively ensured that Feras, a plaintiff and direct heir, had no opportunity to review the document or contest its accuracy.

**404.**    If Gulf Air intended transparency, they could have disclosed the death summary and hospital records to all heirs present at the funeral gathering. This event, attended by Gulf Air's legal team with retirement money and award certificates, provided a clear and practical opportunity to share the documents openly.

**405.**    Instead, Gulf Air Co Pilot selectively handed the falsified death summary to Nancy Alhendi, the wife's sister,  at the airport, where key plaintiffs such as Feras

and Samiha were absent. This decision ensured limited scrutiny of the report and prevented immediate questions about its accuracy.

406.    The envelope containing the Captain's belongings and death summary was handed over by co-pilot Khalil Razzak, who was aware of discrepancies in the timeline and omissions but did not disclose this information to Nancy.

407.    The death summary was delivered without accompanying hospital documents that were critical for verifying the timeline of care, medical treatment provided, and procedural delays.

408.    The absence of these records concealed evidence of negligence and created a misleading impression of Gulf Air's and United Hospital's actions.

409.    The false report was part of Gulf Air's attempt to deflect responsibility for the Captain's condition and conceal medical negligence, while presenting a misleading narrative to protect their reputation and avoid liability during their DOT application process.

410.    The misrepresentation concealed the airline's lack of proper medical oversight and the negligence in care provided to the Captain at a hospital that's known for malpractice.

411.    Khalil Razzak, as the co-pilot, was in direct communication with Gulf Air's Incident Operations Center (IOC) throughout the timeline of events and delivered the death summary along with the Captain's belongings. Khalil did not falsify the death summary nor claim it was inaccurate.

412.    Statements obtained during legal proceedings confirm that Khalil was aware of discrepancies in the timeline and omissions in the report, including the

absence of Dr. Omar Farouk during critical treatment periods. Despite this knowledge, Khalil presented the death summary to the family without clarification, acting under Gulf Air's directives.

413.   Gulf Air presented a statement by Co Pilot Khalil to the court, Plaintiff Tala due to her conversations with the Co Pilot prior to the death alleges the Gulf Air falsified that statement, and prevented Khalil from coming to the court to testify.

414.   After conducting surveillance  on Plaintiff Tala  in Bangladesh and by leveraging information on her actions in the legal proceeding, Gulf Air manipulated the witness's appearances and tried to  allegedly bribe the court investigator.

415.   **The False Information in the Hospital Death Summary**

### A.  Arrival

416.   The death summary falsely implied that Captain Alhindi received prompt care upon arrival, stating an admission time inconsistent with actual events. Evidence shows that Captain Alhindi became incapacitated at Dhaka Airport at 3:50 AM and did not arrive at United Hospital until approximately 4:30 AM on December 14, 2022, as confirmed by Gulf Air's own submissions in court.

417.   This falsified timeline obscures the delays in transportation and admission that critically affected Captain Alhindi's chances of survival.

### B.  Misrepresentation of Doctor's Presence

418.   The death summary falsely listed "Professor Omar Farouk" as the attending physician during Captain Alhindi's treatment. However, court investigations confirmed that Dr. Farouk was not present. Instead, Captain Alhindi was treated

by junior, underpaid doctors with limited qualifications, contradicting the false

impression of expert medical care.

419.    By falsely naming an esteemed doctor, Gulf Air aimed to fabricate the

appearance of high-quality medical oversight to absolve themselves and United

Hospital of negligence.

### C.  Delay in Critical Care:

420.    Despite the Captain's critical condition, there was a 90-minute gap after

admission during which no significant treatment was administered. This delay

occurred even though Captain Alhindi was presenting with a 99% arterial

blockage requiring urgent intervention.

421.    This prolonged inaction significantly reduced the Captain's chances of

survival and constituted a failure to meet the standard of emergency medical

care.

### D.  ECG Timeline Inconsistency

422.    The death summary reported that an ECG was conducted at 4:42 AM, shortly

after admission. However, this timeline conflicts with the actual delay in care and

admission timeline,

423.    This inconsistency undermines the credibility of the entire death summary and

suggests a deliberate attempt to obscure gaps in critical care.

### E.  Gap in Critical Care Between Admission and First Cardiac
### Arrest:

424.    Between 4;30 am,  6:30 AM (admission) and 7:30 AM (when Captain Alhindi

suffered his third heart attack), the hospital provided no meaningful interventions,

despite the Captain's critical condition.

**425.**　The lack of timely intervention during this critical period likely contributed to the severity of the Captain's condition and eventual death.

### F.　Delay in PCI Procedure:

**426.**　The PCI procedure, necessary to address the Captain's arterial blockage, was delayed until 10:30 AM, nearly six hours after his incapacitation and injury . Gulf Air's refusal to give consent for the procedure delayed its commencement by over an hour, exacerbating the harm.

**427.**　This delay, directly caused by Gulf Air's refusal to provide timely consent, demonstrates a failure to prioritize the Captain's urgent medical needs over procedural or administrative concerns.

### G.　Irregularities

**428.**　There was no name of a cardiologist or any cardiovascular tests.

**429.**　The Name of The Death Certificate signature is an OBGYN doctor

**430.**　There was no records of any medication given

**431.**　The hospital ran unnecessary blood tests for Vitamins piling up the invoice.

**432.　Knowledge of Falsity**

**433.**　 **Actual Knowledge of the Timeline**:

**434.**　Gulf Air had precise knowledge of the incident timeline through direct and contemporaneous reporting by the Co-Pilot and crew. The flight cancellation process required accurate documentation of events, ensuring that Gulf Air's headquarters and key representatives were fully aware of the Captain's incapacitation at 3:50 AM and his arrival at United Hospital at 4:30 AM.

**435.**    Gulf Air's obligation to maintain accurate operational records, as part of its standard protocol, Gulf Air was required to document the precise incident timeline for flight cancellation and crew reporting, leaving no room for unawareness or error in the timeline.

**436.**    Co-Pilot Khalil was in constant contact with the Incident Operations Center (IOC) at Gulf Air's Bahrain headquarters, as confirmed by his own statements. This direct line of communication ensured that Gulf Air's senior leadership was immediately informed of all developments, including the actual admission time and the absence of qualified medical personnel.

**437.**    Court documents show Gulf Air agent signing the admission to the hospital documents and consents for treatment.

**438.**    The headquarters, tasked with incident coordination and real-time updates, was fully aware of the facts on the ground through Khalil's continuous reporting, ensuring Gulf Air's leadership could not claim ignorance of key discrepancies in the death summary.

**439.**    Gulf Air representatives, including Khalil and Issa, signed admission papers and were present at the hospital throughout Captain Alhindi's treatment. They knew that Dr. Omar Farouk did not arrive at the hospital until after 9:30 AM, contradicting the death summary's claim that he was the attending physician from the outset.

**440.**    This fact is corroborated by hospital records and eyewitness accounts, which confirm that junior underpaid doctors, not Dr. Farouk, handled Captain Alhindi's care until hours after admission.

**441.** Gulf Air's actions, including signing inaccurate admission documents and approving the falsified death summary, is an intentional manipulation of facts to present a false narrative. This misrepresentation served to absolve Gulf Air and United Hospital of negligence and deflect scrutiny during Gulf Air's DOT application process.

**442.** The misrepresentation aligns with Gulf Air's ongoing efforts to protect its operational reputation and maintain regulatory compliance, particularly during its DOT application and codeshare partnership reviews.

**443.** Gulf Air's representatives exploited the chaotic and emotionally charged circumstances surrounding Captain Alhindi's death and burial. By delivering the falsified report shortly before the burial, Gulf Air intentionally limited the plaintiffs' ability to question or verify its contents

**444.** The timing of only the report delivery, just an hour before the burial, evidences Gulf Air's calculated strategy to exploit the plaintiffs' grief and preclude immediate scrutiny.

**445.** Gulf Air's actions reflect a broader pattern of deliberate concealment and misrepresentation. The same representatives withheld critical hospital documents and failed to disclose delays in treatment, gaps in critical care, and the lack of qualified medical oversight, further demonstrating knowledge of falsity.

**446.** This pattern of withholding material information and fabricating timelines demonstrates Gulf Air's intent to mislead the plaintiffs and obstruct accountability.

**447.** **Intend to Reduce Reliance**

**448.** Feras and Samiha reasonably relied on Gulf Air's representations due to the

trust built over Captain Alhindi's 30 years of employment with the airline. Gulf Air, as the custodian of his medical records and a position of authority, was expected to act in the captain and plaintiffs best interests and provide accurate information.

**449.**   The falsified death summary, which is named **Professor Dr. Omar Farouk** as the attending physician, created the false impression that expert medical care had been provided, misleading the plaintiffs into believing no further investigation was necessary.

**450.**   Acting on Gulf Air's assurances, Feras and Samiha buried Captain Alhindi, believing the narrative that he had received the best possible care. This decision, influenced by Islamic burial practices discouraging autopsies, prevented an immediate examination into the quality of medical treatment.

**451.**   The plaintiffs also filed a criminal case against Dr. Omar Farouk, relying on Gulf Air's falsified death summary that named him as the attending physician. For 11 months, they pursued this case until a court investigation revealed that Dr. Farouk was not at the hospital during Captain Alhindi's treatment and only arrived after 9:30 AM, well after critical delays in care had already occurred.

**452.**   The inclusion of Dr. Omar Farouk's name as the attending physician in the death summary was materially significant. It concealed the fact that junior, under qualified doctors were responsible for critical decisions during Captain Alhindi's treatment. This misrepresentation directly shaped the plaintiffs' decisions to

  **A.**  Trust Gulf Air's narrative.

  **B.**  Forego immediate scrutiny of the records.

  **C.**  File a criminal case against an individual who was not present during the

critical timeline of care

    D.  Unjust profit of Gulf Air codeshare approval while the Plaintiff spent money on investigation and legal proceedings.

**450.**  Gulf Air deliberately timed the delivery of the falsified death summary an hour before the burial, ensuring the plaintiffs could not act promptly to verify its contents or request an autopsy.

**451.**  By omitting additional hospital records and selectively disclosing incomplete information, Gulf Air reinforced the plaintiffs' reliance on the falsified narrative. The airline's actions exploited the plaintiffs' emotional distress and lack of access to independent information, ensuring their reliance was unavoidable under the circumstances.

**452.**  The burial of Captain Alhindi based on the belief that no further investigation was necessary.

**453.**  The misdirected filing of a criminal case against Dr. Omar Farouk, delaying accountability for those truly responsible for the substandard care.

**454.**  Emotional distress and financial costs incurred over **11 months** to uncover the truth through court proceedings.

**455.**  Delayed discovery of negligence in Captain Alhindi's treatment, which could have been addressed earlier had the plaintiffs known the truth

### e. Public False Statement

**456.**  Gulf Air falsely claimed in public statements that Captain Alhindi received optimal care and that his death was unavoidable. The airline's pattern of making "maliciously false statements" to authorities and the public, consistent with prior

cases.

**457.** Internal communications between Gulf Air's IOC and the co-pilot, dated December 14, 2022, in Co Pilot Statement documents delays in emergency response and acknowledged the negligence of Gulf Air providing the medical history in Emergency. These communications directly contradicted Gulf Air's public claims of optimal care, evidencing the airline's intent to suppress the truth.

**458.** In more incidents, including Criminal Case cases and High court cases, Gulf Air submitted falsified documents and statements to authorities and regulators, demonstrating a systemic pattern of misrepresentation. This consistent behavior is Gulf Air's deliberate strategy to prioritize reputation over transparency.

**459.** By delivering the falsified death summary an hour before the burial, Gulf Air exploited the plaintiffs' grief and cultural practices, obstructing their ability to scrutinize the report or request an autopsy. This timing was a calculated effort to prevent further investigation.

**460.** Gulf Air's refusal to present co-pilot Khalil Abdulrazak, despite multiple court orders, demonstrates its deliberate efforts to suppress key evidence. This refusal delayed accountability and obstructed the plaintiffs' ability to uncover the truth.

**461.** During its DOT application process, Gulf Air submitted incomplete safety reports, omitting incidents of crew medical negligence, including Captain Alhindi's case. These omissions were aimed at securing regulatory approval while concealing systemic failures

**462.** Statements from the crew members contradicted Gulf Air's public narrative, revealing the airline's awareness of inadequate care and failures in emergency

response.

**463.**    Gulf Air's consistent behavior, both before and after Captain Alhindi's death, demonstrates a systematic pattern of making false statements to authorities and misrepresenting the truth without fear of consequences, as evidenced in this case and prior incidents.

**464.**    Had the plaintiffs known the truth—that Gulf Air prioritized its regulatory standing and commercial interests over transparency—they would have acted different

**465.**    Samiha's efforts to seek legal recourse and uncover the true circumstances of her son's death were obstructed by Gulf Air's misrepresentations.

### f.  Duty to preserve evidence

**468.**    Gulf Air was aware or should have been aware of its obligation to retain all relevant evidence once it became clear that litigation was likely. This obligation arises as soon as an incident occurs, especially in a matter involving potential legal claims like wrongful death. Gulf Air breached this duty and violated ICAO 13 by not preserving evidence

**469.** **FRAUD**

**470.** **Gulf Air False Representation**

    **A. Media Representation – January 2023**:

**471.** On January 29, 2023, Gulf Air issued a public statement falsely claiming that Captain Alhindi collapsed at a hotel and was transferred to United Hospital under a pre-existing agreement between the hotel and the hospital. These statements were made to counter the plaintiff's accusations of negligence and divert attention away from the Captain's actual collapse at Dhaka Airport while on duty. Gulf Air strategically maintained this false narrative during its ongoing DOT application process to protect its regulatory standing.

    **B. False Media Representation – September 2023**:

**472.** Gulf Air falsely claimed full cooperation with the Bangladesh Police Bureau of Investigation (PBI) and compliance with court orders during a critical period of regulatory negotiations with the U.S. government. Evidence showed Gulf Air obstructed the investigation by withholding documents, failing to produce witnesses, and ignoring multiple court directives.

**473.** These statements misled the public and authorities while protecting Gulf Air's commercial interests, including a bilateral aviation agreement signed in September 2023

**474.** Gulf Air falsely presented themselves to the Public as the government knows but chooses to turn their head as displayed by the FAA legal team.

**475.** The U.S. government is very aware of the negligence of Gulf Air in the death of the Captain, despite Gulf Air thinking they deceived them and concealed it, yet

the government chose to allow them to continue harassing the Plaintiffs and endanger the public.

**476.    Alleged False Representations**

**477.    DOT Applications**: Gulf Air is accused of making false representations in their Department of Transportation (DOT) applications and certificate for codeshare exemption applications from 2017 to 2024

**478.    Law Enforcement Statements**: False statements made to the Police Bureau Investigation during April, May, June, July, and September 2023

**479.    Civil Aviation Authority Of Bangladesh** : Gulf Air made false representations and submitted false statements and documents to the Civil Aviation Authority of Bangladesh (**CAAB**) in July 2023.

**480.    Public Promotions**: The airline have made false promises to the public about non-stop flights to New York from 2019 to 2024

**481.    Recruitment Advertisements**: Gulf Air false representation in recruitment ads targeting the U.S. public in April 2023.

**482.    False Audit Documents** to IOSA, AA and CAAB

**483.    False Replies** to the Family June 2023

### E.  SECOND DEFENDANT AMERICAN AIRLINES ( AA)

**484.**  <u>**NEGLIGENCE & BREACH OF DUTY**</u>

**485.**  **Duty to Ensure Safety Compliance**:

**486.**  As part of its codeshare partnership with Gulf Air, American Airlines (AA) had a regulatory duty under FAA/DOT guidelines to ensure that Gulf Air complied with safety standards, including crew fitness and operational safety.

**487.**  This duty extended to auditing Gulf Air's compliance and acting on credible safety concerns to protect passengers, crew members, and public trust.

**488.**  AA continued to certify Gulf Air as compliant, misrepresenting its safety status and allowing the systemic deficiencies to persist

**489.**  **Notification of Safety Violations**:

**490.**  In April, Plaintiff Tala formally notified AA's CEO and legal team twice, providing credible evidence of Gulf Air's systemic safety violations. The notifications included specific instances of prior crew incapacitations, Gulf Air's failure to comply with FAA/DOT regulations, and the risk of continued unsafe operations. These communications were sufficient to trigger AA's duty to investigate or at least acknowledgement and report it.

**491.**  **Duty to the Captain (Alhindi):** AA had a duty to ensure Gulf Air's compliance with safety regulations, particularly regarding the fitness of its crew, including pilots, to prevent risks such as medical incapacitation during flight. American Airline had a duty to protect the crewmembers and the public

**492.**  **Duty to the Plaintiffs (including Plaintiff Tala):**

AA had a duty to the plaintiffs as part of the public and tax payers, including loyal

customer Tala, who relied on AA's safety assurances in its codeshare agreements. AA was expected to ensure Gulf Air's compliance with safety standards, which would directly impact passenger safety and public trust.

493.    **Duty to the Public and Passengers,** As a U.S. carrier, AA had a duty to protect the public and passengers by ensuring they are partnering with a safe airline and Gulf Air's operational safety through regular audits and oversight, thereby upholding public trust in aviation safety.

494.    AA had a fiduciary, trust, loyalty, foreseeability and reliance duty to prioritize the safety of U.S. passengers over financial interests, ensuring that taxpayer resources were used effectively for regulatory oversight, not undermined by negligence.

495.    AA had Heightened duty to Gulf Air fatal accidents and constant failure of Bahrain in obtaining safety required level and (IASA) By FAA.

496.    AA breached its duty by failing to conduct meaningful audits of Gulf Air, as required by DOT and FAA regulations. This failure allowed Gulf Air's safety violations, including inadequate medical examinations and crew incapacitation risks, to go undetected.

497.    AA's failure to investigate Gulf Air's systemic safety violations undermined public confidence in FAA/DOT-regulated codeshare partnerships. By certifying Gulf Air as compliant without taking appropriate action, AA contributed to an ongoing risk to passengers, crew, and the integrity of aviation safety regulations.

498.    Despite the credible and actionable information provided, AA failed to acknowledge the notifications or take any meaningful action. AA did not initiate

an audit, investigate Gulf Air's safety compliance, or report the issues to FAA/DOT.

**499.**    Had AA performed the required audits, these risks would have been identified, preventing Captain Alhindi's incapacitation. As a result, his medical condition would have been addressed, and his preventable death would have been avoided.

**500.**    Given Gulf Air's documented history of safety violations, including prior incidents related to crew incapacitation, AA should have foreseen the risks of not conducting thorough audits.

**501.**    The failure to detect violations and safety lapses was entirely foreseeable, as inadequate medical screening and unfit crew members posed a clear danger to both crew and passengers.

**502.**    It was foreseeable that continuing the codeshare relationship without proper oversight could lead to a tragic incident, such as Captain Alhindi's incapacitation

**503.**    As a direct result of AA's failure to audit Gulf Air's compliance with safety regulations, Captain Alhindi's incapacitation occurred, leading to his preventable death. The plaintiffs significant emotional and financial harm, including grief, loss of companionship, and litigation costs.

**504.**    AA's failure to act allowed Gulf Air to operate with unfit crew members, directly contributing to Captain Alhindi's preventable incapacitation and death. The risks were foreseeable given Gulf Air's history of violations.

**505.**    Plaintiff Tala, a loyal AA customer, endured emotional distress and loss of trust in aviation safety due to AA's failure to protect passengers and ensure Gulf Air's compliance with safety standards.

**506.**    AA's failure to act directly contributed to the harm experienced by Tala. If AA had fulfilled its duty by auditing or investigating Gulf Air, Tala would not have been forced to take independent further legal actions.

**507.**    AA's inaction allowed Gulf Air's systemic violations to remain unaddressed, perpetuating the risks and forcing Tala to escalate her efforts through press releases, conferences, and litigation.

**508.**    Had AA  acknowledged or investigated Tala's concerns it would have mitigated and eliminated the need for her advocacy efforts

**509.**    Plaintiff Tala notified both American Airlines (AA) and United Airlines of Gulf Air's systemic safety violations. While United Airlines responded promptly, contacting Tala within a day and initiating a complaint and safety alert, AA failed to acknowledge or act on the same credible concerns.

**510.**    United's proactive response demonstrates reasonable industry conduct, while AA's inaction reflects a clear deviation from expected practices. This negligence forced Tala to escalate her efforts through press releases and litigation, undermining her trust in AA's codeshare operations and commitment to safety compliance.

**511.**    AA failed to adhere to its own protocols for handling safety-related complaint

512.    AA's decision to continue its partnership with Gulf Air without taking any proactive action directly contradicts the expectations of a reasonably prudent airline and demonstrates a reckless disregard for safety.

513.    It was entirely foreseeable that AA's failure to act on credible safety concerns would harm individuals like Tala, who relied on AA's representations of safety in its codeshare partnerships.

514.    AA was already aware of Gulf Air's systemic safety deficiencies prior to her notifications, as part of their regulatory obligations to monitor codeshare partners. Gulf Air had a history of violations known to AA (such as reports from other codeshare audits, industry safety alerts, or prior passenger complaints)

515.    AA could have reasonably anticipated that ignoring the safety risks posed by Gulf Air would lead to escalated actions by those seeking accountability, including financial and emotional harm to whistleblowers like Tala.

516.    AA has formed a pattern lately of failing to adequately audit and adhere to regulations displayed by the latest Sanctions by DOT

517.    The Death of Captain Alhindi caused grief and trauma resulting from the preventable death of their son and brother. Separately from the Psychological harm caused by the two-year fight for justice amidst harassment and obstruction and traveling to unsafe country where Gulf Air could be another boeing

518.    Tala's profound anxiety and fear of flying stemmed from Gulf Air and American Airlines' failure to adhere to safety standards.

519.    AA has disappointed the American people, the public and the Plaintiffs.

520. The plaintiffs' collective loss of confidence in aviation safety affected their ability to travel freely

521. **AMERICAN AIRLINE &FAA AUDIT CERTIFICATE of GULF AIR**

522. **False Representation of Audit Certificates submitted to the FAA**

523. **Duty to Act Honestly and Accurately**

524. Under DOT Order DOT-OST-2008-0195, FAA/DOT guidelines and DOT orders, AA was required to conduct audits and submit accurate certifications of Gulf Air's safety compliance. AA neglected this duty, failing to identify Gulf Air's repeated safety violations, such as crew incapacitation and medical screening failures.

525. American Airlines had to Audit Gulf Air upon commencing renewal of codeshare and submit truthful certificates to the FAA upon completing the audit.

526. American Airlines (AA), through its compliance team, legal counsel, and executive leadership and relevant staff at its headquarters in Fort Worth, Texas, was responsible for preparing, reviewing, and electronically submitting safety audit certifications for Gulf Air to the FAA in Washington, D.C.

527. These individuals acted with reckless disregard for the truth of the certifications, knowing or having reason to know that Gulf Air had failed to comply with FAA/DOT regulations and ICAO safety standards.

528. **2016 through 2023**: AA was obligated to conduct safety audits and submit truthful certifications as part of its codeshare agreement renewal and FAA/DOT oversight obligations.

**529. April 19 and 22, 2023**:  On April 19 and 22, 2023, plaintiffs sent detailed court documents and correspondence to AA's U.S. offices, providing evidence of Gulf Air's systemic safety violations. These included unreported crew incapacitations, medical examination failures, and breaches of ICAO safety standards.

**530. April 28, 2023**: Despite being in possession of this credible evidence, AA electronically submitted the fraudulent certifications to the FAA in Washington, D.C., as part of the final approval process for Gulf Air's foreign air carrier permit.

**531. False Representations or Omissions**:

**532.** American Airlines (AA) explicitly certified that Gulf Air "Meets the Criteria" for FAA/DOT and ICAO safety compliance in audit submissions required for codeshare agreements and foreign air carrier permit renewals. This certification falsely affirmed that Gulf Air complied with ICAO Annexes 1 (Personnel Licensing), 6 (Operation of Aircraft), 13 (Aircraft Accident Investigation), and 19 (Safety Management).

**533. Failure to Conduct Proper Audits**:

AA's certification relied on evaluation criteria incorporating ICAO standards, which required detailed performance checks of Gulf Air's safety practices, including medical fitness of crew, accident reporting, and operational compliance. AA either failed to perform these required audits as mandated or conducted them negligently, overlooking systemic violations such as:

   **A.** Unreported crew incapacitations.

   **B.** Medical screening failures.

   **C.**  Gulf Air's inability to comply with ICAO safety and operational regulations.

   **D.**  Gulf is Violating DOT order and the Public Interest

   **E.**  Gulf Air is vomiting deceptive practice and Frauding the consumers mainly

   **F.**  Failure to report and investigate and address

   **G.**  False Advertising targeting DC and NY

**534.**  AA knowingly or recklessly submitted these certifications electronically to the FAA in Washington, D.C., despite credible evidence, including plaintiffs' notifications, detailing Gulf Air's safety deficiencies. This misrepresentation misled the FAA into believing Gulf Air complied with all necessary safety standards.

**535.**  AA failed to act on credible evidence received from plaintiffs on April 19 and 22, 2023, which outlined Gulf Air's systemic safety violations. Instead of conducting a thorough investigation or disclosing these deficiencies, AA submitted certifications that fraudulently affirmed Gulf Air's compliance.

**536.**  The certification was a critical component of FAA's decision-making process for Gulf Air's foreign air carrier permit approval. By falsely claiming that Gulf Air met all safety standards, AA materially influenced the FAA's final approval on April 28, 2023, enabling Gulf Air to continue unsafe operations.

**537.**  AA's falsification was not an error but a deliberate or reckless act. The certifications were submitted knowing or having reason to know that Gulf Air's operations were non-compliant with FAA/DOT regulations and ICAO standards. This act of falsification undermined the integrity of regulatory oversight and public safety.

**538.**   These certificates would have been submitted after the audit, including 2016 up until 2024, obligating AA to audit upon renewal with Gulf Air or every five years or as required by FAA Guideline every two years

**539.   AA's Knowledge of Violations**:

AA's legal and compliance teams received this information prior to the DOT's final order on April 28, 2023, approving Gulf Air's foreign air carrier permit. Despite this, AA failed to act on or disclose the evidence of Gulf Air's safety deficiencies.

**540.   False Certifications Submitted**:

After receiving credible evidence of Gulf Air's violations, AA knowingly or recklessly submitted false certifications to the FAA in Washington, D.C., affirming Gulf Air's compliance with FAA/DOT safety standards, including ICAO requirements.

**541.**   AA's failure to disclose Gulf Air's safety violations breached DOT regulations, depriving the FAA of critical information to identify risks and enforce compliance, undermining the purpose of the audit certifications.

**542.   RELIANCE Plaintiff Tala**

**543.**   Tala reasonably relied on AA's certifications and codeshare partnership, believing they endorsed Gulf Air's compliance with FAA/DOT and ICAO safety standards. As an AAdvantage member and frequent traveler, she trusted AA had vetted Gulf Air to ensure passenger safety.

**544.**   Tala's reliance was justified because she lacked access to Gulf Air's operational records or audit findings, which were within AA's superior knowledge.

She trusted AA's reputation as a leading U.S. airline, assuming its codeshare partners adhered to strict safety protocols under FAA and DOT oversight.

545.    While other factors influenced her travel choices, AA's representation of Gulf Air as a vetted and safe codeshare partner significantly impacted her decision to fly with them. The codeshare arrangement created a reasonable belief that Gulf Air's operations met the same safety standards as AA's own.

546.    Tala's trust was based not only on regulatory certifications but also on AA's decision to partner with Gulf Air. She believed AA, as a trusted U.S. carrier, would ensure its partners met the highest safety standards, validating her choice to fly with Gulf Air.

547.    As a member of the public and an international traveler, Tala could not independently verify Gulf Air's safety. She reasonably relied on AA's superior knowledge and obligation to ensure its codeshare partners adhered to strict safety standards

548.    Tala suffered emotional distress and financial harm due to AA's continued concealment of Gulf Air's systemic deficiencies. Her reliance on AA's partnership and failure to act forced her to independently address Gulf Air's safety violations, incurring significant expenses.

549.    Tala reasonably expected AA, a reputable U.S. airline, to ethically investigate safety concerns about its codeshare partners. AA's failure to act, prioritizing financial interests over safety, compounded her harm.

550.    Passengers, including Tala, reasonably relied on the FAA's regulatory framework and AA's certifications as assurances that Gulf Air met stringent safety standards required for international codeshare operations.

551.    The public could not reasonably investigate complex safety regulations and relied on the FAA and trusted carriers like AA to ensure codeshare partners' compliance with safety standards.

552.    Passengers and plaintiffs assumed FAA-vetted codeshare agreements, supported by AA's certifications, reflected rigorous audits and compliance with global safety standards.

553.    The DOT's approval of Gulf Air's codeshare agreement, based on AA's certifications, implied Gulf Air's compliance with FAA/DOT safety standards, reinforcing public trust in its operations.

554.    AA's certifications misled passengers and the public, creating a false sense of security that Gulf Air had been rigorously vetted and met safety expectations, directly influencing travel decisions.

555.    AA's failure to disclose Gulf Air's deficiencies, such as unreported incapacitations and medical examination failures, denied passengers and plaintiffs the opportunity to make informed travel decisions, perpetuating risks and harm.

556.    The public and plaintiffs relied on AA's superior knowledge of Gulf Air's operations and safety compliance. Certifications submitted under FAA oversight implied trustworthiness and transparency, reinforcing reliance on AA's assurances.

**557.**    This reliance was justified because AA, as a major U.S. carrier, had a heightened responsibility to ensure codeshare partners complied with safety regulations. Plaintiffs had no reason to doubt that AA had audited Gulf Air and disclosed any deficiencies.

**558.**    Plaintiffs suffered harm due to misplaced reliance. If AA had disclosed Gulf Air's violations, FAA intervention or corrective actions could have mitigated risks, preventing harm and enabling safer travel choices.

**559.**    By failing to disclose Gulf Air's deficiencies, AA perpetuated unsafe practices and undermined public trust in regulatory frameworks and codeshare agreements, directly contributing to Tala's harm.

**560.**    Certifications submitted by AA to regulators acted as implicit safety assurances relied upon by plaintiffs and employees. Plaintiffs lacked access to Gulf Air's operational details and reasonably trusted AA's superior knowledge and regulatory obligations.

**561.**    FAA approvals, influenced by certifications, led passengers and crew to assume safety compliance despite the certifications not being publicly disseminated.

**562.**    If AA had disclosed Gulf Air's violations to the FAA, corrective actions could have reduced plaintiffs' exposure to unsafe conditions. Concealment of violations was a proximate cause of harm, as transparency in safety audits is essential to FAA intervention and risk mitigation.

**563.    Influence of AA's Certifications on FAA Approvals**:

**564.**    AA's submission of certifications affirming Gulf Air's compliance with FAA/DOT and ICAO standards materially influenced the FAA's approval of Gulf Air's codeshare agreement. This approval shielded Gulf Air's deficiencies from scrutiny, allowing it to operate under the illusion of safety compliance and creating systemic risks.

**565.**    By failing to verify and disclose Gulf Air's safety violations, AA deprived the FAA and DOT of critical information necessary for regulatory oversight. This omission enabled Gulf Air's unsafe practices, including inadequate medical screenings and repeated incapacitations.

**566.**    AA's false certifications directly contributed to Gulf Air operating unchecked, leading to repeated safety violations, including the Captain's incapacitation and death. These certifications acted as a regulatory shield, perpetuating unsafe conditions that foreseeably harmed passengers and crew.

**567.**    The absence of corrective actions due to AA's failure to disclose Gulf Air's deficiencies left unsafe conditions unaddressed, creating a foreseeable chain of events that increased risks for passengers, crew, and the public.

**568.**    Had AA fulfilled its duty to verify and disclose Gulf Air's noncompliance, the FAA could have imposed corrective measures to mitigate risks. AA's omissions directly caused plaintiffs' financial and emotional harm, including legal expenses, travel costs, and prolonged distress.

**569.**    By ignoring warnings about Gulf Air's safety violations, AA exacerbated harm to plaintiffs and the public. The approval of Gulf Air's codeshare agreement under

false pretenses exposed passengers and crew to preventable risks, making AA's omissions a substantial factor in the harm suffered.

**570.    Tangible Costs to Plaintiffs**:

AA's breach of duty caused plaintiffs significant financial harm, including legal fees and international travel expenses, to address Gulf Air's systemic safety violations directly linked to AA's failure to fulfill its obligations.

**571.**    By falsely portraying Gulf Air as compliant, AA enabled its unsafe operations to persist, leading to repeated safety violations, including incapacitations and the Captain's death, which directly harmed the plaintiffs.

**572.**    AA's certifications carried regulatory weight, shielding Gulf Air from scrutiny and perpetuating unsafe conditions. This misrepresentation foreseeably allowed systemic risks to escalate, directly impacting the plaintiffs.

**573.**    AA's failure to disclose Gulf Air's violations perpetuated systemic risks and misled regulators. Shielding Gulf Air from scrutiny foreseeably allowed safety failures, including incapacitations, to persist and escalate.

**574.**    AA's omissions undermined public trust in codeshare agreements, creating a false sense of safety that misled passengers, crew, and regulators into assuming compliance with safety standards.

**575.**    AA's continuous omission of Gulf Air's safety violations foreseeably enabled Gulf Air to expand unsafe practices, resulting in preventable harm to passengers, crew, and plaintiffs.

**576.**    By failing to report Gulf Air's deficiencies, AA perpetuated safety risks, foreseeably exposing passengers, crew, and the public to harm, including incapacitations and fatalities.

**577.**    Plaintiff Tala endured extended travel to Bangladesh and multiple trips due to AA's inaction, filing legal requests to force investigation into Gulf Air's violations.

**578.**    Relying on DOT-vetted codeshare agreements, plaintiffs took longer and costlier flight routes to avoid the risks associated with flying on an inadequately vetted airline

**579.**   **Gulf Air Violation of Public Interest**

**580.**   Gulf Air breached public interest

    **A.   49 U.S.C. § 40101(a)(1) "Assigning and maintaining safety as the highest priority in air commerce."**

    **B.   49 U.S.C. § 40101(a)(7)**"Providing the highest level of safety in air transportation that is consistent with the safe operation of the system.

**581.**   Gulf Air violated 49 U.S.C. § 40101(a)(1) and § 40101(a)(7) by failing to prioritize and maintain safety as the highest priority in air commerce.

**582.**   Gulf Air failed to comply with DOT Orders (2008, 2019, 2022), neglecting to identify, mitigate, and report safety hazards as required by ICAO Annex 6 and 19.

**583.**   Gulf Air did not implement an effective Safety Management System (SMS) or Fatigue Risk Management System (FRMS), leading to recurring safety threats.

**584.**   Gulf Air allowed unfit crew members to operate flights, neglecting medical fitness evaluations and failing to address medical emergencies involving crew.

**585.**   Gulf Air's failure to implement corrective measures after prior safety incidents directly contributed to Captain Alhindi's incapacitation and death.

**586.**   Gulf Air submitted fraudulent certifications to the DOT, misrepresenting compliance with FAA and ICAO standards, thereby obstructing regulatory oversight.

**587.**   Gulf Air misled codeshare partners, including American Airlines, about its safety compliance, undermining the FAA's Code-Share Safety Program.

**588.**   Gulf Air concealed incidents of crew incapacitation, obstructing the FAA's ability to enforce safety priorities and preventing necessary corrective actions.

**589.**    Gulf Air's systemic failures and disregard for ICAO Annex 6 and 19 fostered unsafe conditions, foreseeably compromising the safety of passengers and crew.

**590.**    Gulf Air's actions undermined FAA and DOT oversight, eroding trust in the collaborative aviation safety framework and compromising public safety.

**591.**    Gulf Air's violations of DOT Orders (2008, 2019, 2022) and ICAO Annexes 6 and 19 directly compromised public safety by perpetuating systemic deficiencies in safety management and risk mitigation. The airline's failure to implement effective Safety Management Systems (SMS) and Fatigue Risk Management Systems (FRMS) foreseeably led to unsafe operating conditions.

**592.**    These violations not only exposed passengers and crew to preventable risks but also resulted in Captain Alhindi's incapacitation and death, directly linking Gulf Air's systemic negligence to harm suffered by him and the plaintiffs.

**593.**    Gulf Air's actions undermined the statutory mandate under 49 U.S.C. § 40101(a)(1) and § 40101(a)(7) to prioritize and maintain safety in air commerce. By concealing incidents of crew incapacitation and submitting fraudulent certifications to regulators, Gulf Air obstructed oversight mechanisms designed to protect public safety.

**594.**    These failures extended the harm beyond the immediate victims, jeopardizing the safety of passengers, crew, and the broader public who rely on transparent and accountable aviation practices.

**595.**    The airline's non-compliance with DOT mandates and ICAO standards created a pattern of foreseeable harm, demonstrating a disregard for the safety of those entrusted to its care. The resulting harm to the plaintiffs and the public

reflects Gulf Air's willful negligence in fulfilling its obligations, eroding trust in aviation safety systems and contributing to the Captain's preventable death.

**596.**    Gulf Air's repeated violations of 49 U.S.C. § 40101(a)(1) and § 40101(a)(7), through its non-compliance with DOT Orders (2008, 2019, 2022) and ICAO Annexes 6 and 19, breached its statutory duty to assign and maintain safety as the highest priority in air commerce.

**597.**    These violations led to a pattern of preventable safety hazards, including repeated crew incapacitations, which foreseeably culminated in Captain Alhindi's incapacitation and death, demonstrating Gulf Air's systemic disregard for its legal obligations and public safety.

**598.**    Gulf Air's repeated violations of 49 U.S.C. § 40101(a)(1) and § 40101(a)(7), through its non-compliance with DOT Orders (2008, 2019, 2022) and ICAO Annexes 6 and 19, breached its statutory duty to assign and maintain safety as the highest priority in air commerce.

**599.**    These violations led to a pattern of preventable safety hazards, including repeated crew incapacitations, which foreseeably culminated in Captain Alhindi's incapacitation and death, demonstrating Gulf Air's systemic disregard for its legal obligations and public safety.

**600.**    **Statute: 14 CFR § 212.10 – Statement of Authorization**

**601.**    Under 14 CFR § 212.10, foreign carriers entering long-term wet lease or codeshare agreements with U.S. carriers must submit a Statement of Authorization to the DOT. This includes:

**A.** Providing accurate documentation of compliance with FAA safety standards.

**B.** Ensuring reciprocity and adherence to safety standards.

**C.** Serving lease applications to the FAA Director of Flight Standards for safety evaluation.

**602.  Violations**

**603.**  Gulf Air provided incomplete and inaccurate safety documentation in its § 212.10 applications. By misrepresenting compliance with FAA and ICAO Annexes 6 and 19, Gulf Air obstructed regulatory oversight and compromised its legal obligations.

**604.**  Gulf Air violated § 212.10(c) by failing to uphold reciprocal safety standards, creating an imbalance between Gulf Air and U.S. carriers. This undermined the principle of fair and equal compliance.

**605.**  Gulf Air submitted false certifications of safety compliance to the DOT, fraudulently concealing systemic safety deficiencies and bypassing FAA scrutiny. These actions directly violated § 212.10 and eroded regulatory trust.

**606.**  Gulf Air's violations of § 212.10, including failure to provide accurate safety documentation and bypassing FAA oversight, allowed systemic deficiencies in crew fitness and operational practices to persist unchecked.

**607.**   This non-compliance enabled Gulf Air to avoid critical safety evaluations that would have identified unfit crew members and operational risks. These deficiencies foreseeably endangered Captain Alhindi, culminating in his incapacitation and preventable death during active duty.

**608.    Harm to Plaintiffs**

Gulf Air's systemic negligence under § 212.10 foreseeably deprived the plaintiffs of safety interventions that could have prevented Captain Alhindi's harm. As a result, Plaintiff Samiha suffered profound emotional distress, financial loss, and physical decline.

**609.**    The Captain's unfitness, stemming from Gulf Air's neglect, deprived his mother of her primary provider and imposed significant financial burdens, including travel and medical expenses shared with his siblings.

**610.    Broader Public Safety Impact**

Gulf Air's submission of false certifications under § 212.10 bypassed FAA oversight critical to ensuring safe wet lease operations. This failure perpetuated systemic safety risks that endangered not only Captain Alhindi but also passengers and crew relying on Gulf Air's operations.

**611.**    The public, which reasonably depends on FAA and DOT enforcement of safety standards, was foreseeably exposed to preventable risks due to Gulf Air's non-compliance.

**612.** **American Airline Violation of Public Safety**

**613.** American Airlines (AA) has a duty to uphold public safety in aviation, as outlined in 49 U.S.C. § 40101, which emphasizes assigning and maintaining safety as the highest priority in air commerce.

**614.** By submitting false certifications regarding Gulf Air's compliance with safety standards, AA breached this duty, undermining regulatory oversight and endangering passengers, crew, and the public.

**615.** This failure to maintain safety vigilance, as expected by the traveling public, constitutes a violation of public safety and the public interest in aviation.

**616.** The specific provisions of 49 U.S.C. § 40101 that AA violated include:

  **A.** **Section (a)(1)**: Assigning and maintaining safety as the highest priority in air commerce.

  **B.** **Section (a)(3)**: Preventing deterioration in established safety procedures, recognizing the clear intent, encouragement, and dedication of Congress to further the highest degree of safety in air transportation and air commerce, and to maintain the safety vigilance that has evolved in air transportation and air commerce and has come to be expected by the traveling and shipping public.

**617.** By failing to disclose Gulf Air's safety violations and submitting false certifications, AA allowed unsafe practices to continue, directly contradicting these statutory mandates and compromising public safety in aviation.

**618.** American Airlines, as a recipient of codeshare approvals and other regulatory privileges, had an obligation to ensure compliance with FAA/DOT guidelines. By

failing to audit Gulf Air adequately and allowing systemic deficiencies to persist,
AA caused unnecessary strain on publicly funded regulatory bodies (e.g., FAA
investigations, safety reviews) and legal mechanisms designed to uphold aviation
safety. This negligence wasted taxpayer resources that could have been avoided
through proper oversight.

619.    American Airlines unjustly benefited from its codeshare agreements and
regulatory approvals while neglecting its duties under FAA/DOT guidelines. Its
failure to act responsibly created foreseeable risks, necessitating increased
regulatory intervention funded by taxpayer money. This unjust enrichment comes
at the expense of the public and undermines trust in the aviation regulatory
system.

**ATTACHMENT 4**

**620.**    **Claim 1 : Wrongful Death**

**621.**    **Plaintiff** : Samiha Ayyash

**622.**    **Defendant**:  Gulf Air B.S.C

**623.**    Plaintiff Samiha is the mother of Captain Mohanna, legal beneficiary and direct dependent on her first born son .

**624.**    Gulf Air's violations including of **49 U.S.C. § 40101(a)(1)**, **§ 40101(a)(7)**, and **14 CFR § 212.10**, combined with systemic negligence, breach of duties and fraudulent acts, directly led to Captain Mohannad Alhindi's preventable incapacitation and death. Gulf Air failed to detect safety risks which led to incapacitation and death of Captain Mohannad due to the build up of the 99% Blockage

**625.**    Gulf Air Negligence led to the death of Captain Mohannad and harm to his mother

**626.**    As a result, Plaintiff Samiha, his mother, suffered profound emotional and physical harm, including loss of mobility, dependence on medical care, and the loss of her son's $6,000 annual financial support. Gulf Air's negligence caused significant expenses for the family and irreparable harm, establishing its liability in this wrongful death claim.

**ATTACHMENT 4**

**627.    Claim 2 : Negligence**

**628.    Plaintiff** : Samiha Ayyash , Feras Alhindi

**629.    Defendant**:  Gulf Air B.S.C

**630.    Failed to Detect Safety threats and risks**

**631.**    Gulf Air had a duty to ensure the safety, health, and well-being of its crew, passengers, and the public by conducting thorough medical examinations, implementing robust safety systems (SMS, FMS, FMRS, and SRMS), and complying with regulatory standards, including DOT orders, FAA/DOT Codeshare Safety Guidelines, and ICAO Annexes 1, 6, 13, and 19. This duty extended to providing adequate medical care during emergencies, acting transparently, and supporting affected families responsibly.

**632.**    Gulf Air breached this duty by neglecting safety threats, failing to conduct proper medical examinations, and disregarding known risks, including a 99% artery blockage in Captain Mohannad Alhindi. It violated regulatory obligations, withheld critical medical history, mishandled emergency care in Bangladesh, and obstructed justice.

**633.**    But for Gulf Air's systemic negligence, the Captain's incapacitation and death would have been prevented with timely intervention and adequate care and the plaintiffs wouldn't  been harmed by the actions during his medical emergency and after the death

**634.**     These failures and violations and fraudulent acts  foreseeably caused harm to the Captain and irreparable damage to his family.

**ATTACHMENT 4**

**635.    Claim 3 : Negligence**

**636.    All Plaintiffs VS American Airline**

637.    American Airlines, as a codeshare partner of Gulf Air, had a duty to audit, verify, and submit accurate safety certifications, ensuring Gulf Air adhered to safety standards, identified systemic risks, and reported deficiencies to prevent fraudulent certifications that compromised safety and public trust.

638.    American Airlines breached this duty by failing to audit Gulf Air's certifications, allowing fraudulent information to reach the FAA, and neglecting to detect and report systemic safety deficiencies, including unfit crew operations and mishandled medical emergencies and tGulf Air failure in adhering to DOT and ICAO regulations and rules

639.    These failures enabled Gulf Air's negligence to persist, directly contributing to Captain Mohannad Alhindi's incapacitation and death. American Airlines' breach foreseeably caused harm to Plaintiffs Samiha, Feras, and Tala, resulting in emotional trauma, financial dependence, and significant financial and emotional strain.

**ATTACHMENT 4**

**640.    Claim 4 : Negligence Per SE**

**641.    All Plaintiffs VS Gulf Air B.S.C**

**642.**    The airline's egregious failure to adhere to established aviation safety regulations. This negligence directly contributed to the tragic incapacitation and subsequent death of Captain Mohannad Alhindi, a seasoned pilot whose health risks were known yet ignored by Gulf Air. The airline's systemic lapses in health monitoring and failure to implement necessary safety protocols not only jeopardized the Captain's well-being but also endangered the lives of passengers and crew violating DOT orders, Open Sky agreements and the Public  Interest.

   **A.  Violations of DOT Orders on Codeshares (2008, 2019, 2022)**

   **B.   Violations of ICAO Annexes 6 and 19**

   **C.  Violations of Public Safety under 49 U.S.C. § 40101(a)(1) and § 40101(a)(7)**

   **D.  Violations of 14 CFR § 212.10**

   **E.  Violations of 14 CFR § 129:** Gulf Air concealed safety violations, exposing crew and passengers to preventable risks.

**643.**    But for Gulf Air's systemic negligence and regulatory violations, the Captain's death would have been prevented These failures foreseeably caused severe harm to Plaintiffs, including loss of  the Captain, financial strain, emotional trauma, and physical decline

**ATTACHMENT 4**

**644.    Claim 5 : Negligence Per SE**

**645.    All Plaintiffs VS American Airlines INC ( AA )**

**646.**    American Airlines violated aviation safety statutes and regulations, breaching

its statutory duty and directly causing harm to Captain Mohannad Alhindi and

Plaintiffs Samiha, Feras, and Tala.

**647.**    Under the 2008 DOT Order on Codeshares, American Airlines failed to

ensure Gulf Air's compliance with safety obligations by neglecting audits,

certifications verification, and detection of systemic risks, undermining regulatory

oversight and endangering the public.

**648.**    FAA Codeshare Safety Guidelines were breached when American Airlines

failed to implement audits to identify and address Gulf Air's safety deficiencies,

**649.**    By neglecting ICAO Annex 19, American Airlines failed to ensure Gulf Air

established an effective Safety Management System (SMS), preventing the

detection and mitigation of foreseeable risks like crew incapacitation.

**650.**    American Airlines violated 49 U.S.C. § 40101(a)(1) and § 40101(a)(7) by

failing to uphold oversight duties and act on known risks, breaching statutes

designed to ensure safety, accountability, and public trust.

**651.**    American Airlines' failure to audit Gulf Air and detect risks allowed Gulf Air's

negligence to persist. These omissions directly enabled unsafe operations,

leading to Captain Alhindi's preventable death and harm to Plaintiffs.

**ATTACHMENT 4**

**652.    Claim 6 : Breach Of Fiduciary Duty**

**653.    Plaintiffs Feras, Samiha VS Gulf Air**

**654.**    Gulf Air owed Fiduciary duty to Feras and Samiha

**655.**    Gulf Air owed fiduciary duties including duty of care, loyalty, disclosure, and honesty to Captain Mohannad Alhindi and Plaintiff Samiha. Gulf Air breached these duties by withholding critical medical information, failing to secure specialist care, concealing records, and neglecting evidence preservation.

**656.**     It misrepresented facts to regulators, published false narratives, and interfered with Samiha's inheritance while engaging in harassing conduct. These actions directly contributed to the Captain's preventable death and caused irreparable harm to Samiha.

**657.**    As a result,  Captain died, Samiha suffered emotional trauma, financial loss, and physical decline requiring medical care and a caregiver. Feras suffered emotional distress and financial strains covering his brother's share

**ATTACHMENT 4**

**Claim 7 : Breach Of Duty Of Superior Knowledge**

**658.   Plaintiff Samiha, Feras VS Defendant Gulf Air**

659.   Gulf Air, as an experienced aviation operator, owed a duty of superior knowledge to its crew, passengers, and Plaintiffs. Gulf Air breached this duty It misrepresented the Captain's condition, withheld critical information, and failed to preserve evidence such as medical records and CCTV footage, obstructing accountability and informed decision-making by the Plaintiffs.

660.   Gulf Air held information from the hospital, and after by seizing hospital records and by interfering in Samiha's inheritance and claims

661.   As a direct result of these breaches, Samiha suffered emotional trauma, financial loss, and physical decline requiring care, while Feras experienced financial strain and emotional distress. Gulf Air's failure to fulfill its duty of superior knowledge caused preventable harm to the Captain and the Plaintiffs

**ATTACHMENT 4**

662. **Claim 5  Fraudulent Concealment**

663. **All Plaintiffs VS Gulf Air**

664.    The Defendant, Gulf Air, concealed or suppressed critical material facts regarding Captain Mohannad Alhindi's medical condition, the hospital's deficiencies, the actual circumstances of his death, hospital records and medical records .

665.    Gulf Air was under a duty to disclose these facts to the Plaintiffs, including Samiha and Feras

666.    Gulf Air intentionally concealed or suppressed these facts with the intent to defraud the Plaintiffs. This concealment was designed to induce the Plaintiffs to consent to treatment under false pretenses and to prevent them from seeking alternative care or holding Gulf Air accountable for its failures.

667.    The Plaintiffs were unaware of the concealed facts and reasonably relied on Gulf Air's representations. Had they been aware of the Captain's true condition, the hospital's deficiencies, and the delays in treatment, they would have acted differently, including seeking immediate specialist care or intervening to prevent further harm.

668.    As a direct result of Gulf Air's fraudulent concealment, the Captain died and the Plaintiffs sustained significant damages.

**ATTACHMENT 4**

**669.** **Claim 5  False Representation of Death Summary**

**670.** **All Plaintiffs VS Gulf Air**

**671.** Gulf Air deliberately misrepresented key facts about the timeline of events, the presence of physicians, and the quality of care during the Captain's medical emergency. Gulf Air's presented death summary was designed to mislead the family and conceal negligence. Gulf Air exploited the Plaintiffs' emotional vulnerability to protect its corporate reputation and evade accountability.

**672.** Gulf Air falsely claimed that Captain Mohannad Alhindi received adequate care, including competent hospital staff and specialists, despite knowing this was untrue.

**673.** Gulf Air knowingly or recklessly made false statements, intentionally distorting the facts to evade accountability for its failures during the medical emergency.

**674.** Gulf Air intended for Plaintiffs to rely on its misrepresentations, deterring them from questioning care quality, seeking alternative treatments, or pursuing justice for the Captain's death.

**675.** Unaware of the true circumstances, Plaintiffs reasonably relied on Gulf Air's false claims, preventing them from pursuing timely actions or alternative care that could have mitigated harm.

**676.** Plaintiffs suffered emotional  distress and trauma, loss of financial support, physical decline, financial strain, and significant costs uncovering the truth and seeking accountability.

**ATTACHMENT 4**

**677.  Claim 6 CONSTRUCTIVE FRAUD**

**678.  All Plaintiffs VS AMERICAN AIRLINES INC**

**679.**  American Airlines, as a codeshare partner of Gulf Air, had a duty of diligence and good faith to ensure passenger, crew, and public safety by auditing Gulf Air's safety compliance and certifying accurate safety standards. It breached this duty by failing to audit Gulf Air's practices and certifying compliance with FAA/DOT standards despite evidence of systemic deficiencies.

**680.**  Even without intent to deceive, American Airlines acted with reckless disregard by negligently approving safety certifications without proper audits, creating a false impression of safety that endangered passengers, crew, and the public.

**681.**  The public, including Plaintiffs, reasonably relied on American Airlines' certifications, assuming Gulf Air met safety standards. This foreseeable reliance, based on the codeshare partnership and regulatory assurances, directly contributed to unsafe operations, including Captain Alhindi's incapacitation and death.

**682.**  As a result of American Airlines' constructive fraud, Captain Alhindi's incapacitation led to his death, causing Plaintiffs severe emotional and financial harm.

**ATTACHMENT 4**

**683.    Claim 7 : IIED**

**684.    Plaintiff Samiha VS Gulf Air**

**685.**    Gulf Air engaged in extreme and outrageous conduct, intentionally causing severe emotional harm to Samiha. This included concealing critical facts about Captain Mohannad Alhindi's condition, the hospital's deficiencies, and the circumstances of his death. Gulf Air misrepresented events, provided false assurances, and withheld medical records, obstructing Samiha's ability to understand her son's death and pursue justice.

**686.**    Gulf Air interfered with Samiha's inheritance rights, harassed her daughter, and exacerbated her grief by undermining her family's financial stability, including her grandchildren's loss of income. Its actions also endangered Tala's life by creating a hostile and unsafe environment, intensifying Samiha's emotional suffering.

**687.**    Gulf Air acted with intent or reckless disregard, fully aware that its concealment, misrepresentation, and harassment would cause severe harm to Samiha. This deliberate effort to evade accountability directly caused her profound emotional trauma, grief, and physical decline.

**688.**    As a direct result, Samiha is entitled for her emotional trauma, physical health decline, and financial losses caused by Gulf Air's extreme and reckless conduct.

**ATTACHMENT 4**

689.　**Claim 8 NIED**

690.　**Plaintiff Feras VS GULF AIR**

691.　Gulf Air's negligent concealment of material facts about Captain Mohannad
　　　Alhindi's medical condition, hospital deficiencies, and circumstances of death
　　　caused Feras severe emotional distress. By misrepresenting care adequacy,
　　　withholding medical records, and obstructing justice, Gulf Air deprived Feras of
　　　the opportunity to make informed decisions and support his brother during the
　　　critical condition.

692.　These actions foreseeably harmed Feras, as Gulf Air owed a duty of care to
　　　accurately and transparently communicate critical information. Its failure to
　　　uphold this duty was the proximate cause of Feras' emotional suffering,
　　　compounded by his position in the "Zone of Danger" when consent was sought
　　　under false pretenses.

693.　As a result, Feras endured financial strain from investigative and legal efforts,
　　　emotional anguish from his brother's preventable death, and the burden of
　　　uncovering Gulf Air's failures. Gulf Air's negligence directly caused these harms,
　　　entitling Feras to compensation for his distress and damages.

**ATTACHMENT 5**

## PRAYER OF RELIEF

Prayer for Relief Against Gulf Air B.S.C.(C)

Plaintiffs respectfully request that the Court grant the following relief:

1. As pro se plaintiffs without legal expertise or resources, we are currently unable to fully substantiate claims of fraud against Gulf Air and American Airlines, particularly in demonstrating reliance by family members or the public. We respectfully request the court to preserve our right to amend and add these claims during the discovery process

2. Plaintiffs respectfully ask the court to consider whether our reply to Gulf Air's motion to dismiss provides sufficient grounds for false representation to the media, public, and government. If so, we petition the court to order an investigation by the appropriate authorities into the allegedly false statements made by Gulf Air and American Airlines in their public communications and Department of Transportation submissions

3. We understand that the duty to preserve evidence arises when litigation is reasonably anticipated. Therefore, we request that all parties be instructed to implement a litigation hold on all potentially relevant information to ensure its preservation for this case

4. **Costs of Action:** Plaintiffs request reimbursement for the costs of this action and any other relief the Court deems appropriate.

5.  Plaintiffs request discovery in order to pursue additional claims, including potential fraud in documents submitted to federal agencies and perjury related to Gulf Air's statements.


## **Damages**

6.  **Compensatory Damages:**

A.  **Feras:** No Less than $75,000

B.  **Samiha** No Less than $75,000

C.  **Tala :** No less than $75,000

D.  **Emotional Damages:** To be determined by the **Jury** against all defendants.


7.  **For Wrongful Death ( Samiha Vs Gulf Air )**

8.  **Economic damages**: The amount that can be proven including partial of the ( $500 average monthly was paid by Captain Mohannad to his mother )  and/ or decided by jury and court in the direct Loss of financial support from Captain Alhindi

9.  **Non-economic damages**: The amount that can be proven and/ or decided by jury and court for the Loss of Samiha's first born, love, comfort, guidance, support and care

10. **Punitive Damages**

Plaintiffs respectfully request the Court to award punitive damages in an amount deemed appropriate by the jury and court, including:

1. **Punitive Damages for the Plaintiffs**: An amount deemed appropriate by the jury and court to punish Gulf Air's egregious conduct and deter future wrongdoing.

2. Stopping Gulf Air from flying to the USA non Stop until their violations and safety risks are addressed

3. Ban Gulf Air from Codeshare partnership with U.S. Carriers until they address their safety violations no less than 3 years

4. **Sanctions** : Plaintiffs respectfully request the Court to impose Sanctions on both Defendants as below or in an amount deemed appropriate by the jury and court, including:

    A. **DOT & FAA Family Emergency Programs**: No less than $50,000,000 for the improvement of programs addressing family emergencies during aviation incidents.

    B. **Public Safety in the District of Columbia**: No less than $135,000,000 to be directed toward DOT public safety improvements due to Gulf Air's violations, fraud, and negligence.

    C. **FAA Pilots Medical Programs**: No less than $50,000 for the enhancement of medical programs ensuring the fitness of pilots.

**D. High-Risk Pilot Assessment Program**: No less than $50,000,000 for the development of a high-risk pilot assessment program, named in honor of Captain Mohannad Alhindi and other crew members who died on duty.

**E. DOT & FAA Foreign Air Vetting and Auditing**: No less than $75,000,000 for the enhancement of foreign air carrier vetting and auditing programs

**F. DOT & FAA Codeshare Programs**: No less than $120,000,000 to the FAA and DOT for the improvement of codeshare oversight and safety programs.

**G. Public Safety in the District of Columbia (Codeshare Violations)**: No less than $90,000,000 to enhance public safety due to Gulf Air's negligence and violations in codeshare agreements.

**H. FAA Pilot Medical Programs (Additional)**: No less than $60,000 for further advancements in pilot medical assessments and monitoring programs.

**I. TAX money waste**: Gulf Air and AA to pay Sanctions to the Plaintiffs of wasted tax money paid for their violations corrections determined by the Jury and court

This relief seeks to ensure accountability, improve aviation safety systems, and honor those affected by Gulf Air's negligence.

Date : December 31 2024

Feras Hindi

Samiha Ayyash

Tala Josephano

Pro Se

Pro se

Pro Se