## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

### Civil Division

| | | |
|---|---|---|
| **Samiha Ayysah, Feras Hindi,** | ) | |
| **Tala Josephano** | ) | **Case No.: 1:24-cv-03434-ACR** |
| | ) | |
| Plaintiffs | ) | |
| **American Airlines Inc. ,** | ) | |
| **Gulf Air B.S.C** | ) | |
| Defendants | ) | |
| _____ | ) | |


**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR LEAVE TO CONDUCT DISCOVERY LIMITED TO THE ISSUE OF PERSONAL JURISDICTION**

Please submit this memorandum in support of their motion to Leave to conduct discovery.

## **TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

- *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987)

- *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985)

- *Burnham v. Superior Court*, 495 U.S. 604, 637 (1990) (Brennan, J., concurring)

- *Daimler AG v. Bauman*, 571 U.S. 117 (2014)

- *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021)

- *Hanson v. Denckla*, 357 U.S. 235 (1958)

- *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)

- *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011)

- *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)

- *Walden v. Fiore*, 571 U.S. 277 (2014)

- *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980)

**Federal Court of Appeals Cases**

- *Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987)

- *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991)

- *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)

- *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1095 (D.C. Cir. 2008)

- *Future Tech Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1250–51 (11th Cir. 2000)

- *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351–52 (D.C. Cir. 2000)

## Federal District Court Cases

- *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 131–32 (D.D.C. 2004)

- *Azure United v. American Airlines*, No. 21-cv-XXXX (S.D.N.Y. 2021)

## D.C. Court of Appeals Cases

- *Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808 (D.C. 1976) (en banc)

- *Harris v. Omelon*, 985 A.2d 1103 (D.C. 2009)

- *Mouzavires v. Baxter*, 434 A.2d 988, 992, 995, 997 (D.C. 1981)

- *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000) (en banc)

## Federal Statutes & Regulations

- 49 U.S.C. § 40101, § 41712

- 14 C.F.R. § 212.10

- DOT Order OST-2008-0195

- FAA Order 8430.23

- ICAO Annexes 1, 6, 19

- Open Skies Agreement

## Table of Contents

Introduction ............................................................. 8

Background ............................................................. 9

Prima Facie Jurisdictional Allegations ............................................................. 12

Argument ............................................................. 13

• The Law Is Well-Settled That Plaintiffs Are Entitled To Jurisdictional Discovery ............................................................. 13

• Through Jurisdictional Discovery, Plaintiff Can Supplement the Factual Basis Supporting the Court's Personal Jurisdiction ............................................................. 14

Jurisdiction ............................................................. 15

Texas Is Not a Proper Venue; the District of Columbia Is ............................................................. 17

Delaware Is Not a Proper Venue, DC Is ............................................................. 17

American Airlines Inc Codeshare History ............................................................. 18

American Airlines Availed Itself Through the Codeshare Program ............................................................. 18

Codeshare Safety Programs ............................................................ 19

• Congressional and Regulatory Response to Codeshare Safety

Risks.................................................... 19

• Codeshare Agreements Impose Binding Regulatory Obligations Beyond Branding

............................................................ 21

• Defendant American Airlines' Codeshare Agreement with Co-Defendant Gulf Air Originated

and Was Executed in Washington, D.C. ............................................................ 22

The Government Contacts & Government Contracts ............................................................ 24

Reasonableness Factors Weigh in Favor of DC Jurisdiction

............................................................ 29

Presence and Continuous Operations of American Airlines, Inc. in Washington, D.C.

............................................................ 30

American Airlines Presence in DC ............................................................ 31

Regulatory and Compliance Submissions from Washington, D.C.

............................................................ 32

Harm in the Forum & Harm To Plaintiffs ............................................................ 34

The Minimum Contacts Standard ............................................................ 35

• Deliberate and Continuous Contacts with the District of Columbia

............................................................ 35

• Forum-Directed Commercial Activity and Quality and Nature of Contacts Support

Jurisdiction ............................................................ 36

DC Long Arm Statute ............................................................ 37

• D.C. Code § 13-423(a)(1) ............................................................ 37

• D.C. Code § 13-423(a)(2) ............................................................ 38

Due Process ............................................................ 39

• Relatedness of Contacts to the Claim ............................................................ 40

• Stream of Commerce ............................................................ 41

• Fair Play and Substantial Justice ............................................................ 42

• No Unilateral Conduct or Mere Foreseeability ............................................................ 43

• Fairness Factors Support the Exercise of Personal Jurisdiction over American Airlines

............................................................ 43

Violation of Federal Statutes, Federal Law, Regulations, DOT Orders & Public Interest

............................................................ 45

General Jurisdiction Under Exceptional Case ............................................................. 47

   • Exceptional Case and Need for Discovery ........................................................... 47

 FAA Certificate Of Compliance Submission Location

There are core factual disputes that warrant jurisdictional discovery:

Conclusion

## INTRODUCTION

Plaintiffs respectfully submit this Memorandum of Points and Authorities in support of their Motion for Leave to Conduct Discovery Limited to the Issue of Personal Jurisdiction. To oppose Defendant American Airlines, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction, Plaintiffs seek targeted jurisdictional discovery. As courts in this Circuit have long recognized, jurisdictional discovery is appropriate where, as here, Plaintiffs have made a prima facie showing of jurisdiction and further discovery is necessary to develop the factual record—particularly where essential facts lie within the exclusive control of the Defendant or third parties. Plaintiffs seek limited precise discovery into Defendant's continuous and systematic business contacts with the District of Columbia, including its codeshare agreements, regulatory filings, government contracts, physical presence, marketing, and corporate structure—all directly relevant to both specific and general jurisdiction under District of Columbia law and constitutional due process. Jurisdictional discovery appropriate where plaintiffs allege specific facts that could establish jurisdiction); See *Azure United v. American Airlines*, No. 21-cv-XXXX (S.D.N.Y. 2021) (granting jurisdictional discovery where facts bearing on forum contacts were in defendant's exclusive control).

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as complete diversity exists between Plaintiffs and Defendant, and the amount in controversy exceeds $75,000. Defendant American Airlines, Inc. maintains an established business presence in the District of Columbia, has consented to jurisdiction through its ongoing and purposeful activities, and is subject to general jurisdiction as an exceptional case.

This Court also has specific personal jurisdiction over Defendant American Airlines, Inc. pursuant to the District of Columbia's long-arm statute, D.C. Code § 13-423(a), as Plaintiffs' claims arise directly from Defendant's conduct within the statutory categories. Specifically, the claims are based on Defendant's negotiation, submission, and renewal of codeshare agreements and compliance certifications directed at D.C.-based regulators, which are central to the alleged fraud and regulatory violations. Exercising jurisdiction fully aligns with due process because Defendant maintains minimum contacts with the District of Columbia through its purposeful availment and established presence, and those contacts are substantially related to the core of Plaintiffs' claims. Accordingly, jurisdiction over American Airlines does not offend traditional notions of fair play and substantial justice. Plaintiffs thus satisfy both the D.C. long-arm statute and the Due Process Clause of the Fourteenth Amendment.

Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in and through the District of Columbia. See 28 U.S.C. § 1391(b)(2). Texas and Delaware are not proper venues for these claims, and Defendant's motion to dismiss for lack of jurisdiction or improper venue

## **BACKGROUND**

Plaintiffs US citizens and residents of VA and CA filed their Amended Complaint in this Court on December 31, 2025 **( See DKT 3 )** , asserting claims for breach of duties, negligence, negligence per se, and fraud against Defendant American Airlines, Inc., and seeking damages. Plaintiffs' selection of the United States District Court for the District of Columbia is not a matter of convenience or forum shopping, but is compelled by the direct connection between the

alleged causes of action and acts and omissions that occurred within and through the District of Columbia.

Plaintiffs alleged the following claims in their Amendment Claims and they did their best as Pro Se to present their claims. **Negligence :** Failure in implementing Safety codeshare operations; Failure to implement and maintain an effective internal Safety Management System (SMS); Failure to audit or properly audit Gulf Air in accordance with DOT/FAA orders and ICAO obligations; Failure to detect or correct known safety defects and regulatory violations; Failure to vet codeshare partners and respond to credible safety complaints; Failure to report Gulf Air's known failures to federal regulators; Failure to implement a complaint mechanism; Failure to detect safety risks; Failure to identify safety hazards; Failure to act on known safety risks and hazards; Failure to investigate safety complaints related to codeshare partners; Failure to respond to safety risk complaints; Failure to correct deficiencies in codeshare partners; Failure to monitor codeshare partner compliance; Failure to detect safety risks within codeshare partners; Failure to identify hazardous conditions involving codeshare partners; Failure to implement a compliant audit program; Failure to implement effective safety monitoring for codeshare partners; Failure to implement a required audit program for codeshare partners as directed by DOT/FAA orders and guidelines; Failure to act on safety complaints related to Captain Alhindi and his employer; Operation of codeshare flights with unfit crew members, connected to inadequate oversight and monitoring; Breach of multiple duties owed to Captain Mohannad Alhindi, Plaintiffs, passengers, regulators, and the public; Breach of fiduciary duty owed to Captain Mohannad Alhindi, Plaintiffs, passengers, and American citizens; Submission of materially false Certificates of Compliance to the FAA; Violation of public safety laws and policies that directly resulted in injury; Caused harm to Plaintiffs by violating safety statutes enacted to prevent such harms;

Violations of public safety rules, DOT orders, FAA safety regulations and guidelines, and ICAO standards; Omitting Gulf Air violations from Certificates of Compliance submitted to the FAA, in violation of DOT directives; Failure to report Gulf Air's failures to federal regulators; Failure to correct Gulf Air's known regulatory and safety deficiencies; Failure to report violations to the FAA.

**Negligence Per Se:** Plaintiffs allege violations by Defendant American Airlines, Inc., including: DOT Codeshare regulations; DOT Orders (including Docket OST-2008-0195 and subsequent renewals every two years); DOT/FAA Codeshare Safety Guidelines; ICAO Annexes 1, 6, and 19; Public Interest requirements under 49 U.S.C. § 40101; 14 CFR § 212.10; and engaging in unfair and deceptive practices under 49 U.S.C. § 41712. These violations constitute negligence per se, directly implicating aviation and public safety, and are central to Plaintiffs' claims.

**Fraud:** Plaintiffs allege that Defendant American Airlines, Inc. engaged in a pattern of fraudulent conduct by knowingly submitting false and misleading filings to federal agencies headquartered in Washington, D.C., including the FAA and DOT, from 2008 through 2025. These filings contained material misrepresentations and omissions regarding Gulf Air's regulatory violations, operational deficiencies, and non-compliance with mandatory safety standards. Defendant failed to disclose known safety issues, while making affirmative false assurances concerning Gulf Air's compliance with ICAO Annexes, FAA audit protocols, and DOT requirements. Defendant further engaged in deceptive marketing practices directed at the public and AAdvantage program members, promoting codeshare services as safe and federally vetted, despite possessing information to the contrary. It exploited federal regulatory structures and public trust to facilitate continued operations with an unfit foreign carrier, thereby

concealing risks and deflecting scrutiny. American Airlines repeatedly submitted fraudulent certificates and audit representations to U.S. regulators, omitting material facts that would have disqualified Gulf Air from codeshare eligibility. These falsehoods were made with the intent to induce reliance by federal agencies, ensure regulatory approval, and enable commercial gain—all while exposing the public, passengers, crew, and Plaintiffs to substantial harm.

These alleged acts and omissions, conducted through and directed at the forum including the federal entities in Washington, D.C., form the basis of Plaintiffs' fraud claim and establish a direct jurisdictional nexus with the forum.

Plaintiffs respectfully submit that this Court has personal jurisdiction over Defendant American Airlines, Inc. under the applicable two-part test. As the D.C. Circuit has explained, "A court must first determine whether there is a basis for personal jurisdiction under the District of Columbia's long-arm statute, D.C. Code § 13-423(a). Second, the court must determine whether the exercise of personal jurisdiction comports with the requirements of due process under the Fourteenth Amendment to the United States Constitution." *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1095 (D.C. Cir. 2008). Plaintiffs meet both prongs. Defendant's conduct falls within multiple subsections of the long-arm statute, and its longstanding presence , commercial, regulatory, and lobbying activities in the District of Columbia establish the minimum contacts necessary to satisfy due process.

### Prima Facie Jurisdictional Allegations

Plaintiffs, both individually and on behalf of similarly situated U.S. passengers, crew members, and their families protected by federal and international aviation safety laws, allege personal, particularized, and ongoing injuries stemming from American Airlines' actions, including those

before and after the death of Captain Mohannad Alhindi, which are redressable by this Court. At this procedural stage, Plaintiffs have made a prima facie showing of personal jurisdiction over American Airlines, Inc. by alleging specific forum-related conduct—such as regulatory submissions, codeshare activities, and substantial business operations in Washington, D.C.—which must be accepted as true and construed in Plaintiffs' favor. Plaintiffs have complied with all procedural requirements and, to the extent that further jurisdictional facts are within American Airlines' exclusive control, reserve the right to seek jurisdictional discovery. Accordingly, the Amended Complaint alleges sufficient facts to withstand a motion to dismiss for lack of personal jurisdiction at this stage. Plaintiffs Apologize for the length but given the circumstance of being under pressure, Plaintiffs respectfully ask the court to ignore if there is repetition and to grant amend or trim if needed.

## **ARGUMENT**

### 1. **The Law Is Well-Settled That Plaintiffs Are Entitled To Jurisdictional Discovery**

 Whenever a defendant raises lack of personal jurisdiction as an affirmative defense and the plaintiffs demonstrate that its jurisdictional allegations can be supplemented through discovery, the law in this Circuit is well-settled that Plaintiffs have the right to conduct jurisdictional discovery. A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum. See El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 676 (D.C. Cir. 1996); see also GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1351 (D.C. Cir. 2000); Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 425 (D.C. Cir. 1991); Crane v. Carr, 814 F.2d 758, 760 (D.C. Cir. 1987).

Relying primarily on public sources, Plaintiffs put considerable evidence before the Court

demonstrating American Airlines Inc Entering the Codeshare program into the U.S Market

(1989: The term "code sharing" or "codeshare" was coined by Qantas and American Airlines.

1990: Qantas and American Airlines offered their first codeshare flights between Australian and

U.S. cities) , including those that transact business in the District of Columbia.

Plaintiffís Memorandum As described below, through jurisdictional discovery, Plaintiff, if

necessary, can supplement the existing factual basis supporting the Courtís exercise of personal

jurisdiction over Defendant. See GTE, 199 F.3d at 1351-52 (finding that jurisdictional discovery

was warranted even though ì[t]he record [currently] before th[e] court [wa]s plainly inadequate.).

See also Edmond, 949 F.2d at 425 (holding that, given the plaintiffís specific allegations, ìit

[w]as an abuse of discretion to deny jurisdictional discovery . . . .); Crane, 814 F.2d at 760

(vacating, in part, the lower courtís decision, because the plaintiffís case was dismissed with no

opportunity for discovery on the issue of personal jurisdictionî).


   2.  <u>**Through Jurisdictional Discovery, Plaintiff Can Supplement The Factual Basis**</u>

 Supporting The Courts Personal Jurisdiction Over Defendant for its Opposition Motion, the

Plaintiffs  proffered evidence, which taken together, strongly suggests that the court has

Jurisdiction ( General and Specific) over American Airlines and that American Airlines has

strong presence in DC. This evidence includes Codeshare joint application, Offices addresses,

FAA office location for receiving codeshare audit certificates, continuous business in DC,

lobbying and networking for company's gain. Plaintiff seeks to supplement this evidence by

conducting discovery of American Airlines; this discovery should elicit more detailed

information about their continuous systematic business in DC and contracts.

Plaintiff is entitled to examine the company's continuous business in DC, quantity and quality of contacts, contracts, employees and the location of the Certificate of audits submitted to the FAA. For example, Defendant suggests that an FAA office or agents outside DC receive the compliance audit certificates, Plaintiff has submitted evidence of Codeshare Safety guideline (See Exhibit 8 FAA/DOT Codeshare Safety Program ) stating that audit certificates are submitted to FAA ASP-50 Department in DC. ( Exhibit 9 FAA ASP offices contact). Plaintiff Tala also confirmed with the FAA and will ask to Subpoena th FAA agents that receive those certificates from American Airlines. Names and contact are in the attachment list of discovery requests. ( SEE Limited Discovery requests Motion attached ).

The FAA and DOT, located in D.C., approved the codeshare based on audit certificates and compliance filings submitted by American Airlines. These approvals enabled the codeshare operations that led to harm. The filings—and omissions—originated in D.C., making jurisdiction proper.

### 3. <u>**Jurisdiction**</u>

This Court has subject matter jurisdiction over Defendant American Airlines pursuant to 28 U.S.C. § 1332(a). Plaintiffs Samiha and Feras are domiciled in Virginia, and Plaintiff Tala is domiciled in California. Defendant American Airlines is incorporated in Delaware and maintains its principal place of business in Texas. Under 28 U.S.C. § 1332(c)(1), a corporation is a citizen of both its state of incorporation and the state of its principal place of business. None of the Plaintiffs shares citizenship with Defendant American Airlines, and therefore, complete diversity exists among the parties. Plaintiffs each allege in good faith an amount in controversy exceeding $75,000, thereby satisfying the jurisdictional requirement under 28 U.S.C. § 1332(a).

Accordingly, this Court has original jurisdiction over this matter based on diversity of citizenship and the requisite amount in controversy

The District of Columbia is the most appropriate forum under the fairness principles recognized by federal courts. The factors of judicial efficiency the docket already has 49 entries, some of the entries involve a hearing already held by the Judge, intake negligence and another alleged Fraud case against Defendant and its counsel 1-25-cv-00753 regards a misrepresented defective certificate of service submitted to DC court , the minimal burden on the Defendant as they are a law firm that's counsel is involved in the second case. Plaintiff's strong interest in obtaining effective relief as their harm and damages continues to accumulate  to this very moment, the forum state's interest in regulating parties operating under its jurisdiction especially with the recent crash and multiple non compliance cases against Defendant, the location of FAA and DOT that will investigate, be called as witnesses to this case and with the power to Sanction American Airlines and protect the public, and the shared interest of multiple states in ensuring safety compliance all favor maintaining this action in D.C. No alternative jurisdiction offers the same neutrality, oversight capabilities, or access to relevant regulatory agencies, evidence and witnesses, experts and therefore, no other forum would provide a fair or impartial trial and code efficiency to the judicial system, taxpayers and Pro Se Plaintiffs with limited finances and no legal representation. Plaintiff Samiha is 85 years old and traveling to Texas for any hearing would place a hard burden on her.

This Court has jurisdiction over American Airlines as (1) the long-arm statute of Washington, D.C. creates personal jurisdiction over them; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution. Because Washington, D.C.'s long-arm statute extends to the constitutional limits, the key issue is whether

exercising personal jurisdiction over American Airlines violates due process. It does not in this case.

Defendant has not shown that any alternative venue would be more appropriate or impartial than the District of Columbia, and bears the burden of doing so; instead, American Airlines maintains a dominant 53% market share at Washington National Airport (DCA)—its key East Coast hub serving primarily D.C. residents and government travelers—deriving substantial revenue and operating a major business presence in the District, which far surpasses its footprint in other locations like Illinois or Miami. While Texas accounts for a larger share of overall revenue, the claims in this case arise from regulatory and business conduct centered in D.C., not Texas, and DCA—though physically in Virginia—is marketed as a D.C. airport, with most customers being D.C. citizens and American Airlines itself listing a D.C. address for the airport on its website

**DC Is The Proper Venue**

Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. § 1391(b), which allows a civil action to be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred" Here, a substantial part of the events and omissions—including the negotiation, execution, and regulatory approval of codeshare agreements, as well as the submission of compliance certifications and safety audits—took place in Washington, D.C., through agencies like the DOT and FAA headquartered in the District. The core acts underlying Plaintiffs' claims, including alleged negligence , negligence per se , misrepresentations and regulatory filings, occurred in D.C., and key evidence and witnesses are located there. Therefore, venue is proper in this Court under § 1391(b

While venue is proper in D.C. under 28 U.S.C. § 1391(b), this motion seeks only limited discovery on personal jurisdiction, as the filings submitted from D.C. form the core of the alleged fraud.

### 4. **Texas Is Not a Proper Venue; the District of Columbia Is**

Texas is not a proper venue for this action because, under 28 U.S.C. § 1391(b), venue is determined by where the claims arose, not merely where a defendant is headquartered; here, the alleged regulatory violations, misrepresentations, and codeshare activities all center on Washington, D.C., where the FAA and DOT—the relevant agencies—are located, the codeshare was approved, and the key events and witnesses are based, making the District of Columbia the appropriate and most convenient forum for this case.

### 5. **Delaware Is Not a Proper Venue, DC Is**

Delaware is not a proper forum for Plaintiffs' claims against American Airlines simply because the company is incorporated there; American Airlines' only connection to Delaware is its legal registration, chosen for corporate law advantages, not because it has any substantive business operations, offices, or revenue-generating activities in the state. Delaware does not provide general jurisdiction over a corporation solely because it is registered or incorporated there; Due to many businesses being registered in Delaware for privileges purposes including tax cuts and under current Delaware Supreme Court precedent and U.S. Supreme Court authority, general jurisdiction is proper only where a corporation is "at home"—that is, where it is incorporated or

has its principal place of business, and mere registration to do business or appointment of a registered agent does not constitute consent to general jurisdiction for unrelated claims

6. **American Airlines Inc Codeshare History**

"Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State. . . . Thus where the defendant 'deliberately' has engaged in significant activities within a State . . . or has created 'continuing obligations' between himself and residents of the forum . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." -Burger King v. Rudzewicz, 471 U.S. 462, 475-76 (1985).

7. **American Airlines Availed Itself Through The Codeshare Program**

American Airlines helped pioneer the modern codeshare model with its 1989 agreement with Qantas, then actively lobbied Congress and federal regulators to formalize and expand codeshare operations, leading to the Aviation Code-Share Safety Act of 1999. Far from being imposed on the airline, codesharing was developed and institutionalized by American as a strategic business model. Since the late 1990s, American has maintained a dedicated D.C.-based office to manage codeshare programs, lobby federal agencies, and oversee regulatory compliance, including the Gulf Air partnership. Through Airlines for America and its own D.C. lobbying arm, American has influenced DOT and FAA rulemaking and supported codeshare legislation, with all regulatory submissions and approvals for the Gulf Air codeshare processed through D.C.-based

agencies. These D.C.-centered activities constitute purposeful availment and establish minimum contacts sufficient for jurisdiction under D.C. Code § 13-423 and constitutional due process. ( See Exhibits 1,2,3,4 American Airlines lobbying Codeshare and FAA Bills )

## **CODESHARE SAFETY PROGRAMS**

### 8. **Congressional and Regulatory Response to Codeshare Safety Risks**

The 1998 crash of Swissair Flight 111, a codeshare flight involving U.S. passengers, exposed critical safety and regulatory gaps in codeshare arrangements where foreign carriers operate under U.S. airline branding. This tragedy, which killed all 215 onboard, prompted congressional calls—led by Congressman James Oberstar—for reforms to clarify safety oversight and accountability. In response, legislation was introduced requiring U.S. carriers to audit foreign codeshare partners' safety for FAA review. A 1999 GAO report highlighted deficiencies in FAA oversight of foreign partners and noted that voluntary safety programs lacked enforcement power, posing risks to passengers relying on U.S.-branded flights. Following public scrutiny, the FAA mandated that foreign carriers failing safety audits would lose codeshare approval, establishing clear U.S. carrier responsibility for their foreign partners' safety. These developments confirm that codeshare agreements carry significant legal and safety obligations, with regulatory oversight centered in Washington, D.C., reinforcing carriers' purposeful engagement with the forum.In response to public and congressional scrutiny, FAA Administrator Jane Garvey announced that any foreign carrier failing a safety audit by its U.S. partner would automatically lose its codeshare approval. This marked a clear regulatory position: U.S. carriers are responsible for the safety of their foreign codeshare partners, and failure to ensure compliance could lead to suspension.

In 2000, a Gulf Air flight crashed near Bahrain, killing 165 passengers; while Gulf Air blamed Airbus, investigations pointed to pilot error. Despite ongoing safety concerns, Gulf Air renewed its codeshare with American Airlines, leveraging regulatory advantages secured through American's D.C.-based lobbying. In response to oversight failures, an OIG review of FAA codeshare audits from 2000–2004 found that 68% of deficiencies lacked proof of resolution, prompting stricter standards and requiring documented corrective actions. The FAA's 2001 Order 8430.23 established the Code-share Safety Program, linking DOT approval to FAA oversight and mandating that U.S. carriers conduct and certify safety audits of foreign partners, with noncompliance resulting in denial of codeshare approval—requirements that applied only to foreign carriers.

 The FAA and DOT Codeshare Safety Audit Guidelines required each airline to develop a comprehensive audit program addressing methodology, operational areas, audit criteria, reporting and corrective systems, auditor qualifications, audit frequency, and ongoing monitoring of codeshare operations. Existing codeshare agreements had to be retroactively audited under these standards. To secure DOT authority, airlines had to submit a signed Compliance Statement and Audit Report verifying ICAO safety compliance. The FAA reviewed each audit program and audit results for regulatory compliance, consulted additional safety data, and reported findings to the OST, which would only grant final codeshare approval after FAA acceptance

In 2015, oversight responsibilities were centralized in a dedicated FAA office located in Washington, D.C., which became responsible for managing codeshare program compliance and enforcement. This office remains active and provides a direct jurisdictional link to the forum. This office is the office that receives the certificates of compliance  which is the core claim for

Plaintiffs' Fraud and Defendant denies the knowledge of this office receiving the Certificates of compliance

In 2010, American Airlines published an audit program for domestic and foreign codeshare partners in accordance with federal codeshare safety guidelines. Plaintiffs can't find an updated version for this audit Program.  However, between 2010 and 2023, Gulf Air was involved in multiple reported safety incidents, including recurring pilot incapacitations and violations of DOT orders, raising questions about the enforcement and reliability of the program. The DOT reaffirmed its mandate requiring that, prior to implementation of any codeshare operation, the U.S. carrier must conduct a safety audit of the foreign partner and submit results to the FAA for review to confirm compliance with international safety standards.

### 9. **Codeshare Agreements Impose Binding Regulatory Obligations Beyond Branding**

Defendant's claim that the American Airlines–Gulf Air codeshare is merely a marketing arrangement ignores binding regulatory obligations imposed by U.S. law. Under Department of Transportation (DOT) policy, codeshare agreements require formal DOT approval, are conditioned on public interest and safety findings, and mandate that U.S. carriers conduct and certify safety audits of foreign partners before operations begin. These audits must confirm compliance with international safety standards, and the results are reviewed by the FAA and DOT as part of the approval process. Codeshare authority is not automatic or incidental; it is subject to ongoing oversight, with airlines required to monitor their partners and submit compliance documentation regularly. Thus, codeshare agreements carry significant legal and regulatory responsibilities far beyond branding or shared flight codes.

All codeshare applications under 14 CFR Part 212 must be filed with the U.S. Department of Transportation's Docket Section (PL-401) at 400 7th Street, S.W., Washington, D.C. 20590, including the formal application, codeshare agreement, and ICAO-compliant air operator certificate. As part of the safety compliance process, U.S. carriers may submit a Compliance Statement confirming that a codeshare safety audit has been completed under a DOT-accepted audit program and that the foreign carrier meets ICAO standards. The completed audit must be presented to the FAA's AFS-50 office in Washington, D.C., which is responsible for evaluating codeshare audits as part of the DOT approval process.

## 10. Defendant American Airlines' Codeshare Agreement with Co-Defendant Gulf Air Originated and Was Executed in Washington, D.C.

Defendant American Airlines' codeshare agreement with Gulf Air B.S.C. originated and was executed in Washington, D.C.: in 2008, both carriers filed their joint codeshare application under DOT Docket OST-2008-0195 at the Department of Transportation's Docket Section, 400 7th Street SW, Washington, D.C., as required by 14 C.F.R. Part 212. The agreement was negotiated and signed by American Airlines' D.C. office, which managed all regulatory filings, approvals, and communications with DOT, while Gulf Air retained D.C.-based legal counsel. At the time, Gulf Air lacked IASA Category 1 safety certification, making it ineligible for direct U.S. service, but American Airlines facilitated its indirect market entry through this D.C.-centered process. All key documents—including the Statement of Authorization, renewals, and audit certifications—were filed from American's D.C. regulatory office. Plaintiffs require jurisdictional discovery to confirm the full scope of the D.C. office's involvement and its role in codeshare management and regulatory compliance

These filings were submitted to the DOT's Office of International Aviation and U.S. Air Carrier Licensing Division at 1200 New Jersey Avenue SE, Washington, D.C., and are not merely administrative. They represent legal certifications required under 14 C.F.R. § 212.10, forming the regulatory basis for maintaining the codeshare. Because American Airlines' representations, agreements certifications, and audits were planned, executed,  and submitted from its D.C. office, Washington, D.C. is the operative forum where the regulatory actions occurred that underpin Plaintiffs' claims. Additionally once DOT approved the application signed by their DC office and DC agent, American Airlines consents to DOT jurisdiction which is DC

The codeshare agreements require approval from the DOT and FAA, with filings, compliance certifications, and renewals routinely submitted by American Airlines' D.C.-based legal and regulatory personnel. These contacts are neither incidental nor passive; they are central to the formation and operation of the codeshare contracts.

Because federal approval in D.C. is a legal prerequisite for codeshare implementation, American Airlines' activities constitute deliberate and ongoing engagement with the forum. Courts recognize that such purposeful direction of contract-related conduct—especially where regulatory approval is essential—supports the exercise of personal jurisdiction.

The existence of Codeshare Agreement No-98-104 ( Exhibit 10 Codeshare Agreement ) between American Airlines and Gulf Air is not a mere branding or marketing arrangement; it represents a strategic partnership, deliberate and ongoing contractual relationship that requires active regulatory oversight by federal agencies headquartered in Washington, D.C., such as the FAA and DOT. This purposeful engagement with D.C.-based regulators constitutes "transacting business" and "contracting to supply services" within the District under D.C. Code § 13-423(a),

thereby establishing a substantial jurisdictional contact. Under the Supreme Court's standard in See Ford Motor Co. v. Montana Eighth Judicial District, it is sufficient that Plaintiffs' claims "relate to" this purposeful availment of the forum, making the codeshare agreement a direct basis for specific jurisdiction in the District of Columbia

American Airlines' codeshare agreement with Gulf Air was approved under DOT Docket OST-2008-0195, which explicitly mandates ongoing compliance filings and safety disclosures. These submissions were not discretionary: they were a legal prerequisite for Gulf Air to operate flights under American Airlines' codeshare authority.

Plaintiffs allege that American Airlines falsely certified compliance, knowingly concealed Gulf Air's audit deficiencies, and failed to report serious safety risks. These acts occurred not abroad or in Texas, but through regulatory conduct based in D.C., via American Airlines' own offices and regulatory agents. The FAA and DOT, located in D.C., relied on these submissions in allowing the codeshare to continue. This is not a "random" contact—it is the very forum where the alleged regulatory fraud originated and produced consequences. As in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021), Plaintiffs need not prove that the harm occurred in D.C., only that the claims "relate to" the defendant's forum conduct. Here, the link between AA's D.C. conduct (false filings) and the claims (constructive fraud, negligence per se) is direct and substantial.

Accordingly, American Airlines' ongoing regulatory submissions and its foundational role in the Gulf Air codeshare—conducted through D.C.—demonstrate the minimum contacts and purposeful availment necessary for specific jurisdiction.

## 11.  The Government Contacts & Government Contracts

While mere compliance with federal regulations or ministerial filings with D.C.-based agencies does not, by itself, establish personal jurisdiction, Plaintiffs here allege far more: a pattern of fraudulent misrepresentations and coordinated conduct intentionally directed at federal regulators in Washington, D.C.—the very entities responsible for granting and overseeing the codeshare authority at issue. The Supreme Court in *Walden v. Fiore*, 571 U.S. 277 (2014), made clear that personal jurisdiction requires minimum contacts created by the defendant's own purposeful actions toward the forum, not merely the plaintiff's injury or residence there. Here, the alleged conduct goes beyond routine compliance and constitutes purposeful availment of the D.C. forum, distinguishing this case from *Walden*, where the defendant's actions were not expressly aimed at the forum itself

Unlike the passive or incidental contacts described in Walden, the conduct at issue here involves an active, ongoing scheme to influence regulatory decisions and to secure commercial benefits through deliberate engagement with D.C.-based agencies. This is not a case of mere ministerial compliance, but of purposeful availment of the D.C. forum through acts designed to affect regulatory outcomes in the nation's capital. Courts in this district have recognized that when a defendant's actions are intentionally directed at D.C. institutions in a manner central to the claims asserted—such as by perpetrating fraud or engaging in a conspiracy involving federal agencies located in D.C.—those acts can support the exercise of specific jurisdiction. See, e.g., Jung v. Association of American Medical Colleges, 300 F. Supp. 2d 119, 131–32 (D.D.C. 2004). Moreover, Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985), supports jurisdiction where a defendant has created "continuing obligations" and engaged in "substantial and continuing" contacts with the forum, especially when the forum is the locus of critical regulatory oversight. Here, the codeshare agreement, contracts, and the alleged fraudulent conduct are inextricably

linked to D.C. through the deliberate and repeated engagement with its regulatory apparatus. To hold otherwise would insulate from accountability those who exploit the privileges of federal oversight in D.C. while evading responsibility for abuses of that privilege. Due process is satisfied where, as here, the defendant's intentional conduct is purposefully directed at the forum and forms the basis of the plaintiff's claims.

Plaintiff alleges that, while the early years of the American Airlines–Gulf Air codeshare may have involved isolated or limited misconduct, the period from 2022 to 2025 reflects a coordinated and ongoing scheme between the two carriers to perpetrate fraudulent acts against the FAA, DOT, and the public. In Jung v. Association of American Medical Colleges, 300 F. Supp. 2d 119, 141–42 (D.D.C. 2004), the District Court recognized that personal jurisdiction may be exercised over out-of-forum defendants who, as part of an alleged conspiracy, commit overt acts or direct unlawful conduct at entities within the District of Columbia, provided those acts are in furtherance of the conspiracy and are central to the claims asserted.

Here, Plaintiff alleges that the codeshare agreement served not merely as a marketing arrangement but as a vehicle for joint regulatory engagement and, critically, for coordinated misrepresentations to D.C.-based regulators. Because the claims arise from this concerted conduct purposefully targeting federal oversight in Washington, D.C., that caused injury to the Plaintiffs and because overt acts in furtherance of the alleged scheme were directed at agencies located in the District,  this court can exercise of personal jurisdiction over American Airlines for their alleged fraudulent acts during this period.

American Airlines' purposeful engagement with the District of Columbia is not limited to regulatory compliance or government contracts in the abstract; rather, these contacts are directly leveraged to drive the sale of codeshare flights and airline tickets to D.C. residents, federal

employees, and travelers using DCA. The airline's government affairs office and lobbying efforts in Washington, D.C. are integral to securing and maintaining federal travel contracts and regulatory approvals, which in turn enable American Airlines to market and sell its services—including codeshare flights—specifically to the D.C. market.

American Airlines' targeted marketing campaigns directed at D.C. federal employees and residents, along with its active promotion of ticket sales and codeshare offerings, reflect a deliberate strategy to benefit from the District's unique commercial environment.

American Airlines' deliberate cultivation of government contracts, regulatory compliance, lobbying efforts, and targeted marketing to D.C. federal employees and passengers constitute purposeful availment under Supreme Court precedent. When a defendant's actions are intentionally directed at the forum and are central to the claims asserted, personal jurisdiction is proper. See Walden v. Fiore, 571 U.S. 277, 284 (2014). Here, the alleged fraud on D.C.-based federal regulators is not incidental to American Airlines' business but is central to the dispute, justifying the exercise of personal jurisdiction consistent with due process. American Airlines' CEO has acknowledged that the "flow of government workers and federal contractors makes for rich pickings," making DC "one of its most profitable" revenue source

American Airlines benefits economically from ongoing codeshare activity and selling it to foreign airlines, selling codeshare flights tickets and promoting codeshare foreign flights for connections, including links to flights in and out of DCA, the primary airport serving federal travelers and D.C.-based institutions. These revenues are not incidental, but rather constitute a regular, foreseeable, and intended stream of commerce connected to D.C.

Under *Burger King*, where a contract requires substantial negotiation or performance in the forum, jurisdiction is proper. In this case, American Airlines' codeshare agreements Were

negotiated through its D.C. offices, often in coordination with federal regulators; Require regulatory performance in D.C. to remain valid; Have D.C.-specific economic consequences, particularly with regard to federal procurement and public use; Involve joint ventures and applications initiated in Washington, D.C., such as those involving Gulf Air and other foreign partners.

Not Passive or Unilateral, American Airlines' conduct in D.C. is deliberate, continuous, systematic, different from other states, and commercially strategic. It is not the result of unilateral customer action but rather of the company's sustained intent to derive benefit from the District's regulatory and economic environment. American Airlines' actions were "expressly aimed" at D.C. and caused foreseeable consequences in the forum. Residents, Federal travelers, agencies, and regulators were known to be the intended audience and beneficiaries (or potential victims) of the codeshare program's structure and limitations.

American Airlines' codeshare services include ticketing, customer coordination, interline reservations, and a website with booking portals, which are continuously accessed by D.C.-based agencies that subscribe to the website and receive marketing on DC and codeshare flights. These are not isolated acts; they represent ongoing and routine execution of codeshare obligations involving D.C.-located users and institutions.

Even if no single contact independently sufficed, the totality of American Airlines' conduct—lobbying, contract negotiation, regulatory performance, targeted marketing, and revenue extraction from D.C.—creates a cohesive, deliberate relationship with the forum. This clearly satisfies the minimum contacts threshold for specific jurisdiction.

12. **Reasonableness Factors Weigh in Favor of DC Jurisdiction**

Jurisdiction would not be unfair or burdensome. American Airlines Already operates offices in

D.C.; markets and income heavily from DC, Regularly appears before federal regulatory bodies

here; Has reaped substantial economic benefit from D.C.-based contracts and travelers; markets

and sells codeshare programs tickets and services through DC And should reasonably anticipate

being haled into court here ( See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286

(1980)). If it wasn't for DC American Airlines can't operate or enter into Codeshare agreements

to sell in or through Dc or anywhere else.

The Supreme Court has made clear that specific jurisdiction exists when a defendant

"purposefully avails itself of the privilege of conducting activities within the forum state," and

the claims "arise out of or relate to" those activities " A court's exercise of *specific* jurisdiction

may be constitutional when the defendant: (1) purposefully avails itself of the privilege of

conducting activities within the forum state; and (2) the defendant's contacts with the forum give

rise to, or are related to, the plaintiff's claims. A defendant's contacts with the forum may relate

to the plaintiffs' claims even in the absence of a strict causal relationship between the contacts

and claims .

American Airlines' engagement with the District of Columbia is deliberate, repeated, and

commercially motivated, extending far beyond incidental or unilateral contact. The codeshare

program was born, built, and regulated in D.C., and is marketed to and relied upon by

D.C.-based stakeholders. Under binding Supreme Court precedent, these facts establish the

requisite minimum contacts, and this Court may properly assert personal jurisdiction over

American Airlines in any action arising from the codeshare program or from committing alleged

fraud against DC entities , DC passengers and the Public including crew members, Plaintiffs and their families

### 13. <u>Presence and Continuous Operations of American Airlines, Inc. in Washington, D.C.</u>

 Justice Brennan's concurrence in *Burnham* confirms that voluntary presence in the forum, combined with purposeful availment of its regulatory and commercial benefits, satisfies due process requirements. See *International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Burnham v. Superior Court*, 495 U.S. 604, 637 (1990) (Brennan, J., concurring). American Airlines has voluntarily established a long-term physical and regulatory presence in Washington, D.C., including maintaining government affairs and regulatory offices, employing registered agents, retaining local legal and lobbying counsel, and directly submitting codeshare applications and audit filings to (DOT) and  (FAA). Through these deliberate actions, American Airlines has repeatedly invoked the benefits and protections of D.C.'s legal, political, and economic systems, and cannot now disavow jurisdiction in the very forum from which it has profited and sought federal approval.

Second, the exercise of personal jurisdiction must comport with the requirements of due process. "To satisfy the requirements of due process, the nonresident defendant must have had sufficient 'minimum contacts' with the forum state to justify subjecting him to the exercise of personal jurisdiction by its courts." Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc., 355 A.2d 808, 811 (D.C. 1976) (en banc); see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). In assessing whether a defendant's contacts with the District are sufficient, "the most critical inquiry is not whether the nonresident defendant is physically present in the forum but whether the defendant's contacts with the forum are of such a quality and nature that they

manifest a deliberate and voluntary association with the forum and are not fortuitous or accidental." Harris v. Omelon, 985 A.2d 1103, 1105 (D.C. 2009) (internal editing and citation omitted); see also World-Wide  Volkswagen Corp. v. Woodson, 444 U.S. 286, 295-99 (1980). "This requires 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State' to establish personal jurisdiction." Harris, 985 A.2d at 1105 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). We have said that the District's long-arm statute permits the exercise of personal jurisdiction over nonresident defendants to the fullest extent permissible under the due process clause of the United States Constitution. Environmental Research, 355 A.2d at 810- 11;see also Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 326 (D.C. 2000) (en banc)


14. **American Airlines Presence in DC  ( See Exhibits 5,6,7 AA PAC Profile, Job Listings, DCA Address on American Airlines Website )**

American Airlines operates a fully staffed commercial office at 1101 17th St. NW, Suite 600, Washington, D.C. 20036, handling core business functions such as customer service, HR logistics, codeshare management, joint ventures, commercial contracting, marketing, and industry relations; Plaintiffs seek discovery to confirm these activities.

Its Government Affairs Office at 1200 17th St. NW, Suite 400, Washington, D.C. 20036, led by Stephen Neuman, serves as the airline's political and lobbying headquarters, managing legislative strategy, direct advocacy before Congress, DOT, and FAA, and relationship-building for American Airlines's commercial advantage; this presence is voluntary and not required by regulators.

American Airlines, Inc. is registered as a foreign business entity in D.C. under File No. 550147, maintaining continuous legal status since 1955; Plaintiffs seek discovery to link this registration to the D.C. offices and clarify the roles of American Airlines Inc. and American Airlines Group. The company designates Corporation Service Company, 1156 15th St. NW, Suite 605, Washington, D.C. 20005, as its registered agent for service of process, confirming its readiness to submit to D.C. jurisdiction. American Airlines regularly retains multiple D.C.-based law firms for regulatory and litigation matters, including Greenberg Traurig LLP and Skadden, Arps, Slate, Meagher & Flom LLP, further evidencing its active legal presence in the District. American Airlines' Political Action Committee (AAPAC), registered in D.C. (FEC Committee ID: C00107300), engages in federal election activity on the airline's behalf, demonstrating integration into the D.C. political ecosystem.

At Reagan National Airport (DCA)—marketed and operated as Washington, D.C.'s primary airport—American Airlines holds a dominant 53% market share and conducts extensive business activities (staffing, ticketing, boarding, cargo), functionally tying its operations to the D.C. market, as reflected in public materials and its own website

### 15. Regulatory and Compliance Submissions from Washington, D.C.

American Airlines routinely files legally binding certifications, audit reports, and compliance documents with federal regulators headquartered in Washington, D.C.—including the DOT and FAA. Required submissions, such as codeshare authority applications, safety audits, and compliance statements, are sent to: DOT Docket Section (PL-401): 400 7th Street SW, Washington, D.C. 20590; DOT Air Carrier Licensing Division: 1200 New Jersey Avenue SE, Washington, D.C. 20590; FAA Codeshare Review Division (AFS-50): 800 Independence Avenue SW, Washington, D.C. 20591. These filings are prepared and processed by American

Airlines' regulatory and legal teams at its D.C. offices, 1101 and 1200 17th Street NW. This demonstrates American's deliberate, ongoing engagement with D.C. agencies to maintain its commercial authority and legal status under U.S. aviation law, not mere administrative convenience.

American Airlines' dual office presence, long-standing registration, lobbying activity, legal engagements, and D.C.-based political financing establish purposeful, continuous, and profit-driven contact with the District of Columbia. These contacts support both general and specific jurisdiction, especially in litigation arising from regulatory certifications, codeshare agreements, or safety representations developed and maintained through its D.C. infrastructure.

American Airlines' participation in the codeshare agreement with Gulf Air—approved in DOT Docket OST-2008-0195—was entirely voluntary in the commercial sense. No law requires an airline to enter a codeshare arrangement or to partner with a foreign carrier. However, once American Airlines elected to pursue and maintain that relationship, it was subject to mandatory regulatory obligations enforced by D.C.-based federal agencies. Specifically, under DOT and FAA authority, American Airlines was required to: (1) conduct audits of Gulf Air's operations; (2) submit formal certificates of compliance attesting to safety standards; and (3) renew and certify those filings periodically. These were not discretionary filings—they were legal prerequisites for operating the codeshare and formed the binding foundation of the entire business relationship.

The continuous recurring submissions to FAA's AFS-50 Division and DOT's Office of International Aviation in Washington, D.C. demonstrate American Airlines' purposeful and volunteer continuous engagement with the D.C. forum, not as a passive consequence of

regulation, but as a necessary and integral part of its chosen commercial conduct. American Airlines' failure to report Gulf Air's deficiencies (e.g., crew incapacity, audit failures) directly impacted the FAA's oversight — which is headquartered and functions in Washington, D.C..That failure to act (or false certification) occurred through D.C.-based conduct and had legal effect in the District.

### 16. Harm in the Forum & Harm To Plaintiffs

The alleged fraud on D.C.-based regulators (FAA and DOT) is not a mere technicality; it undermines the regulatory process that D.C. consumers, crew, and federal travelers rely on for safety and trust. The harm from misrepresenting the safety and regulatory status of codeshare flights is felt directly in D.C., where the products are marketed, sold, and used. The harm in this case is not abstract or remote: it is direct, personal, and ongoing within the District of Columbia. The captain's death occurred during the embarkation stage of a codeshare flight marketed and sold by American Airlines as a D.C.-originating product, with the forum's residents and workforce—including federal employees—among its primary consumers. Critically, after the captain's death, American Airlines and Gulf Air continued to renew and operate the codeshare agreement, perpetuating the same misrepresentations to D.C.-based regulators and the public.

This renewal and the last submissions of Audit Certificates of Gulf Air  and American Airlines cover up after being notified  not only delayed justice for the plaintiffs, who were forced to navigate a regulatory and legal landscape clouded by ongoing fraud, but also caused them additional financial harm as they continued to rely on the legitimacy of FAA and DOT approvals procured through deception. The continued marketing and sale of these codeshare flights in D.C. directly tie the defendants' conduct to the forum, and the persistent nature of the fraud means that each renewal of the codeshare agreement constitutes a new act of harm within the District.

This pattern of conduct satisfies the "stream of commerce plus" standard for specific jurisdiction, as the defendants purposefully directed their products and fraudulent conduct at the D.C. market, and the resulting injuries were suffered in the forum. "But for" the defendant's regulated activities and compliance in DC, the alleged harm would not have occurred, there is a sufficient nexus for specific jurisdiction. "But for" the defendant's regulated activities and compliance in DC, the alleged harm would not have occurred, there is a sufficient nexus for specific jurisdiction

### 17. <u>The Minimum Contacts Standard</u>

The Supreme Court established in *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), that a court may exercise personal jurisdiction over a defendant only if the defendant has "minimum contacts" with the forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. This standard requires that the defendant's contacts with the forum be purposeful, not fortuitous or accidental, and that the claims arise out of or relate to those contacts (*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980); *Mouzavires v. Baxter*, 434 A.2d 988, 992, 995, 997 (D.C. 1981)).

Deliberate and Continuous Contacts with the District of Columbia; Forum-Directed Commercial Activity and Quality and Nature of Contacts Support Jurisdiction

These contacts are directly connected to the claims at issue, satisfying both the "minimum contacts" and "arising from" requirements for specific jurisdiction.

American Airlines has established sufficient minimum contacts with the District of Columbia to justify the exercise of specific personal jurisdiction under D.C. Code § 13-423(a)(1) and the Due Process Clause. It has purposefully availed itself of the D.C. market by voluntarily entering into federally regulated codeshare agreements that require initiation, approval, and continued compliance through agencies headquartered in Washington, D.C., namely the U.S. Department of

Transportation (DOT) and the Federal Aviation Administration (FAA). These agreements are not passive or ministerial—they are business-generating activities that directly serve the D.C. market, involve government contracting, and require ongoing engagement with D.C.-based regulators.

Plaintiffs' claims arise directly from this forum-directed conduct. The regulatory filings, compliance certifications, and safety oversight responsibilities that American Airlines executed through its D.C.-based infrastructure form the very basis of the allegations. This is not a case of random, fortuitous, or attenuated contact with the forum; it is a direct and substantial relationship to D.C. involving core operational, legal, and commercial conduct.

Under the minimum contacts standard articulated in International Shoe Co. v. Washington, 326 U.S. 310 (1945), and clarified in subsequent cases such as Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985), American Airlines' actions meet the constitutional threshold. The Court's inquiry is not confined to the geographic location where the injury occurred, but instead centers on whether the defendant's conduct connected it to the forum in a meaningful way. Here, American Airlines' conduct was deliberate, systematic, and profit-driven, making jurisdiction in the District consistent with traditional notions of fair play and substantial justice.

In sum, American Airlines did not merely participate in a national industry; it transacted business within Washington, D.C. by negotiating and maintaining codeshare agreements through its local offices, executing contracts that supplied air services to D.C. consumers and federal agencies, and submitting regulatory filings essential to those agreements from the forum. These contacts are more than sufficient to establish specific jurisdiction.

## 18.DC LONG ARM STATUTE :

First, in order to establish the court's jurisdiction, the plaintiff must satisfy a two-part test. Part one of this test is that the defendant must have purposefully availed itself of the privilege of conducting activities within the forum state. There must be some quid pro quo; the defendant must have obtained some benefit from the forum state in order to justify imposing on it the burden of defending a lawsuit in the forum. Part two of the test requires the plaintiff to demonstrate that even if the defendant purposefully availed itself of some benefit of conducting activities in the forum state, the exercise of jurisdiction must also be "reasonable."

***D.C. Code § 13-423(a)(1)*** A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's... transacting any business in the District of Columbia."— *D.C. Code § 13-423(a)(1)*
Under the D.C. long-arm statute, Plaintiffs make a prima facie showing for jurisdictional discovery by demonstrating that American Airlines has purposefully and voluntarily transacted substantial business in the District of Columbia through: Extensive Codeshare Network Rooted in D.C. Regulation The legal seat of approval, renewal, and oversight for all such agreements is D.C., making D.C. the jurisdictional origin of these business transactions; Maintaining dedicated D.C. offices for regulatory, legal, and lobbying operations, reflecting strategic, profit-driven engagement beyond mere regulatory compliance; Selling and distributing codeshare tickets—including those with Gulf Air—through channels directed at D.C. consumers, with

DCA marketed and branded as a D.C. hub Generating significant revenue from ticketing and sales in D.C., supported by local customer service and compliance staff; Entering into government contracts with D.C.-headquartered federal agencies, such as the GSA City Pair

Program, for commercial gain; Making continuous regulatory filings and certifications from D.C. offices to the FAA and DOT, including codeshare applications and safety audits; Engaging D.C.-based law firms and industry groups for litigation, compliance, and policy advocacy directly benefiting American's business interests in the District; Maintaining formal corporate registration and a registered agent in D.C. since 1955, evidencing intent to conduct ongoing business under D.C. law.

These persistent, voluntary, and revenue-generating activities satisfy multiple prongs of D.C. Code § 13-423(a), including "transacting any business" and "engaging in a persistent course of conduct" in the District, and warrant jurisdictional discovery

### *D.C. Code § 13-423(a)(2)*

*A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's ... contracting to supply services in the District of Columbia." — D.C. Code § 13-423(a)(2)*

Under the D.C. long-arm statute, Plaintiffs make a prima facie showing for jurisdictional discovery by demonstrating that American Airlines has purposefully and voluntarily contracted to supply services in the District of Columbia within the meaning of D.C. Code § 13-423(a)(2). This includes Entering into and managing codeshare agreements that require mandatory regulatory approval, audits, and renewals by D.C.-based federal agencies (DOT and FAA); Selling and distributing airline tickets for codeshare flights marketed and provided to consumers in D.C., including federal employees and government agencies; Maintaining offices and staff in D.C. who negotiate, manage, and comply with these contracts and regulatory obligations.; Holding commercial government travel contracts with D.C.-headquartered federal agencies.

These activities constitute purposeful, substantial, and ongoing contracting to supply air transportation and related services in the District, satisfying the statutory threshold for personal jurisdiction and justifying jurisdictional discovery.

### 19. DUE PROCESS

To comport with the Due Process Clause, the exercise of specific personal jurisdiction must satisfy three requirements: (1) the defendant must have purposefully availed itself of the privilege of conducting activities within the forum; (2) the cause of action must arise out of or relate to those activities; and (3) it must be reasonably foreseeable that the defendant could be haled into court in the forum. Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1250–51 (11th Cir. 2000); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).

First, American Airlines has purposefully availed itself of the District of Columbia by deliberately and repeatedly engaging in substantial commercial activities within the forum. Such contacts are not "random," "fortuitous," or "attenuated," nor the result of the "unilateral activity of another party or a third person," but are the direct result of American Airlines' own strategic and sustained conduct.

Second, the causes of action in this case arise directly from American Airlines' forum-directed activities. The claims are based on the airline's misrepresentations regarding codeshare obligations, fraudulent engagement with U.S. regulatory authorities in D.C., and regulatory violations—all of which are central to the alleged harm suffered by Plaintiffs. These are not remote or incidental contacts; they are the foundation of the claims asserted.

Third, given American Airlines' deliberate and ongoing engagement with D.C. regulators, agencies, and consumers, it was reasonably foreseeable that it could be haled into court in the District for claims arising from those activities. Exercising jurisdiction over American Airlines in

these circumstances is consistent with "fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Burger King, 471 U.S. at 476–77.

Accordingly, the Court's exercise of specific jurisdiction over American Airlines comports with due process, as the airline's own conduct created a substantial connection with the District of Columbia and gave rise to the claims at issue

American Airlines has deliberately and systematically engaged in activities directed at Washington, D.C., affirmatively invoking the benefits and protections of its laws. This is not passive foreseeability—it is purposeful and strategic

## 20. Relatedness of Contacts to the Claim

The plaintiffs' claims arise directly from American Airlines' forum-directed activities: Misrepresentations to the crew, public, passengers,  FAA and DOT regarding the safety compliance of Gulf Air occurred through filings and audits conducted from AA's D.C. offices; The codeshare approvals, safety certificates, and compliance statements required to keep the codeshare operating were submitted in D.C.—the very documents plaintiffs claim were false or fraudulent; The non compliance, cover up and regulatory conduct in D.C. is the nexus between AA's actions and plaintiffs' harm. These are not tangential connections—they are the regulatory and contractual engines of the codeshare itself. This satisfies the "arising out of or relating to" standard under *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021).

## 21. Stream of Commerce

American Airlines does not merely place services into the stream of commerce—it takes additional steps to serve the D.C. and U.S. markets, which satisfies the "stream of commerce

plus" standard under *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987) and *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011) Tickets for codeshare flights are sold under AA's brand, including flights to and from Washington Reagan National Airport (DCA), and promoted as American Airlines-operated products; AA uses its website, mobile app, and distribution networks including D.C.-based travel agencies to sell these services directly to D.C. consumers and federal entities; Marketing, billing, and customer service for codeshare flights are conducted under AA branding, creating the appearance of direct operation even for Gulf Air-operated segments; AA also contracts with U.S. federal agencies headquartered in D.C. for travel services, targeting the forum in both private and public markets.

This goes far beyond passive conduct—it reflects targeted, sustained, and regulated participation in the D.C. market.

### 22. Fair Play and Substantial Justice

Jurisdiction over American Airlines would not offend traditional notions of fair play and substantial justice, given Low Burden on Defendant: AA already maintains full business operations, staff, legal counsel, and regulatory infrastructure in D.C. It cannot claim hardship in litigating there; Strong Forum Interest: D.C. and the United States have a vital interest in regulating codeshare safety and holding airlines accountable for fraudulent or negligent behavior in filings submitted to federal agencies based in the District; Plaintiffs' Interest: Plaintiffs are U.S. residents with claims directly tied to D.C.-based regulatory failures. D.C. offers a meaningful venue for redress and access to evidence; Judicial Efficiency: The claims concern federal oversight, federal filings, and aviation standards, all supervised from D.C.—where the agencies, documents, and witnesses reside; Public Policy: Accountability in the safety and

transparency of international aviation—especially under codeshare partnerships—is essential to protecting public safety, which is the cornerstone of the FAA and DOT missions.

### 23. <u>No Unilateral Conduct or Mere Foreseeability</u>

American Airlines' jurisdictional exposure does not arise from the actions of Gulf Air or third parties. Instead, it is based on its own affirmative and repeated conduct It files documents directly with FAA/DOT; It sells tickets and earns revenue from D.C. consumers and agencies; It maintains offices and legal representation in the District; It certifies codeshare compliance under penalty of law from the D.C. forum. These are American Airlines' own contacts, making it subject to specific jurisdiction under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

### 24. Fairness Factors Support the Exercise of Personal Jurisdiction over American Airlines

Litigating in the District of Columbia would not impose an undue burden on American Airlines. The company has voluntarily maintained physical offices in Washington, D.C. for decades, engages local law firms and lobbyists, and routinely interacts with D.C.-based federal agencies including the DOT and FAA. Given its substantial and continuous presence in the District, defending litigation here is neither unreasonable nor unexpected.

Plaintiffs have a strong interest in obtaining relief in the District of Columbia because their claims arise from American Airlines' conduct in and through this jurisdiction—specifically, regulatory filings, codeshare applications, and safety representations submitted to federal agencies headquartered in D.C. The alleged fraud and misrepresentations are rooted in this forum, making it the most appropriate place for redress.

The District of Columbia has a compelling interest in adjudicating disputes that arise from conduct directed at and occurring within its borders—particularly when it involves the integrity

of federal aviation oversight, public safety, and consumer protection. American Airlines' actions in D.C. directly implicate regulatory compliance and aviation safety, matters of public concern rooted in this jurisdiction.

While aviation regulation has international dimensions, the United States—through its D.C.-based agencies—retains primary authority for oversight of U.S. air carriers and codeshare agreements. Exercising jurisdiction in this case is consistent with U.S. aviation law and international obligations under ICAO, which are administered from Washington, D.C. No foreign policy or sovereignty concerns are undermined by hearing this case in D.C.

The District of Columbia is the most efficient forum for adjudicating this case. The relevant documents, regulatory agencies, witnesses, and evidence related to codeshare approval, FAA audit oversight, and DOT compliance are all centralized in D.C. Litigating here promotes judicial economy and avoids duplicative or fragmented proceedings.

American Airlines clearly satisfies all elements of the minimum contacts test: Purposeful availment of the D.C. market and legal system; Plaintiffs' claims arise from those specific activities; Forum-based conduct connects American Airlines to the litigation; Jurisdiction is fair, reasonable, and grounded in due process.The Core Rule: "A lawsuit must not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) it doesn't in the case of American Airlines Inc.

## 25. Violation of Federal Statue, Federal law, Regulations, DOT Orders & Public Interest

The alleged violations—including 49 U.S.C. § 40101, FAA rules, DOT Order 2008, and the Open Skies Agreement—arise from regulatory obligations administered and enforced in Washington, D.C., directly tying American's conduct to the District. The Open Skies Agreement, negotiated and overseen by D.C.-based federal agencies, sets binding requirements for codeshare

operations and international air service, and violations of these agreements or their implementing

orders are adjudicated by the DOT in Washington, D.C.

The relevant inquiry for specific jurisdiction is not just where the injury occurred, but whether

the defendant's conduct—subject to D.C.-based federal oversight—gives rise to the claims. Here,

American Airlines' compliance with, and alleged violations of, these federal laws and

international agreements are central to the claims and provide the necessary substantial

connection to the District. Courts have recognized that when a defendant's regulatory and

business activities are purposefully directed toward and causally connected to the forum,

personal jurisdiction is proper, even if the harm occurred elsewhere. Thus, American Airlines'

D.C.-based regulatory failures and breaches of the Open Skies Agreement support the exercise of

specific jurisdiction in this forum.

## 26. General Jurisdiction Under Exceptional Case

Plaintiffs don't rely on General Jurisdiction unless discovery can establish exceptional case. To

establish general personal jurisdiction over American Airlines in the District of Columbia as an

"exceptional case," Plaintiffs must demonstrate that American's contacts with D.C. are so

continuous, systematic, different than other states e.g North Carolina, Miami, Chicago etc are all

have common systematic and continuous business, but not DC, DC is the root and is the source

of income for American Airlines. and central to its operations that the District functions as a

surrogate corporate home—mirroring the rare circumstances recognized in *Perkins v. Benguet

Mining Co.* The Supreme Court's decisions in *Daimler AG v. Bauman* and *BNSF Railway Co. v.

Tyrrell* confirms that general jurisdiction is the exception, not the rule, and is typically limited to

a corporation's place of incorporation or principal place of business, unless the forum is so

integral to the corporation's affairs as to serve as an additional headquarters. If it wasn't for DC

and DC contacts including government contacts, and codeshare program as a contact and

Permits, American Airlines would not be able to operate or Texas headquarter would not have

possibly existed

### 28. <u>Exceptional Case and Need for Discovery</u>

Unique Corporate Integration: American Airlines' core regulatory, compliance, and operational

functions are continuously anchored in Washington, D.C. Its ability to operate as a certified air

carrier—including codeshare agreements, federal contracts, and regulatory approvals—depends

on ongoing, high-level engagement with D.C.-based federal agencies. This is foundational to

American's corporate identity and existence, not routine business activity; Comparable to a

Second Headquarters: American's D.C. operations—including dedicated regulatory, government

affairs, and compliance offices, as well as a dominant hub at Reagan National Airport

(Washington, D.C. 20001)—are so extensive and central that D.C. serves as a functional second

headquarters for its most critical business activities; Revenue and Contractual Core: Major

federal agency contracts and the management of essential business relationships are handled

from D.C. These are central to American's revenue model and operational authority, not

peripheral or incidental; Exceptional Case Threshold: This degree of integration and centrality

far exceeds the "doing business" standard rejected in *BNSF* and aligns with the "exceptional

case" in *Perkins*, where the forum state became a de facto principal place of business due to

necessity and corporate function.

Plaintiffs require jurisdictional discovery to obtain internal records and testimony detailing the

full scope and significance of American's D.C. operations. Only American possesses evidence

showing how these D.C.-based activities are integrated into its corporate structure and revenue

streams. This discovery is essential to confirm that D.C. is, for all practical purposes, a corporate home for American Airlines, justifying general jurisdiction in this exceptional case.

### 29. FAA Certificate Of Compliance Submission Location

Electronic submission of audit compliance certificates does not alter the jurisdictional analysis. Courts recognize that electronic filings or communications purposefully directed to a forum—especially in a regulatory context—constitute purposeful availment, satisfying the minimum contacts requirement for personal jurisdiction

 Here, American Airlines intentionally directed its conduct at Washington, D.C. by submitting federally mandated compliance documents to agencies headquartered in the District. The fact that these submissions were made electronically does not diminish their legal significance; what matters is the deliberate targeting of D.C.-based regulators as part of the federal approval process American Airlines disputes Plaintiffs' allegations and evidence that the Gulf Air audit compliance was submitted to the FAA in D.C. This factual dispute underscores the need for jurisdictional discovery to obtain the relevant audit certificates and related communications. Such discovery is also essential for Plaintiffs' fraud claims, as these certificates are central to proving how American Airlines allegedly misrepresented compliance to the FAA. Thus, electronic transmission does not insulate American from jurisdiction in D.C.; rather, it supports purposeful availment and the need for discovery to fully develop the record

### 30. There are core factual disputes that warrant jurisdictional discovery:

First, American Airlines asserts in its March 28, 2025 filing and motion to dismiss that it has "no presence" and "no contacts" in the District of Columbia, and that no harm arose from any D.C.-based activity. Plaintiffs dispute this, contending that American Airlines maintains ongoing

regulatory, operational, and business activities in D.C., including but not limited to its conduct at Reagan National Airport and its engagement with D.C.-based federal agencies

Second, American Airlines claims that the FAA agent who received the Gulf Air audit compliance certificates could be located anywhere in the United States, and thus no purposeful contact with D.C. occurred. Plaintiffs disagree, maintaining that federal regulations and airline practice require such regulatory submissions to be directed to and processed by FAA offices headquartered in Washington, D.C., and that these activities constitute purposeful availment of the forum.

## **CONCLUSION**

Plaintiffs respectfully request limited, precise jurisdictional discovery, as outlined in Attachment One, to obtain evidence regarding American Airlines' regulatory compliance, audit submissions, and internal practices related to its codeshare with Gulf Air. There are material factual disputes as to whether American Airlines has a presence or sufficient contacts in the District of Columbia, and whether required audit compliance certificates were submitted to the FAA in Washington, D.C and American Airlines and Gulf Air Codeshare venture in relation to the Plaintiffs Harm and injuries This discovery is necessary to develop the factual record needed to oppose Defendant's motion to dismiss and to establish that this Court has personal jurisdiction. Plaintiffs Request the court to Grant the discovery requested items listed in the motion.

Plaintiffs further request leave to amend this motion and to leave to amend the complaint if warranted by facts revealed in discovery, and for such other and further relief as the Court deems just and proper

Submitted,

June 12  2025

**Pro Se Plaintiffs**

Tala Josephano
615 S Catalina Ave #233
Redondo Beach CA 90277
347-749-4980

Feras Hindi
7823 New London Dr.
Springfield VA 22153
703-980-6955

Samiha Ayyash
7823 New London Dr.
Springfield VA 22153
703-623-3767

## CERTIFICATE OF SERVICE

I hereby certify that on June 12 2025, Plaintiff Feras Hindi, Plaintiff Tala & Plaintiff Samiha will be sending a true and correct copy of the following documents to be served upon the parties listed below:

Motion Leave for Limited Discovery, Memorandum & attachments

1-Defendant American Airlines, Inc. Micah E. Ticatch 1945 Old Gallows Road, Suite 650 Vienna, Virginia 22182 . Method of Service: Email

2-Defendant Gulf Air B.S.C., Inc Darcy & Mark  **AT** Eckert Seamans Cherin & Mellott, LLC 1717 Pennsylvania Ave., N.W., 12th Floor 12th Washington, D.C. 20006 Method of Service: Email, First Class mail

Submitted,

June 12  2025

**Pro Se Plaintiffs**

Tala Josephano
615 S Catalina Ave #233
Redondo Beach CA 90277
347-749-4980

Feras Hindi
7823 New London Dr.
Springfield VA 22153
703-980-6955

Samiha Ayyash
7823 New London Dr.
Springfield VA 22153
703-623-3767