## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Civil Division

| | | |
|---|---|---|
| **Samiha Ayysah, Feras Hindi,** | ) | |
| **Tala Josephano** | ) | Case No.:  1:24-cv-03434-ACR |
| | ) | |
| Plaintiffs | ) | |
| **American Airlines Inc. ,** | ) | |
| **Gulf Air B.S.C** | ) | |
| Defendants | ) | |
| _____ | ) | |

**PLAINTIFFS' SUPPLEMENTAL REPLY TO DEFENDANT AMERICAN AIRLINES' OPPOSITION AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR JURISDICTIONAL DISCOVERY**

Plaintiffs respectfully submit this reply in support of their Motion for Jurisdictional Discovery (Dkt. 61) and in response to American Airlines' opposition. Contrary to American Airlines' assertion, Plaintiffs have not filed an opposition to the motion to dismiss at this time. Instead, Plaintiffs have properly moved solely for jurisdictional discovery, as permitted by federal practice when the facts necessary to establish personal jurisdiction are within the exclusive control of the defendant. Plaintiffs expressly reserve the right to submit a full opposition to the motion to dismiss at such time and in such manner as the Court may direct.



RECEIVED

JUL 7 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

## Table of Authorities

**Cases**

1.  Ford Motor Co. v. Montana, 141 S. Ct. 1017 (2021)

2.  Walden v. Fiore, 571 U.S. 277 (2014)

3.  GTE New Media Servs., Inc. v. BellSouth Corp., 199 F.3d 1343 (D.C. Cir. 2000)

4.  Diamond Chem. Co. v. Atofina Chems., Inc., 268 F. Supp. 2d 1 (D.D.C. 2003)

5.  United States v. Philip Morris Inc., 116 F. Supp. 2d 116 (D.D.C. 2000)

6.  First Chicago Int'l v. United Exchange Co., 836 F.2d 1375 (D.C. Cir. 1988)

7.  Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952)

8.  Daimler AG v. Bauman, 571 U.S. 117 (2014)

9.  Cockrum v. Donald J. Trump for President, Inc., 319 F. Supp. 3d 158 (D.D.C. 2018)

10. Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)

11. International Shoe Co. v. Washington, 326 U.S. 310 (1945)

12. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978)

13. Hughes v. A.H. Robbins Co., 490 A.2d 1140 (D.C. 1985)

14. Beachboard v. Trustees of Columbia University, 475 A.2d 398 (D.C. 1984)

15. Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp., 35 A.3d 1127 (D.C. 2012)

16. Savage v. Bioport, Inc., 460 F. Supp. 2d 55 (D.D.C. 2006)

17. Alkanani v. Aegis Def. Servs., LLC, 976 F. Supp. 2d 13 (D.D.C. 2014)

18. In re Air Crash at Lexington, 486 F. Supp. 2d 640 (E.D. Ky. 2007)

**Statutes and Regulations**

1.  D.C. Code § 13-423(a)(1)

2.  14 C.F.R. § 212.10

3.  49 U.S.C. § 40101

4.  28 U.S.C. § 1631


**Government Reports and Secondary Sources**

1.  DOT OIG Report AV-2013-046

2.  GAO-05-930, *Aviation Safety: Oversight of Foreign Code-Share Safety Program Should Be Strengthened*

3.  "Home Is Where the Court Is: A New Approach to General Personal Jurisdiction," 62 Cath. U. L. Rev. 697 (2013)

## Table of Contents

INTRODUCTION ................................................................. 6

I. Jurisdictional Discovery Will Provide Essential Evidence Supporting Personal Jurisdiction Over Defendant in This Court ................................................................. 7

II. Plaintiffs Satisfy Every Prerequisite and Threshold for Jurisdictional Discovery ................................................................. 8

III. Non-Conclusory, Colorable Showing of Jurisdictional Facts ................................................................. 9

IV. Good Faith Basis / Not Speculative ................................................................. 10

V. Relevant Jurisdictional Facts Are Uniquely Within Defendant's Control ................................................................. 11

VI. Evidentiary Support and Policy Context ................................................................. 12

VII. American Airlines' Non-Delegable Duty and Enabling Conduct Under Federal Law ................................................................. 13

VIII. Judicial and Regulatory Precedent for Accountability ................................................................. 15

IX. Government Contacts Doctrine Does Not Shield Defendant ................................................................. 16

X. Purposeful Availment Encompasses Deliberate, Strategic Regulatory Conduct ................................................................. 18

XI. Jurisdiction Is Proper Where Claims Arise From Forum-Based Conduct Central to the Dispute ................................................................. 20

XII. Commercial and Regulatory Conduct in D.C. Is Not Excluded from Jurisdictional Analysis ................................................................. 21

XIII. The Government Contacts Doctrine Is Not a Blanket Immunity—Especially in Aviation Regulation ................................................................. 22

XIV. Exceptional Case and the Need for Jurisdictional Discovery
................................................................................ 22

XV. Defendant's Reliance on Huynh v. Air Canada Is Misplaced
................................................................................ 24

XVI. Transacting Business Alleged Under D.C. Code § 13-423(a)(1)
................................................................................ 25

XVII. Harm Arising From Forum-Based Business Conduct
................................................................................ 27

XVIII. After Death of Captain: Continuous Harm Arising from D.C.-Based Business Conduct
................................................................................ 35

XIX. Direct and Foreseeable Harm to Plaintiffs
................................................................................ 37

XX. Collusion and Retaliatory Conduct .................................................................. 38

XXI. Continuous Harm & Business Activity in D.C. as the Nexus
................................................................................ 39

XXII. Transnational Harm and Barriers to Justice
................................................................................ 40

XXIII. Public Interest Harm: Undermining U.S. Aviation Safety and Endangering Plaintiffs as
Members of the Traveling Public .................................................................. 42

XXIV. Substantial D.C. Connection: Codeshare Creation, Regulatory Oversight, and Audit
Certifications Establish Jurisdiction—Discovery Is Essential
................................................................................ 43

## **INTRODUCTION**

Plaintiffs respectfully submit this supplement in support of their Motion for Jurisdictional

Discovery and in response to American Airlines' improper submission DKT 61 . The motion is

grounded in specific allegations demonstrating American Airlines' sustained, purposeful conduct

in Washington, D.C.—not merely incidental regulatory contact—gave rise to the injuries asserted

in this case. For nearly two decades, American Airlines' regulatory and legal operations in D.C.

played a central role in creating and maintaining the codeshare relationship with Gulf Air.

Through the DC office, American Airlines submitted safety certifications, negotiated regulatory

approvals, and coordinated policy advocacy efforts—all while Gulf Air lacked the FAA's

required IASA Category 1 safety rating. Plaintiffs allege these D.C.-based activities included

deliberate misrepresentations to federal agencies concerning their own and Gulf Air's

compliance with safety standards, despite actual knowledge of systemic medical and operational

violations. These actions foreseeably harmed Plaintiffs, both individually and as members of the

traveling public, and continue to expose them to ongoing safety risks and quantifiable damages.

Plaintiffs request limited, targeted jurisdictional discovery to uncover facts that are exclusively

within American Airlines' control and that bear directly on the Court's jurisdictional analysis..

### **Clarifying the Purpose and Procedural Validity of Plaintiffs' Discovery Motion**

Defendant's assertion that Plaintiffs' Motion for Jurisdictional Discovery is an untimely

opposition to the motion to dismiss is legally and factually baseless. Plaintiffs' Jurisdictional

Discovery motion was timely filed on **June 12, 2025,** within the scheduling deadlines set by the

Court, and fully complies with the Federal Rules of Civil Procedure and prevailing jurisdictional

discovery standards. It is well established that where jurisdictional facts are contested or

undeveloped, a plaintiff is not required to preemptively oppose a motion to dismiss before

jurisdictional discovery occurs. See *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (jurisdictional discovery is appropriate where plaintiffs make a "sufficient start" on jurisdictional allegations). Plaintiffs' motion properly seeks narrowly tailored discovery to resolve jurisdictional questions central to the Court's threshold analysis.

Defendant's procedural argument ignores the significant hurdles Plaintiffs have faced as pro se litigants. Despite harassment, unequal resources, and the Court's failure to address prior urgent hearing requests, Plaintiffs filed their discovery motion on time and in good faith. Meanwhile, Defendant misrepresented its compliance, obtained leave to file a second, more sophisticated motion to dismiss, and now seeks to block jurisdictional discovery by raising new arguments months after their deadline submission  that require factual development to rebut. This tactic leverages corporate power and procedural technicalities at the expense of fairness. Contrary to Defendant's claim, no rule prohibits a timely-filed discovery motion from serving as a partial response to a motion to dismiss. Plaintiffs clearly explained their need for discovery before addressing the full merits, as critical jurisdictional facts remain solely within Defendant's control. Plaintiffs respectfully request that the Court to Affirm the procedural validity of their jurisdictional discovery motion; Defer ruling on Defendant's motion to dismiss until Plaintiffs have a fair opportunity to develop the jurisdictional record; and Reject Defendant's attempt to short-circuit this process by conflating distinct procedural steps.

I.    **<u>Jurisdictional Discovery Will Provide Essential Evidence Supporting Personal Jurisdiction Over Defendant in This Court</u>**

It is well established that the district court has broad discretion in its resolution of jurisdictional discovery issues." *FC Inv. Grp. v. IFX Markets, Ltd.*, 529 F.3d 1087, 1093 (D.C. Cir. 2008) (quoting *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983)). The standard for

permitting jurisdictional discovery is "quite liberal." *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003). "[I]f a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). While "mere conjecture or speculation" is insufficient (*FC Inv. Grp.*, 529 F.3d at 1094), a plaintiff need only provide a good faith basis that targeted discovery could support personal jurisdiction. *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). That is exactly what Plaintiffs have done here. As detailed in Dkt. 54—and corroborated by American Airlines' own admissions in Dkt. 7—Plaintiffs' showing easily meets and exceeds this standard. The record establishes a pattern of systematic and continuous business activity centered in Washington, D.C.—distinct from operations in other states. D.C. serves as a principal nerve center and source of revenue for American Airlines, with business operations, regulatory submissions, and key decisions emanating from its D.C. offices. The creation and management of the codeshare program, along with the submission of FAA-related certifications, originated in D.C. and directly gave rise to the alleged harm.  This concentrated and sustained regulatory activity in D.C.—directly tied to Plaintiffs' injuries—surpasses the sporadic or attenuated contacts courts have deemed insufficient.

## II.    <u>Plaintiffs Satisfy Every Prerequisite and Threshold for Jurisdictional Discovery</u>
**Plaintiffs Satisfy Every Procedural and Substantive Threshold for Jurisdictional Discovery**

Plaintiffs' motion complies with both the procedural and substantive standards governing jurisdictional discovery. It identifies specific, narrowly focused areas of inquiry—such as internal communications, regulatory filings, and personnel records related to American Airlines' codeshare oversight in Washington, D.C.—all of which are directly relevant to the jurisdictional

analysis and solely within Defendant's control. Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, discovery is permitted on "any nonprivileged matter that is relevant to any party's claim or defense," including identifying documents and individuals with knowledge of contested facts. Courts have consistently applied this standard liberally in the jurisdictional context. See *Hansen v. Neumueller*, 163 F.R.D. 471, 473 (D. Del. 1995); *Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982). Plaintiffs' motion meets this standard by clearly delineating targeted requests necessary to resolve jurisdictional disputes at this preliminary stage. If the court inherent authority is required, Plaintiffs ask the court to invoke its authority to grant Plaintiffs motion.

### III.    Non-Conclusory, Colorable Showing of Jurisdictional Facts

Plaintiffs have alleged specific, non-conclusory facts demonstrating purposeful availment and a direct causal connection between American Airlines' D.C.-centered conduct and their injuries. As outlined in their discovery motion (Dkt. 54), Plaintiffs have identified narrowly focused areas of inquiry relevant to resolving this jurisdictional question, including internal communications, regulatory filings, and FAA-related certifications.—relevant to resolving this jurisdictional question. Where, as here, allegations are supported by a factual foundation and not merely speculative, jurisdictional discovery is appropriate. See *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003). If necessary, Plaintiffs also seek limited FAA testimony to verify who prepared and submitted key regulatory documents central to the claims. Plaintiffs' jurisdictional showing more than satisfies the threshold required for discovery. Defendant's claim that Plaintiffs offer "no specifics" is plainly inaccurate. The motion identifies precise lines of inquiry—rooted in American Airlines' D.C.-based regulatory conduct—that are likely to yield relevant jurisdictional evidence. These requests are not speculative; they are

focused on resolving factual disputes essential to ensuring a complete and accurate record before the Court rules.

## IV. <u>Good Faith Basis / Not Speculative</u>

Defendant's blanket claim that jurisdictional discovery would be "futile" lacks any supporting evidence or affidavit showing that relevant facts cannot be uncovered. This falls well short of the governing standard. Courts in this Circuit permit jurisdictional discovery where facts are reasonably in dispute, and mere assertions of futility are insufficient. See *In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d 26, 35 (D.D.C. 2000). Plaintiffs are not required to prove jurisdiction at this stage—only to demonstrate a good faith belief and a factual basis sufficient to justify limited discovery. Plaintiffs have diligently supplemented the record as new evidence became available, but critical jurisdictional facts—such as the preparation of regulatory filings and codeshare certifications—remain solely within American Airlines' control. This targeted discovery request is grounded in concrete allegations of D.C.-based conduct directly tied to Plaintiffs' injuries, and it reflects a good faith effort to develop the jurisdictional record—not a speculative or overbroad inquiry. Courts routinely grant jurisdictional discovery where plaintiffs articulate a good faith belief that limited inquiry will uncover facts establishing jurisdiction. See *GTE New Media Servs., Inc.*, 199 F.3d at 1351.

Key jurisdictional facts remain in dispute—particularly whether American Airlines' regulatory certifications were submitted from Washington, D.C., and whether those actions constitute commercial conduct rather than protected government contacts. Plaintiffs' motion details why this information is essential and includes targeted discovery requests consistent with federal precedent. See *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003); *In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d 26, 35 (D.D.C. 2000).

This discovery will help the Court build a complete jurisdictional record to assert personal Jurisdiction and the correct venue over Defendant and avoid premature dismissal. It will also serve the public interest by enabling judicial evaluation of whether American Airlines' forum-based conduct—including its D.C.-based certifications and codeshare oversight—complied with federal safety obligations intended to protect passengers and the broader community. As already noted, the D.C. Circuit in GTE New Media Servs., Inc. v. BellSouth Corp., 199 F.3d 1343, 1351 (D.C. Cir. 2000), held that jurisdictional discovery is appropriate when a plaintiff identifies the specific information sought and there is ambiguity about the defendant's forum contacts—even if the existing record appears weak. Plaintiffs' targeted requests also satisfy that standard. Defendant has offered no declarations or other evidence to refute Plaintiffs' factual allegations or to clarify where its relevant conduct occurred. In these circumstances, discovery is the appropriate tool for "sorting out" contested jurisdictional facts. See Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 n.13 (1978) (recognizing that discovery is available whenever jurisdiction or venue is in dispute).

**V.    <u>Relevant Jurisdictional Facts Are Uniquely Within Defendant's Control</u>**

The information necessary to resolve this jurisdictional dispute—particularly the scope and location of American Airlines' codeshare oversight and regulatory filings—resides entirely within Defendant's internal records. These facts are not publicly accessible and cannot be verified without limited discovery. Plaintiffs have identified the specific evidence needed, including internal communications and compliance submissions, which bear directly on the company's D.C.-based conduct. Without access to these materials, Plaintiffs cannot fully establish the forum connections that gave rise to the harm.

Courts routinely authorize jurisdictional discovery where key facts lie within the defendant's exclusive control. See *In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d 26, 35 (D.D.C. 2000). Here, only American Airlines can confirm whether the challenged regulatory submissions and codeshare activities were directed from its D.C. office—information critical to determining whether its forum conduct supports jurisdiction under D.C. Code § 13-423(a)(1). Substantiating allegations that depend on facts uniquely within Defendant's control—specifically, whether American Airlines' D.C.-based conduct gave rise to the claims at issue. Limited discovery is necessary to determine whether Plaintiffs' injuries "arise out of or relate to" Defendant's forum conduct, as required by *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021 )Moreover, jurisdictional discovery in this case further advances the public interest by allowing the Court to assess whether American Airlines' D.C.-based conduct complied with federal safety obligations intended to protect passengers and the broader community. Although American Airlines does not dispute the occurrence or severity of Plaintiffs' injuries, it seeks dismissal without disclosing whether its D.C.-based regulatory actions contributed to those harms. Jurisdictional discovery is necessary to resolve that question under D.C. law.

## VI.    **Evidentiary Support and Policy Context**

FAA's pattern of deference to American Airlines created a dynamic of regulatory capture that allowed Gulf Air to operate with limited oversight. From its D.C. office, American Airlines submitted compliance filings that misrepresented their own compliance and Gulf Air's adherence to safety standards—contributing to unsafe conditions and regulatory approvals that would not have been granted had the full facts been disclosed. These actions directly enabled systemic violations, including the fatal incapacitation of Captain Alhindi, and created ongoing barriers to Plaintiffs' redress.

**VII.**    **American Airlines' Non-Delegable Duty and Enabling Conduct Under Federal Law**

Under DOT codeshare approvals, FAA regulations, and the DOT Code-Share Safety Program, American Airlines bears a non-delegable duty to audit, monitor, and certify the safety compliance of its foreign codeshare partners, including Gulf Air. See 14 C.F.R. § 212.10; DOT Order OST-2008-0195. This oversight obligation is continuous and cannot be transferred or excused. Both the Government Accountability Office (GAO) and the DOT Office of Inspector General (OIG) have affirmed that U.S. carriers serve as the **"gatekeepers"** of safety in codeshare arrangements and are responsible for ensuring foreign partners meet all applicable safety standards. See GAO-05-930; OIG AV-2013-006.

Regulatory capture is where powerful industry actors shape oversight agencies to serve private interests—has been well-documented by both government watchdogs and legal scholars. The DOT Office of Inspector General has warned that such dynamics lead to "lax enforcement" and "systemic safety risks." See OIG AV-2013-006. Within this environment, American Airlines has exercised significant influence over FAA regulatory processes, resulting in prematurely closed investigations and inadequate corrective actions—effectively insulating itself from full accountability and enabling recurring safety violations.

Federal agencies ( especially lately ) have recognized patterns of regulatory noncompliance by American Airlines, resulting in enforcement actions and penalties. However, structural barriers—such as the complexity of jurisdictional rules and the difficulty faced by pro se litigants—often prevent meaningful accountability in civil litigation. This context underscores the need for robust judicial oversight and regulatory enforcement to protect public safety, citizens and passengers rights..

For over three decades, American Airlines has maintained a strategic partnership with Gulf Air, facilitating its entry and continued access to the U.S. market—even during periods when Gulf Air lacked full International Aviation Safety Assessment (IASA) compliance. American Airlines did not simply endorse Gulf Air's regulatory standing; it actively submitted safety certifications and compliance representations from its Washington, D.C. office that were relied upon by the FAA and DOT for codeshare approvals and renewals. These filings constituted material representations directly bearing on aviation safety and regulatory eligibility.

These certifications were, in fact, deliberate, material representations on which the FAA and DOT critically relied when approving and renewing the codeshare, far beyond mere routine paperwork. Courts have held that when a defendant's affirmative filings conceal ongoing violations, jurisdictional discovery—and ultimately liability—may follow. Without these certifications, the codeshare would not have been renewed, and Gulf Air could not have expanded its U.S. operations until its crew-fitness and systems deficiencies were corrected. The death of Captain Alhindi was not an isolated tragedy—it exposed systemic regulatory violations that had already been reported prior to the codeshare renewal. Despite receiving notice of these issues, American Airlines proceeded to submit the necessary certifications, allowing the codeshare to continue. In doing so, it shielded Gulf Air from deeper scrutiny and accountability. As confirmed in GAO-05-930, U.S. carriers play a critical role in ensuring foreign partners meet safety obligations, and lapses in oversight can have serious consequences.

Public Lobbying Disclosure filings show that American Airlines has spent significant sums advocating on transportation and international-aviation policy—often on matters that directly affect Gulf Air and other foreign partners. This sustained lobbying, coupled with American's established presence in Washington, helped create a regulatory climate in which foreign-carrier

compliance could be relaxed or subject to exceptions. Consequently, Gulf Air was able to expand

its U.S. codeshare operations during periods when it failed to meet full IASA safety standards,

including episodes involving serious safety incidents that would ordinarily trigger heightened

scrutiny. By providing regulatory assurances and continuing to certify Gulf Air despite known

compliance issues, American Airlines eliminated the pressure and incentive for Gulf Air to

address safety deficiencies. This facilitated Gulf Air's continued U.S. expansion to the point they

were granted permit to fly non stop to NY and DC under deception and misrepresentations to the

DOT applications and the Public, while avoiding corrective oversight—thereby exposing

Plaintiffs and the traveling public to ongoing safety risks and avoidable harm. While the

government contact doctrine generally aims to shield interactions with government from being

jurisdictional hooks, it does **not** protect contacts that are commercial in nature, actively tortious,

or part of a broader pattern of purposeful availment that directly gives rise to the plaintiff's

claims.

## VIII.    <u>Judicial and Regulatory Precedent for Accountability</u>

Federal courts and agencies have repeatedly recognized that airline regulatory filings and

certifications are not ministerial formalities, but substantive representations subject to legal

scrutiny. In 2019, American Airlines agreed to pay $22.1 million to resolve allegations under the

False Claims Act that it knowingly submitted false international mail delivery data, violating its

contractual obligations to the U.S. Postal Service. This enforcement action—centered on false

filings submitted to federal authorities in Washington, D.C.—demonstrates that regulatory

misrepresentations can trigger serious government investigations and significant penalties. That

precedent supports judicial oversight of similar representations in other regulatory contexts,

including those at issue here. Plaintiffs allege that American Airlines submitted materially

inaccurate compliance statements in connection with the Gulf Air codeshare, misrepresenting

safety standards and contributing to the harms alleged in this case.

### IX.  Government Contacts Doctrine Does Not Shield Defendant

Plaintiffs do not rely on protected government contacts to establish jurisdiction. Instead, they

allege purposeful, commercial activity in the District of Columbia, including the creation, sales

of codeshare management of codeshare agreements, coordination of ticket sales and partnerships,

and leadership in aviation industry lobbying. These actions constitute "transacting business" in

the District and fall well outside the narrow scope of the government contacts doctrine.

Moreover, Defendant did not raise this defense in its motion to dismiss, and jurisdictional

objections not timely asserted are deemed waived. *See First Chicago Int'l v. United Exchange

Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988).

The government contacts doctrine does not protect a defendant that uses governmental processes

as a vehicle for fraud—even where the resulting government action is not directed at the

plaintiff. As the D.C. Court of Appeals held in *Companhia Brasileira Carbureto De Calcio v.

Applied Industrial Materials Corp.*: "A person who uses the government as an instrumentality of

fraud, and thereby causes unwarranted government action against another, forfeits the protection

of the government contacts exception. Such fraud does not warrant our protection, and we will

not extend the government contacts exception to shield it." 35 A.3d 1127, 1134 (D.C. 2012).

This principle applies directly to Plaintiffs' allegations that American Airlines submitted material

misrepresentations to federal regulators in D.C. to shield its own and Gulf Air's ongoing

noncompliance.

The "unwarranted government action" referenced in *Companhia Brasileira* is not limited to enforcement or penalties directed at a plaintiff. The D.C. The Court of Appeals recognized that a defendant who engages in fraudulent misrepresentations that induce the government to take action it otherwise would not—such as granting approvals, permits, or regulatory clearances—cannot claim the doctrine's protection. This exception applies even when the resulting government action is not formally "against" the plaintiff, so long as it causes harm to a private party. In this case, Plaintiffs allege that American Airlines' false filings from Washington, D.C. induced the FAA and DOT decisions that enabled Gulf Air's continued noncompliance and directly contributed to the alleged injuries—a chain of events caused by Defendant's forum conduct and a foreseeable consequence. Plaintiffs have presented detailed factual allegations and supporting evidence establishing a direct causal link between Defendant's fraudulent conduct and subsequent government approvals that deprived Plaintiffs—and the public—of essential safety protections. These are precisely the type of "credible and specific allegations" required to invoke the fraud exception to the government contacts doctrine. The D.C. Court of Appeals has further recognized that such deliberate, voluntary misrepresentations constitute purposeful availment of the District, thereby satisfying the due process and minimum contacts requirements for personal jurisdiction.

When a defendant's fraudulent inducement of government action results in increased risks to public safety or the denial of statutory protections, the resulting harm squarely falls within the scope of the fraud exception. The exception prevents defendants from evading accountability by manipulating governmental processes to the detriment of private individuals and the public at large. As the D.C. The Court of Appeals made clear: "Use of the known lie as a tool is at once at odds with... the comity rationale for the government contacts exception, because the government

has no interest in being fraudulently manipulated." *Companhia Brasileira*, 35 A.3d at 1134.

Accordingly, American Airlines cannot invoke the government contacts exception merely

because the government's actions were not formally directed at Plaintiffs; it is the fraudulent

misuse of government processes—and the foreseeable harm that resulted—that triggers the

exception. American Airlines' false or misleading statements to federal regulators directly

induced the government to approve, renew, or maintain codeshare arrangements and regulatory

permissions—actions that would not have occurred but for the fraud, and that foreseeably

resulted in harm to Plaintiffs. Under these circumstances, the government contacts exception

does not apply. The relevant focus is on the defendant's conduct and its causal role in securing

unwarranted government action not on whether the agency's response was formally directed at

the plaintiff.

## X.    Purposeful Availment Encompasses Deliberate, Strategic Regulatory Conduct.

American Airlines' forum contacts were neither random nor fortuitous. The Supreme Court has

made clear that purposeful availment exists where a defendant "deliberately has engaged in

significant activities within a State, or has created continuing obligations between himself and

residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985).

Jurisdiction is proper "where the contacts proximately result from actions by the defendant

himself that create a 'substantial connection' with the forum State." *Id.* at 475. American

Airlines' decision to anchor its codeshare regulatory operations and FAA/DOT certifications in

Washington, D.C. was a calculated, profit-driven business strategy—not a compelled or

incidental act—and therefore satisfies the purposeful availment standard under due process.

As the D.C. Circuit has recognized, "purposeful availment requires only that the defendant's

contacts with the forum result from actions by the defendant himself that create a substantial

connection with the forum State." *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). American Airlines meets this standard through its deliberate and sustained regulatory engagement in Washington, D.C., including the submission of FAA and DOT compliance filings and coordination of its codeshare operations. These are not random or attenuated contacts, but intentional business activities that, under both *GTE New Media* and *Burger King*, satisfy the constitutional standard for purposeful availment. American Airlines' activities in Washington, D.C.—including regulatory filings, coordination with federal agencies, and codeshare management—are not incidental or peripheral; they are central to its commercial strategy and the claims at issue. These contacts are far from the "random," "fortuitous," or "attenuated" connections that fail to establish jurisdiction under Supreme Court precedent. Rather, they reflect deliberate, forum-directed business conduct that constitutes "transacting business" under D.C. Code § 13-423(a)(1), thereby satisfying the minimum contacts requirements.

Crucially, the government contacts exception is narrowly limited to activity undertaken *solely* for the purpose of petitioning or communicating with the federal government. However, when a defendant engages in conduct that goes beyond mere petitioning—such as using regulatory channels to advance private commercial interests or to mislead federal agencies—the doctrine does not apply. This includes American Airlines' D.C.-based management of codeshare programs, commercial partnerships, and regulatory filings designed to secure competitive or financial advantage. As recognized in *Hughes v. A.H. Robbins Co.*, "[t]he exception does not apply to the actual transaction of business, such as entering commercial contracts with or using the federal government." 490 A.2d 1140, 1145 n.4 (D.C. 1985). Here, American Airlines not only managed its codeshare operations from Washington, D.C., but also submitted materially

false safety and compliance filings that concealed Gulf Air's ongoing regulatory violations. These acts were operationally significant, commercially driven, and directly contributed to the harms alleged—placing them squarely within the scope of conduct supporting personal jurisdiction under both D.C. law and constitutional standards. American Airlines' regularity and statutes compliance and violations, management of codeshare agreements, contract negotiations, and operational oversight from D.C. are commercial acts—not shielded government contacts. These purposeful, revenue-driven activities fall squarely within the jurisdictional analysis.

## XI.    **Jurisdiction Is Proper Where Claims Arise From Forum-Based Conduct Central to the Dispute.**

 D.C. law provides for specific jurisdiction where the plaintiff's cause of action "arises from" the defendant's business transacted in the District. Plaintiffs allege that American Airlines' D.C.-based regulatory activities were not merely purposeful but central to the creation, maintenance, and alleged misconduct of the codeshare program with Gulf Air. The harm to Plaintiffs arose directly from these D.C.-originated regulatory filings and certifications, which enabled unsafe operations and regulatory evasion. The D.C. Court of Appeals directly addressed this connection in *Beachboard v. Trustees of Columbia University*, holding that "if the plaintiff's claim arises from the activities relating to the government contacts, the long-arm statute can be invoked as a basis for personal jurisdiction." 475 A.2d 398, 401 (D.C. 1984). Here, Plaintiffs' claims precisely arise from American Airlines' commercial conduct in D.C.—including codeshare management, safety oversight, and business communications related to those regulatory filings—making the assertion of jurisdiction proper under D.C. law.

**XII.**    **Commercial and Regulatory Conduct in D.C. Is Not Excluded from Jurisdictional**
         **Analysis.**

American Airlines' reliance on *Savage v. Bioport, Inc.* and *Alkanani v. Aegis Def. Servs., LLC* is
misplaced. Both cases involved routine lobbying or contract negotiations—activities the
government contacts doctrine protects solely as exercises of First Amendment petitioning or
information-gathering. However, this narrow doctrine does not shield conduct that is commercial
in nature or involves the misuse of government processes for proprietary gain.

Crucially, neither *Savage* nor *Alkanani* addressed the fraud exception, which applies when a
defendant's government contacts are part of a fraudulent or commercially motivated scheme that
provokes unwarranted government action causing harm to others. As the D.C. District Court
emphasized regarding this exception, it is triggered by "credible, particularized allegations that
the defendant's conduct induced government action as an instrumentality of fraud." Plaintiffs
here do not allege mere lobbying. Instead, American Airlines' D.C.-based regulatory activities
were part of a coordinated, profit-driven scheme that directly resulted in unwarranted
government action and harm to Plaintiffs. These are fundamentally commercial acts, not
protected petitioning. The government contacts exception originated to protect First Amendment
petitioning and information-gathering, and "was not intended to create a blanket immunity for all
dealings with the federal government." American Airlines' activities in D.C. are fundamentally
commercial and profit-driven, not merely exercises of First Amendment rights. Thus, its conduct
is not immunized by the government contacts doctrine and properly supports jurisdiction under
the D.C. long-arm statute.

XIII.    **The Government Contacts Doctrine Is Not a Blanket Immunity—Especially in Aviation Regulation.**

"Jurisdictional discovery is routinely permitted when facts relevant to personal jurisdiction are disputed or uniquely within the defendant's control. This allows plaintiffs to uncover whether American's D.C. activities were commercial (such as codeshare management and business operations) rather than protected government contacts, which is essential for the court's jurisdictional analysis. Discovery is needed to determine if American's conduct falls outside the government contacts exception, particularly if there is evidence of business-driven activities or fraud in dealings with government agencies. Courts recognize that plaintiffs must be given a fair opportunity to respond to a defendant's jurisdictional challenge with evidence, not just allegations. Allowing American Airlines to escape jurisdiction in this case would not only undermine established due process principles but would also undermine the integrity of federal regulatory processes and the public interest in aviation safety. For all the foregoing reasons, personal jurisdiction over American Airlines is proper in this District.

XIV.    **Exceptional Case and the Need for Jurisdictional Discovery**

Plaintiffs allege that American Airlines presents the rare "exceptional case" contemplated by *Daimler* and *Perkins*, warranting general personal jurisdiction in the District of Columbia. Unlike companies whose forum contacts are merely routine or peripheral, American Airlines' Washington, D.C. operations are qualitatively and strategically dominant in its global business model. The D.C. office is the functional nerve center for American's regulatory, codeshare, and governmental affairs—activities that are essential to its ability to operate as a global airline.

Specifically, Plaintiffs allege Strategic Command as American's D.C. office directs and manages its most consequential regulatory and operational decisions, including negotiating and

maintaining codeshare agreements, submitting critical safety certifications, and managing ongoing relationships with federal agencies such as the DOT and FAA; Regulatory Leverage as Without its D.C. operations, American would lose essential leverage with U.S. and international regulators and partners, directly impacting its market access and competitive position worldwide, and its ability to simply operate as an airline; Core Business Function as The D.C. office is not a minor outpost, but the locus of American Airlines' regulatory, compliance, and governmental and executive operational strategy. These functions are disproportionately concentrated and coordinated in D.C., forming the backbone of American Airlines' international business operations; Entwinement with Federal Policy American's D.C. presence enables it to engage in sustained lobbying, federal deal-making, and strategic governmental engagement—activities that are integral, not incidental, to its business and directly tied to the conduct at issue in this case; Public Policy Nexus as Plaintiffs' claims involve not just private commercial disputes, but allegations of public and government-affiliated abuse, retaliation, and regulatory violations with broad policy implications, all orchestrated from D.C.

Plaintiffs do not rest their case on the number of employees or flights in D.C., but on the qualitative centrality and dominance of D.C.-based operations in American Airlines's corporate structure. While American Airlines is headquartered in Texas, its Washington, D.C. operations truly are the functional nerve center for regulatory, codeshare, and governmental affairs—activities essential for its ability to operate as a global airline. Without the approvals, regulatory management, and federal engagement conducted in D.C., American Airlines could not legally or practically fly, making D.C. indispensable to its business model. Unlike other states, D.C. is not just another location in the American Airlines's network; it is the pulse of the airline's operational and regulatory existence. American Airlines markets Ronald Reagan Washington

National Airport (DCA) as a D.C. hub, and its D.C.-based activities drive the approvals and relationships necessary for every flight and revenue stream nationwide. The company's own financial disclosures, reporting over $54 billion in revenue in 2024, depend fundamentally on its ability to secure and maintain federal approvals and contracts managed from D.C.

American cannot claim D.C. as a marketing asset to passengers and partners while denying its centrality for jurisdictional purposes. The revenue and profits generated by American Airlines are inextricably linked to its D.C. operations, and for jurisdictional analysis, the qualitative dominance of D.C. in American's business should be recognized. Given the fact-intensive nature of the "exceptional case" standard, and the information asymmetry regarding the true scope of American's D.C. operations, targeted jurisdictional discovery is essential. Only such discovery can reveal whether American's D.C. activities are so substantial and central as to render it "essentially at home" for general jurisdiction purposes.

## XV.    Defendant's Reliance on Huynh v. Air Canada Is Misplaced

Defendant's citation to *Huynh v. Air Canada* is inapposite. In *Huynh*, the court denied general jurisdiction because Air Canada's D.C. contacts were limited to routine commercial activities, not the type of substantial, forum-based conduct required by *Daimler*. In stark contrast, Plaintiffs allege that American Airlines' Washington, D.C. operations are qualitatively distinct—encompassing core regulatory, codeshare, and compliance activities directly tied to the alleged misconduct. Unlike the incidental contacts in *Huynh*, American's D.C.-based actions include the submission of material safety certifications and regulatory filings central to Plaintiffs' claims and indicative of its D.C. office as an essential power center for decision-making. This permanence and enduring impact distinguish D.C. from the temporary wartime hub in *Perkins*, further supporting American Airlines' status as an "exceptional case" for general jurisdiction.

Plaintiff's request for jurisdictional discovery is neither a fishing expedition nor futile; rather, it seeks to clarify and update the framework governing general jurisdiction in light of significant doctrinal shifts. The rigid reliance on fixed "home" forums, as suggested in *Daimler* and pre-*Goodyear* decisions, increasingly employs outdated metaphors for a jurisdictional landscape that has materially evolved. As the verified legal study, "Restructuring General Jurisdiction" by David Crump (Catholic University Law Review, Vol. 70, Issue 3, 2021), demonstrates, post-*Daimler* jurisprudence has narrowed general jurisdiction to the point of incoherence, particularly when corporations engage in pervasive national or global commerce yet evade jurisdiction everywhere except their "paradigm" forums.

For instance, the Delaware Supreme Court's ruling that general jurisdiction could not be asserted over American Airlines—despite its incorporation in Delaware—highlights the dissonance between corporate presence and judicial reach. This reinforces that the current legal standard grants large corporations disproportionate shelter from suit. This legal scholarship argues persuasively that such a rigid framework creates legal absurdities—corporations may operate extensively in a forum and yet remain untouchable under general jurisdiction. Plaintiffs' position, supported by this scholarship, urges the Court to recognize that evolving doctrine demands a more nuanced application of jurisdictional rules. The old metaphor no longer fits, and discovery into the Defendant's operations is warranted to determine whether, under modern realities, the forum may constitutionally assert general jurisdiction despite precedent that oversimplifies the corporate "home" concept.

## XVI.   Transacting Business Alleged Under D.C. Code § 13-423(a)(1)

Specific Jurisdiction Is Properly Alleged, and Discovery Is Justified. American Airlines has purposefully and systematically transacted business in the District of Columbia within the

meaning of D.C. Code § 13-423(a)(1). From its D.C.-based regulatory affairs office, American Airlines created, negotiated, and managed codeshare agreements—including the Gulf Air arrangement at issue—by engaging directly with federal regulators headquartered in the District. These activities are not incidental administrative functions but involve substantive regulatory advocacy and strategic commercial decision-making, as evidenced by FAA and DOT filings. American Airlines' D.C.-based regulatory team prepared, signed, and submitted joint codeshare applications to the U.S. Department of Transportation, securing federal authorization for Gulf Air and other foreign partners to operate in U.S. airspace under American's brand. These authorizations are essential for American Airlines' international business model and enable it to market and sell codeshare flights as its own, directly generating revenue from D.C.-based consumers and federal government travel contracts. Beyond regulatory filings, American Airlines promotes and sells these codeshare flights in the District through targeted marketing, digital platforms, and corporate partnerships. This deliberate and forum-directed commercial activity demonstrates that American Airlines' presence in the District is not incidental but integral to its global operations.

The Gulf Air-American Airlines codeshare is not a regulatory arrangement—it is a commercial product conceived and executed in D.C. American's D.C.-based regulatory team prepared, signed, and submitted joint codeshare applications to the DOT, securing federal authorization for Gulf Air to operate in U.S. airspace under American's brand. This regulatory groundwork—developed entirely in Washington, D.C.—is central to American Airlines' business model. These codeshare agreements act as revenue-generating instruments and products. Without the D.C.-originated regulatory approvals, these flights could not be offered to Gulf Air Crew members and U.S. consumers. Defendant has not disputed these key facts or

identified who submitted the joint codeshare filings. Instead, it mischaracterizes Plaintiffs'
allegations as "tangential." However, Plaintiffs have demonstrated that American Airlines' D.C.
operations were integral—not incidental—to the creation and maintenance of the codeshare
program including their first US partnership, Gulf Air codeshare and to the alleged misconduct at
issue especially where Gulf Air couldn't meet the FAA safety Standards IASA.

American Airlines actively markets and sells codeshare partnership and codeshare
flights—including Gulf Air's—as core products offered to D.C. consumers. Through its website,
travel agencies, and corporate partnerships, American Airlines integrates codeshare partnerships
into heavy marketing campaigns targeting D.C. consumers and derives substantial revenue from
these sales. It also holds federal government travel contracts that include codeshare services,
further tying these commercial offerings to its D.C.-based operations. These deliberate,
forum-directed activities demonstrate that American Airlines is not a passive actor but an active
participant in promoting and profiting from codeshare flights, even where safety violations
undermine passenger security. This continuous, purposeful business activity demonstrates that
American Airlines' presence in the District of Columbia is not incidental but central to its
operations and revenue model.

Through this sustained and commercially focused engagement, American Airlines has
purposefully availed itself of the privilege of conducting business in the District of Columbia,
establishing sufficient minimum contacts to render the exercise of specific jurisdiction consistent
with traditional notions of fair play and substantial justice. The creation, negotiation, approval,
and marketing of the Gulf Air codeshare—all tied to voluntary filings and strategic decisions
made in D.C.—form a direct jurisdictional nexus to Plaintiffs' claims. These joint submissions to
DOT and FAA were not passive regulatory obligations but deliberate commercial actions

designed to secure federal authorization, maintain Gulf Air's access to U.S. markets, and sustain American Airlines' codeshare revenue stream and dominance in international air travel. The resulting safety failures and preventable harm to Plaintiffs flow directly from this D.C.-based conduct, satisfying the requirements for specific jurisdiction under D.C. Code § 13-423(a)(1).

## XVII.    **Harm Arising From Forum-Based BusinessConduct**

Plaintiffs alleged the following claims in their Amendment Claims and they did their best as Pro Se to present their claims.

Many of these negligent acts and omissions continued after Captain Alhindi's death, exposing the traveling public and other crew members to ongoing risk, and demonstrating a pattern of disregard for safety and regulatory compliance that affects the public interest

1. **Negligence**

   i.    Failure to implement and maintain an effective internal Safety Management System (SMS).

   ii.   Failure to implement a compliance audit program.

   iii.  Failure to implement required audit programs for codeshare partners as directed by DOT/FAA orders and guidelines.

   iv.   Failure to implement effective safety monitoring for codeshare partners.

   v.    Failure to implement a complaint mechanism.

   vi.   Failure to audit or properly audit Gulf Air in accordance with DOT/FAA orders and ICAO obligations.

   vii.  Failure to monitor codeshare partner compliance.

   viii. Failure to detect safety risks.

ix.    Failure to identify safety hazards.

x.    Failure to detect safety risks within codeshare partners.

xi.    Failure to identify hazardous conditions involving codeshare partners.

xii.    Failure to act on known safety risks and hazards.

xiii.    Failure to correct deficiencies in codeshare partners.

xiv.    Failure to detect or correct known safety defects and regulatory violations.

xv.    Failure to report Gulf Air's known failures to federal regulators.

xvi.    Failure to vet codeshare partners.

xvii.    Failure to respond to credible safety complaints.

xviii.    Failure to investigate safety complaints related to codeshare partners.

xix.    Failure to respond to safety risk complaints.

xx.    Failure to act on safety complaints related to Captain Alhindi and his employer.

xxi.    Operation of codeshare flights with unfit crew members, connected to inadequate oversight and monitoring.

xxii.    Breach of multiple duties owed to Captain Mohannad Alhindi, Plaintiffs, passengers, regulators, and the public.

xxiii.    Breach of fiduciary duty owed to Captain Mohannad Alhindi, Plaintiffs, passengers, and American citizens (if applicable).

xxiv.    Failure to comply with federal aviation regulations, DOT/FAA orders, and ICAO standards, resulting in regulatory violations.

xxv.    Failure to adequately train and supervise employees and codeshare partners.

xxvi.    Failure to communicate or disclose known safety risks or violations to authorities or affected parties.

xxvii.    Failure to take timely remedial or corrective action.

xxviii.   Failure to exercise reasonable care in managing codeshare agreements and partner oversight.

xxix.     Failure to enforce compliance with safety and regulatory requirements.

## 2. Negligence Per Se

Plaintiffs allege that American Airlines is negligence per se because it violated multiple safety statutes and regulations designed to protect the traveling public, crew, and all persons affected by commercial aviation operations. These include, but are not limited to:

I.     ICAO Annexes 1, 6, and 19: International standards for crew qualifications, safe operation, and safety management systems.

II.    DOT Orders (including 2008 and onward): U.S. Department of Transportation directives governing codeshare safety, audit requirements, and regulatory compliance.

III.   FAA Regulations (14 CFR, including Parts 129, 212, and related sections): Federal regulations requiring safety management systems, codeshare oversight, and truthful regulatory filings.

IV.    FAA/DOT Codeshare Safety Guidelines: Policies and guidance requiring audits, compliance checks, and accurate reporting for codeshare partners.

V.     Public Interest Statutes (e.g., 49 U.S.C. § 40101): Federal law mandating that air carriers operate in a manner consistent with public safety and the national interest.

Specific Violations Alleged:

VI.    Submitting materially false or misleading information to government regulators, including in Certificates of Compliance and codeshare applications.

VII.    Failing to conduct, or properly conduct, required audits of codeshare partners as mandated by DOT orders and FAA regulations.

VIII.   Omitting known violations by Gulf Air and other partners from required regulatory filings.

IX.     Failing to report or correct known safety and regulatory deficiencies, in violation of FAA, DOT, and ICAO requirements.

### 3. Fraud (Misrepresentation and Omission)

I.      Fraudulent representations made in filings submitted to the FAA and DOT in Washington, D.C., from 2008 to 2024.

II.     Material omissions of Gulf Air's regulatory violations and unsafe practices in required disclosures.

III.    Deceptive marketing to the public and AAdvantage members regarding the safety of codeshare operations.

IV.     Fraudulent misrepresentations and omissions directed at passengers and the traveling public, deceiving them about the true safety risks associated with American Airlines' and Gulf Air's codeshare flights.

V.      Misuse of federal regulatory processes and public trust to provide regulatory cover for an unsafe foreign airline.

VI.     False assurances to U.S. agencies about American Airlines' and Gulf Air's compliance, resulting in foreseeable reliance by regulators and harm to the public.

VII.    Continuous submission of false certificates and compliance statements to the FAA from 2008 through 2024.

VIII.    Omitting Gulf Air's safety issues and violations of federal and D.C. laws in regulatory filings.

IX.    Deceiving the public about the safety of codeshare partners.

X.    Providing regulatory "umbrella cover" for unsafe airlines, including Gulf Air, through misrepresentation and omission.

XI.    Causing damages to Plaintiffs—who are individuals and members of the traveling public—and exposing the broader public to ongoing safety risks.

XII.    Causation of harm through misrepresentation: Misstatements made in or through D.C. agencies support specific jurisdiction for harm originating from the forum.

**4. Other Allegations**

XVIII.    Breach of duties, including fiduciary duties owed to Plaintiffs, passengers, regulators, and the public.

XIX.    Misuse and waste of taxpayer funds (where relevant for public interest or factual support).

XX.    Plaintiffs' harm arising from regulatory misconduct in Washington, D.C.: Injuries flow from violations of duties owed under D.C.-based federal oversight and filings.

XXI.    Shielding Gulf Air from accountability Enabled through D.C.-based regulatory filings, approvals, and lack of enforcement by DOT/FAA.

XXII.    Emotional and personal injury damages sustained by Plaintiffs as a result of Defendant's failures.

XXIII.    Defendant's failure to correct regulatory violations and its continued certification and regulatory filings perpetuate the risk and actual harm to Plaintiffs and the public to this day, as American Airlines remains subject to federal oversight yet continues to engage in

the same patterns of misconduct. Plaintiffs continue to face exposure to unsafe practices
and regulatory breaches, with no adequate corrective action having been taken by
Defendant or federal authorities.

The harm alleged by Plaintiffs arises directly from American Airlines' D.C.-originating business
conduct. By filing joint codeshare applications and regulatory certifications from its D.C. office,
American Airlines acted as a shield for Gulf Air—providing not merely access to U.S. markets
but a false veneer of compliance that emboldened Gulf Air to disregard systemic safety failures.
Gulf Air—a carrier from a jurisdiction with a documented history of regulatory
deficiencies—relied on American Airlines' audits and certifications as protective cover, enabling
it to evade detection and avoid meaningful oversight of repeated crew incapacitations and
medically unfit pilots. Rather than serving as a gatekeeper for safety, American Airlines enabled
Gulf Air to minimize and dismiss serious medical and operational violations—including
documented incapacitations in 2008, 2011, 2017, 2022, and 2023—as mere acts of fate, rather
than preventable safety threats. This deliberate regulatory cover incentivized Gulf Air to
perpetuate unsafe practices, directly culminating in the fatal incapacitation on the codeshare
flight in December 2022 and the resulting harm to Plaintiffs. As part of its codeshare agreements,
American Airlines undertook audit obligations to ensure Gulf Air's compliance with
international safety standards, including ICAO Annexes 1, 6, and 19. These audits and
certifications, initiated and filed from Washington, D.C., were critical to maintaining Gulf Air's
U.S. operations. Plaintiffs allege that American Airlines' D.C.-based regulatory staff either failed
to detect or actively concealed Gulf Air's repeated violations—all while continuing to certify its
compliance to federal regulators.

This pattern of misconduct breached multiple safety mandates, including DOT Orders, FAA codeshare guidelines under 14 C.F.R. § 212.10, and international obligations under the Open Skies Agreement and ICAO Annexes 6 and 19, constituting negligence per se. By obstructing FAA and DOT oversight, American Airlines created systemic safety risks and undermined public interest protections codified in 49 U.S.C. § 40101. Had American Airlines fulfilled its audit obligations and truthfully reported Gulf Air's deficiencies, federal regulators would have intervened, requiring corrective action or suspending Gulf Air's access to U.S. markets. Instead, Gulf Air's continued operation under American Airlines' codeshare directly led to the fatal incapacitation of a pilot in December 2022, Captain Alhindi's death, and the ongoing harm to Plaintiffs. This direct and foreseeable chain of causation satisfies the "arising out of or relating to" standard for specific jurisdiction as articulated in *Ford Motor Co. v. Montana*, 141 S. Ct. 1017 (2021), and supports the exercise of jurisdiction under D.C. Code § 13-423(a)(1).

Unlike the generalized and unsupported allegations in *Cockrum*, Plaintiffs here have presented a detailed, evidence-based motion for jurisdictional discovery. This motion is significantly buttressed by public FAA records, codeshare agreements, and other documentation demonstrating American Airlines' continuous, D.C.-centered regulatory engagement. Crucially, Defendant has not submitted a single declaration, affidavit, or piece of evidence to rebut these specific facts or clarify the locus of its relevant conduct. The existing record already clearly demonstrates that the Gulf Air–American Airlines codeshare agreement was not a passive arrangement. Instead, it demanded ongoing, D.C.-based management, expansion, and regulatory maintenance. FAA and DOT filings confirm that these agreements required active engagement with federal regulators in Washington, D.C.—engagement which, according to Plaintiffs' unrebutted allegations, was the direct vehicle for the very harm at issue. Therefore, discovery is

essential to uncover critical facts uniquely within American Airlines' control, including precisely who made key regulatory submissions, how D.C. personnel managed the codeshare, and whether pivotal decisions and misrepresentations originated from Washington, D.C.—facts that, if proven, would unequivocally establish specific jurisdiction under *Walden* and *Ford*. Given these specific, non-conclusory allegations of substantial business transacted in D.C. and active concealment of violations, Plaintiffs have more than met the necessary threshold for comprehensive jurisdictional discovery.

## XXIV.    Bold <u>After Death of Captain: Continuous Harm Arising from D.C.-Based Business Conduct</u>

Defendant's persistent attempts to narrowly frame this case as merely a wrongful death action arising from a heart attack in Bangladesh fundamentally misrepresent the breadth and gravity of Plaintiffs' claims. Far from being the sole focus, the tragic death of Captain Alhindi served as the catalyst that *uncovered* a pervasive pattern of systemic violations by both American Airlines and its co-defendant—a strategy of misdirection the Defendant has employed since February 12 2025. This litigation is not confined to a single fatality, or even the subsequent death of a flight attendant on a codeshare flight; it exposes a deeper scheme of non-compliance, a calculated disregard for legal inhibitors, a comfort in using undue influence to cover up egregious safety failures, and a reckless endangerment of lives that extends to the traveling public. American Airlines' conduct, orchestrated from its D.C. operations, constitutes a pervasive fraud against the employees of airlines, government, the public, and its passengers, leading to the waste of taxpayer funds and obstructing vital regulatory efforts to enhance aviation safety. Plaintiffs' causes of action sound in negligence and fraud, leading to harm that is both individual and public, arising from a deliberate course of conduct that impacted the Captain's family before his

death, and the broader public after. Plaintiffs do not seek to litigate wrongful death against American Airlines; rather, they seek accountability for American Airlines' systemic failures and fraudulent representations that caused and continue to cause substantial harm, irrespective of the specific incident that brought these malfeasances to light.

### D.C.-Originated Certifications Enabled Unsafe Operations

 American Airlines' D.C.-based business conduct, particularly its ongoing regulatory certifications, has created and sustained a dangerous dynamic that perpetuates harm long after Captain Mohannad's tragic death. Under its codeshare agreements, American Airlines remains obligated to audit Gulf Air and certify its compliance with international safety standards to the DOT and FAA. These biennial certifications, prepared and filed from American Airlines' D.C.-based regulatory affairs office, are not merely administrative functions; they are critical, recurring acts of business conduct indispensable for Gulf Air to retain its U.S. market access and operate flights under the American Airlines brand.

By continuing to voluntarily certify Gulf Air's compliance, American Airlines has perpetuated a false aura of legitimacy, effectively providing Gulf Air with an "open door" to U.S. markets despite its failure to meet the international safety standards required of IASA-rated carriers. Each subsequent certification, originated in D.C., represents a fresh act of misconduct that has continued to shield Gulf Air's systemic noncompliance from robust federal oversight. Rather than prompting remedial action following the fatal incident, American Airlines' continued audits and certifications have, in effect, incentivized Gulf Air to normalize violations and operate with impunity. This regulatory shield, strategically maintained through American's D.C. filings, has continued to insulate Gulf Air from necessary oversight and accountability, becoming a

persistent commercial backbone of American Airlines' codeshare model and a sustained revenue stream.

Even after Captain Mohannad's death and the initiation of this lawsuit, American Airlines' D.C.-based regulatory staff allegedly continued to conceal Gulf Air's repeated safety violations—including documented pilot incapacitations in 2008, 2011, 2017, 2022, and 2023—while actively renewing certifications to federal regulators. This pattern of post-death concealment is exemplified by American Airlines' submission of another misrepresented certificate in 2025, demonstrating an ongoing disregard for safety despite awareness of Gulf Air's documented deficiencies and the very allegations central to this case.

This continuous D.C.-based misconduct has perpetuated the harm, each subsequent certification reinforced Gulf Air's sense of impunity, allowing it to escalate risky practices without fear of oversight. Plaintiffs, including surviving family members and the traveling public, continue to suffer ongoing emotional, financial, and reputational harm as American Airlines renews these certifications and actively perpetuates the unsafe conditions it helped create, further endangering the public and undermining confidence in aviation safety.

## XXV.    Direct and Foreseeable Harm to Plaintiffs

 American Airlines' D.C.-based misconduct, specifically its renewal of Gulf Air's certifications in 2023 and 2025 despite Plaintiffs' extensive evidence of ongoing non-compliance, has foreseeably inflicted direct and continuous harm on Plaintiffs, including Significant Financial Burden,  Plaintiffs have incurred substantial out-of-pocket costs pursuing simultaneous legal actions in the U.S. and abroad, expenses that would have been entirely avoided had American Airlines not violating DOT and regulations, truthfully reported Gulf Air's deficiencies and

fulfilled its safety obligations; Betrayal of Trust and Loyalty: As American Airlines frequent

flyers and U.S. citizens, Plaintiffs entrusted their safety and loyalty miles to a carrier they

believed adhered to the highest safety standards. Instead, they were profoundly betrayed by

American Airlines' false assurances and misleading D.C.-based regulatory filings, which enabled

Gulf Air's dangerous practices; Chronic Fear and Psychological Distress: Plaintiffs now live in a

state of chronic fear and paranoia, deeply shaken by American Airlines' documented history of

systemic safety violations. They are haunted by the prospect of Gulf Air causing a mass-casualty

event over major U.S. cities, including Washington, D.C. or New York, a risk directly

perpetuated by American Airlines' continued D.C. certifications; Physical and Psychological

Exhaustion: The prolonged advocacy, years of uncertainty, and denial of closure have exacted a

profound toll on Plaintiffs' well-being, leading to significant physical and psychological

exhaustion.

## XXVI.    <u>Collusion and Retaliatory Conduct</u>

Compounding these harms, Plaintiffs allege that American Airlines engaged in active collusion

with Gulf Air to shield their codeshare revenue stream. Gulf Air's harassment of

Plaintiffs—including obstructing access to information, defaming Plaintiffs in foreign

jurisdictions, and retaliatory actions to intimidate Plaintiffs—was tolerated, if not tacitly

encouraged, by American Airlines. Moreover, American Airlines itself submitted a

misrepresented Certificate of Service in U.S. proceedings, designed to prejudice Plaintiffs and

induce dismissal of their claims. This conduct was not incidental but a strategic effort to preserve

the codeshare relationship and protect the financial benefits tied to regulatory certifications filed

from Washington, D.C. This pattern of misconduct fits within American Airlines' history of

regulatory failures that endangered passengers. Federal authorities have repeatedly imposed

penalties on airlines for systemic violations—including the DOT's $50 million fine against American Airlines in 2024 for safety breaches and its 1999 criminal plea for hazardous materials violations, which underscored the dangers of corporate misconduct in aviation.

## XXVII.    Continuous Harm & Business Activity in D.C. as the Nexus

The gravamen of Plaintiffs' claims lies in the continuous nature of American Airlines' tortious conduct and the ongoing injuries it inflicts, a pattern directly falling within the "continuing tort" or "continuous violation" doctrine recognized by courts. This doctrine permits claims to proceed where a defendant's unlawful conduct is ongoing, or where discrete acts of misconduct continually give rise to new injuries or compound existing ones, thereby preventing a statute of limitations from running from a single, initial event. American Airlines' D.C.-based misconduct constitutes such a continuing wrong, demonstrably establishing a nexus between its forum contacts and Plaintiffs' injuries:

Ongoing D.C. Conduct: American Airlines' actions are not isolated events but a series of fresh acts of forum-based conduct. Its ongoing submissions to federal regulators in Washington, D.C., and the biennial renewal of Gulf Air's certifications in 2023 and 2025 serve as concrete, repetitive instances of misconduct originating in the District. These were voluntary, strategic filings directly tied to American Airlines' commercial interests in sustaining and profiting from the codeshare product marketed and sold in D.C., each reinforcing Gulf Air's access to U.S. markets despite documented safety failures (including crew incapacitations and unfit pilots in 2008, 2011, 2017, 2022, and 2023). This continuous certification created a "regulatory shield" that perpetually emboldened Gulf Air to normalize systemic safety failures.

Compounding Misconduct with their continuous enablement was further compounded by a pattern of collusive actions and direct obstructive acts within the forum. These include American Airlines' tolerance, if not encouragement, of Gulf Air's harassment of Plaintiffs abroad and, critically, American Airlines' own submission of a misrepresented Certificate of Service in U.S. proceedings. These were not isolated incidents but part of an ongoing, intentional strategy to suppress scrutiny of the codeshare program and preserve its revenue stream at Plaintiffs' expense, thereby continuously impeding Plaintiffs' pursuit of justice.

Continuous and Compounding Harm as the harm suffered by Plaintiffs is not limited to a single past event, but continues today as a direct result of American Airlines' ongoing D.C.-based actions. But for American Airlines' persistent violations of DOT Orders, federal statutes, and international safety regulations—including its willful and ongoing failure to detect and report Gulf Air's deficiencies during mandatory audits—the injuries Plaintiffs suffer would not have occurred and would not persist. American Airlines' D.C.-originated conduct has perpetuated a cycle of preventable harm, resulting in The tragic death of Captain Alhindi on a codeshare flight; Plaintiffs' profound and ongoing financial, emotional, and reputational harm; and A pervasive and continuing fear among Plaintiffs, as members of the traveling public, of future catastrophic events involving Gulf Air flights over major U.S. cities, including Washington, D.C. This continuous stream of D.C.-based tortious conduct, directly causing ongoing and compounding injuries to Plaintiffs, establishes the requisite jurisdictional nexus and squarely places the claims within the purview of the continuous harm doctrine, satisfying D.C. Code § 13-423(a)(1).

## XXVIII.    **Transnational Harm and Barriers to Justice**

In Bangladesh and similar jurisdictions, a profound societal infatuation with Western institutions, particularly an old company like American Airlines—often regarded as a quasi-national

carrier—fosters an unwavering belief in their inherent compliance and integrity. For decades, a culture of unexamined reliance and faith in U.S. institutions meant it was simply inconceivable to local populations and legal systems alike that American Airlines would engage in non-compliance, fraud, discrimination, or be associated with crashes. There was an implicit, unshakeable trust that the FAA was competent and uninfluenced, and that a U.S. airline would never turn a blind eye in an industry as critical as aviation, where innocent lives are at stake. This deeply ingrained deference meant that American Airlines' false certifications and regulatory cover—originating from Washington, D.C.—directly undermined Plaintiffs' credibility and catastrophically obstructed their access to justice abroad. Local courts and regulatory bodies, deferring entirely to the perceived legitimacy conferred by American Airlines and U.S. government approvals, effectively shielded Gulf Air from meaningful scrutiny.

Plaintiffs and their investigators in Bangladesh faced significant procedural obstacles within foreign legal systems, forced to fruitlessly chase Gulf Air for simple witness testimonies and critical documents, as their local courts deferred to American Airlines' perceived authority. This systemic resistance to accountability has also manifested within these U.S. proceedings, where Co-Defendant has, for instance, submitted an old, expired, and unverified contract for Captain Alhindi as legitimate evidence, and engaged in ongoing litigation misconduct, including harassing Plaintiffs and taking actions designed to impede Plaintiffs' legal efforts within this forum. These actions demonstrate  an alarming resolve to ensure their cover-up remains intact and their codeshare to the USA is not interrupted by the Plaintiffs. This pattern of foreseeable transnational harm, rooted in institutional deference and aggressive obstruction, flowed directly from American Airlines' fraudulent filings in Washington, D.C., which created a false appearance of Gulf Air's compliance and emboldened it to dismiss repeated safety violations,

leaving Plaintiffs utterly powerless to challenge a network of corporate and governmental deference.

These same dynamics have also manifested in this Court. From Plaintiffs' first hearing, they were confronted with what appeared to be procedural challenges given their pro se status. The Court's silence and delays on Plaintiffs' urgent requests, coupled with its inherent authority, created conditions that, as a practical matter, allowed American Airlines to continue its non-compliance without immediate consequences. This procedural dynamic, compounding Plaintiffs' injuries and denying them a fair opportunity to be heard. As pro se litigants, Plaintiffs faced an uphill battle not only against Gulf Air—a Kingdom flag carrier—but also against American Airlines, a U.S.-based global airline with deep regulatory influence. Plaintiffs' efforts to hold Gulf Air accountable were repeatedly thwarted by American Airlines' D.C.-based misrepresentations, which created a narrative of compliance that foreign courts, U.S. regulators, and in these proceedings, was accepted as authoritative. This reliance on corporate representations was rooted in American Airlines' regulatory influence and reinforced by strategic misrepresentations filed from D.C., which created an insurmountable barrier to Plaintiffs' fair hearing in both domestic and foreign forums. These cascading harms—emotional, financial, and reputational—are a direct and foreseeable result of forum-based business conduct and support the exercise of personal jurisdiction under D.C. Code § 13-423(a)(1).

## XXIX.    **Public Interest Harm: Undermining U.S. Aviation Safety and Endangering Plaintiffs as Members of the Traveling Public**

The public interest in aviation safety is a cornerstone of U.S. law. Under 49 U.S.C. § 40101, air carriers must operate "with the highest possible degree of safety in the public interest," a duty enforced through the FAA and DOT. American Airlines' repeated submission of false

certifications and concealment of Gulf Air's systemic safety violations—executed through its D.C.-based regulatory office—directly compromised these federal safeguards. These deliberate misrepresentations, including the biennial Certificates of Compliance filed from Washington, D.C., crippled robust regulatory oversight, preventing the FAA and DOT from detecting documented crew incapacitations, unfit pilots, and other critical deficiencies. Such conduct not only allowed unsafe practices to persist but also emboldened Gulf Air to normalize violations, leaving Plaintiffs—and millions of other unsuspecting passengers—exposed to preventable disasters.

This misconduct subverted the statutory balance between private carriers and government regulators, effectively replacing independent oversight with self-serving misrepresentations designed to protect American Airlines' codeshare profits. Especially in the post-COVID era, when aviation systems face heightened risks, American's D.C.-originating conduct dismantled a crucial line of defense for public safety. As U.S. citizens and frequent travelers, Plaintiffs had a reasonable expectation that air carriers would comply with federal mandates and that regulators would act without interference. Instead, the very public safety that federal mandates seek to ensure was profoundly jeopardized, leading to devastating consequences for Plaintiffs and threatening the integrity of the U.S. aviation system itself. These cascading harms are not incidental; they reflect a systemic breach of duty that undermines public confidence in air travel.

Courts have long recognized the compelling public interest in exposing aviation safety failures and preventing carriers from manipulating federal oversight for profit. See In re Air Crash at Lexington, 486 F. Supp. 2d 640, 644 (E.D. Ky. 2007). Jurisdictional discovery is therefore essential to uncover the full scope of American Airlines' D.C.-based misconduct and its profound impact on both Plaintiffs and the broader traveling public. Denying such discovery

would improperly shield American Airlines from warranted scrutiny, further weakening federal agencies' ability to protect passengers and eroding public confidence in the safety of air travel.

## XXX.    Substantial D.C. Connection: Codeshare Creation, Regulatory Oversight, and Audit Certifications Establish Jurisdiction—Discovery Is Essential

Defendant's attempt to downplay its D.C. contacts is directly contradicted by the regulatory record and the undisputed centrality of Washington, D.C., to every material stage of the codeshare process. The Gulf Air codeshare agreement was not conceived or administered in isolation; it was created, negotiated, and managed through American Airlines' D.C.-based regulatory affairs office. All joint codeshare applications—including Gulf Air's—were submitted from D.C. to the (DOT), and the DOT's orders requiring biennial safety audits, as well as implementation of international standards under ICAO Annexes 1, 6, and 19, originated in D.C. This underscores that the fundamental regulatory framework governing the codeshare arrangement is firmly rooted in the District.

Critically, the FAA's audit certification process was also ordered, administered, and ultimately processed through its International Programs Division (AFS-50), located at 800 Independence Avenue SW, Washington, D.C. The biennial audit certificates—required for Gulf Air's continued operation under the American Airlines brand—were received, reviewed, and acted upon in D.C., not Texas or any other location. Decisions to suspend, revoke, or approve these certifications necessarily rested with federal regulators in D.C., where regulatory discretion and final authority are centralized. Plaintiffs have now submitted evidence showing that American Airlines' D.C. regulatory office prepared and submitted these audit certificates directly to the FAA in D.C. This new evidence corrects earlier uncertainty in Plaintiffs' pleadings—uncertainty directly caused by

lack of access to information uniquely within Defendant's and the FAA's control. As soon as this evidence became available, Plaintiffs supplemented the record in good faith.

These biennial certifications were not mere administrative tasks; each submission was a deliberate act of business conduct, designed to secure DOT and FAA approval, maintain Gulf Air's U.S. market access, and preserve a critical revenue stream for American Airlines' codeshare program. These D.C.-originating certifications created the very regulatory shield and false narrative of compliance that is central to the events giving rise to Plaintiffs' claims, including the alleged fraud and negligence that allowed unsafe operations to persist.

Defendant's current jurisdictional argument was not raised in its original motion to dismiss (Dkt. 7). Instead, Defendant introduced this theory for the first time in its renewed motion, after being granted leave to amend and privy to Plaintiffs and Co Defendant Defenses. Plaintiffs respectfully submit that this procedural tactic unfairly seeks to avoid discovery into facts exclusively within Defendant's knowledge and D.C.'s regulatory sphere. Jurisdiction is proper where a substantial part of the events giving rise to the claims occurred in the forum. Every material regulatory act—from codeshare creation to audit certification—occurred in Washington, D.C., establishing more than incidental contact. This conduct forms a deliberate and outcome-determinative connection to the forum. Defendant's reliance on *United States v. Ferrara* is misplaced: that case involved a single, peripheral contact with D.C. In contrast, American Airlines' biennial certifications—prepared and submitted from D.C.—were central to the regulatory breakdown and alleged fraud at issue. Therefore, jurisdictional discovery is essential to uncover the full scope of American Airlines' D.C.-based conduct and its direct causation of Plaintiffs' injuries.

**XXXI.**    **<u>Jurisdictional discovery is essential to resolve the core factual dispute regarding where these certifications were prepared, submitted, and processed.</u>**

Jurisdictional discovery is essential to resolve the core factual dispute regarding where these critical audit certifications were prepared, submitted, and processed. While Defendant now claims uncertainty about which FAA office handled these certifications, Plaintiffs have, as previously noted, recently presented evidence demonstrating that American Airlines' D.C.-based regulatory office prepared and submitted them, and that the FAA's International Programs Division in Washington, D.C., received and acted upon them.

This contested fact is critical because it bears directly on whether American Airlines purposefully directed its conduct toward the District and whether Plaintiffs' injuries arose from that forum-based activity. Resolving this issue through targeted discovery will provide concrete evidence clarifying American Airlines' substantial D.C. contacts and their causal connection to Plaintiffs' harm. Importantly, it will also assist the Court in determining whether the preparation and submission of these certifications forms part of the "arising out of or relating to" test for specific jurisdiction under *Ford Motor Co. v. Montana, 141 S. Ct. 1017 (2021)*. Given that these certifications are among the forum-based acts Plaintiffs rely on to establish jurisdiction, discovery into their handling is highly material to the Court's analysis. The Court should therefore grant targeted jurisdictional discovery to ensure its jurisdictional determination rests on a complete and accurate record and to prevent Defendant from evading scrutiny through selective omissions about its own regulatory submissions.

**XXXII.**    **<u>Plaintiffs Have Established a Claim-by-Claim Nexus Supporting Jurisdictional Discovery</u>**

Defendant's latest motion raises new arguments challenging the sufficiency of Plaintiffs' jurisdictional allegations on a claim-by-claim basis. These arguments, however, do not

undermine Plaintiffs' threshold showing for jurisdictional discovery. Plaintiffs' motion specifically details how each claim arises directly from American Airlines' D.C.-based conduct, including systemic safety management failures, regulatory violations, and misrepresentations that were conceived, executed, and perpetuated through its Washington, D.C. operations.

This claim-by-claim nexus underscores that Plaintiffs' injuries are not speculative or incidental; they flow directly from American Airlines' purposeful and continuous business activity in the District. Permitting jurisdictional discovery will allow the Court to resolve these disputed factual issues and ensure its jurisdictional analysis rests on a complete and accurate record.

## **CONCLUSION**

American Airlines' D.C.-based regulatory and legal activities, encompassing the negotiation, management, and certification of the Gulf Air codeshare, were not ministerial filings but purposeful, commercially motivated acts directly enabling unsafe operations and causing Plaintiffs' harms. These actions fall outside the government contacts doctrine and squarely establish specific jurisdiction.

Plaintiffs have demonstrated a good faith basis with evidence in DKT 54 for targeted jurisdictional discovery, identifying relevant facts uniquely within American Airlines' D.C. operations, consistent with the standard in this Circuit. Such discovery is essential to provide the Court with a complete record, promote judicial economy, and ensure a fair resolution of the jurisdictional questions.

For these reasons, Plaintiffs respectfully request that the Court:

   A.  Grant Plaintiffs' motion for targeted jurisdictional discovery.

B.  Defer ruling on Defendant's motion to dismiss pending discovery.

C.  Grant Plaintiffs leave to amend their pleadings or submit a full opposition following

discovery, as appropriate.

D.  In the event jurisdiction is ultimately found lacking, grant leave to transfer this action to

the United States District Court for the Northern District of Texas, or, if jurisdiction is

established prima facie, deny Defendant's motion to dismiss outright.

E.  Grant such further relief as the Court deems just and proper.

Submitted July 7, 2025

**Pro Se Plaintiffs**



*Tala Josephano*
 615 S Catalina Ave #233
 Redondo Beach, CA 9027

*Feras Hindi*
7823 New London Dr.
Springfield, VA 22153

*Samiha Ayyash*
7823 New London Dr.
Springfield, VA 22153

## CERTIFICATE OF SERVICE

I hereby certify that on July 7 2025, Plaintiff Feras Hindi, Plaintiff Tala & Plaintiff Samiha will be sending a true and correct copy of the following documents to be served upon the parties listed below:

In Support of Jurisdictional Discovery Motion American Airlines INC

1-Defendant American Airlines, Inc. Micah E. Ticatch 1945 Old Gallows Road, Suite 650 Vienna, Virginia 22182 . Method of Service: Email

2-Defendant Gulf Air B.S.C., Inc Darcy & Mark **AT** Eckert Seamans Cherin & Mellott, LLC 1717 Pennsylvania Ave., N.W., 12th Floor 12th Washington, D.C. 20006 Method of Service: Email and mail on July 7 2025

Submitted,

July 7, 2025

**Pro Se Plaintiffs**

Tala Josephano
615 S Catalina Ave #233
Redondo Beach CA 90277
347-749-4980

Feras Hindi
7823 New London Dr.
Springfield VA 22153
703-980-6955

Samiha Ayyash
7823 New London Dr.
Springfield VA 22153
703-623-3767